# EXHIBIT 5

This Instrument Prepared by (under supervision
of an attorney licensed in Pennsylvania)
and
After Recording Mail To:
Mary O'Kelley, Esq.
Bradley Arant Boult Cummings LLP
1110 Market Street, Suite 302
Chattanooga, TN 37402

## OPEN-END MORTGAGE AND SECURITY AGREEMENT

THIS IS AN OPEN-END MORTGAGE AND SECURES FUTURE ADVANCES

THIS DOCUMENT SERVES AS A FIXTURE FILING UNDER THE PENNSYLVANIA
UNIFORM COMMERCIAL CODE.

This OPEN-END MORTGAGE AND SECURITY AGREEMENT (this "*Mortgage*") is executed and granted as of June 27, 2022 by and from **JEFFERSON HILLS ACQUISITION LLC** ("*Jefferson Owner*"), **BEAVER HEALTHCARE REAL ESTATE, LLC** ("*Beaver Owner*"), **MULBERRY HEALTHCARE REAL ESTATE, LLC** ("*Mulberry Owner*"), **RIDGEVIEW HEALTHCARE REAL ESTATE, LLC** ("*Ridgeview Owner*"), **LAKEVIEW HEALTHCARE REAL ESTATE, LLC** ("*Lakeview Owner*"), and **SCOTTDALE HEALTHCARE REAL ESTATE, LLC**, each a Delaware limited liability company, and each with an address of 448 Old Clairton Road, Clairton, PA 15025 ("*Scottdale Owner*", and together with Jefferson Owner, Beaver Owner, Mulberry Owner, Ridgeview Owner and Lakeview Owner, individually and collectively, the "*Owner*"), and **JEFFERSON HILLS OPERATING LLC** ("*Jefferson Operator*"), **BEAVER HEALTHCARE OPERATING, LLC** ("*Beaver Operator*"), **MULBERRY HEALTHCARE OPERATING, LLC** ("*Mulberry Operator*"), **RIDGEVIEW HEALTHCARE OPERATING, LLC** ("*Ridgeview Operator*"), **LAKEVIEW HEALTHCARE OPERATING LLC** ("*Lakeview Operator*"), and **SCOTTDALE HEALTHCARE OPERATING, LLC**, each a Delaware limited liability company, and each with an address of 448 Old Clairton Road, Clairton, PA 15025 ("*Scottdale Operator*", and together with Jefferson Operator, Beaver Operator, Mulberry Operator, Ridgeview Operator and Lakeview Operator, individually and collectively, the "*Operator*," and, collectively with Owner, the "*Borrower*"), jointly and severally, for the benefit of **BRAVO BRIDGE FUND LLC**, a Delaware limited liability company, with an address of 750 Lexington Avenue, New York, NY 10022 (together with its successors and assigns, "*Lender*").

RECITALS:

Borrower has borrowed the sum of $30,591,000.00 from Lender (the "*Loan*"), and the Loan is evidenced by the Note (as defined below) and the Loan Documents (as defined below). As a

condition precedent to making the Loan, Lender has required that Borrower execute this Mortgage as security for the Loan and the Loan Obligations (as defined below).

AGREEMENT:

NOW, THEREFORE, Borrower does hereby irrevocably grant, bargain, sell, convey, assign, transfer, mortgage, pledge and set over unto Lender, its successors and assigns, in trust, with power of sale and right of entry and possession, the Mortgaged Property (as defined below) and grants to Lender all of Borrower's right, title and interest in and to the Mortgaged Property, subject only to the Permitted Encumbrances;

TO HAVE AND TO HOLD, the Mortgaged Property, together with all the hereditaments and appurtenances thereunto belonging or in anywise appertaining unto the said Lender and its successors and assigns, in fee simple forever; and the said Borrower does hereby covenant and warrant with Lender its successors and assigns, that Borrower, either collectively or individually, is lawfully seized in fee of the Mortgaged Property; that Borrower, either collectively or individually, has a good right to sell and convey the same; that the same is unencumbered; and that the title and quiet possession thereto Borrower will and Borrower's successors shall warrant and forever defend against the lawful claims of all persons;

TO SECURE to Lender the repayment of the Loan Obligations (as defined below) in the manner stipulated herein, in the Note and in the other Loan Documents, and the performance by Borrower of the Loan Obligations, subject however to the terms and conditions herein;

PROVIDED, HOWEVER, that if the Borrower shall pay to the Lender the entire Indebtedness at the times and in the manner stipulated herein, in the Note and in the other Loan Documents, all without any deduction or credit for taxes or other similar charges paid by the Borrower, and shall cause all other obligated parties to keep, perform, and observe all of the Loan Obligations without fraud or delay, then this Mortgage and all the properties, interests, and rights hereby granted, bargained, and sold shall cease, terminate, and be void, but shall otherwise remain in full force and effect;

AND, the Borrower covenants and agrees as follows:

1.     **CERTAIN DEFINITIONS**.  The following terms, when used in this Mortgage (including when used in the above recitals), shall have the following meanings:

(a)     "***Accounts***" means all accounts (as defined in the UCC) arising from or in connection with the Project or the operation thereof, including, without limitation, all (i) rights to payment from Medicaid and Medicare programs, and similar state or federal programs, boards, bureaus or agencies, (ii) rights to payment from patients, residents, private insurers and others arising from the operation of the Project and (iii) rights to payment pursuant to Reimbursement Contracts.  Accounts shall include the proceeds (whether cash or noncash, moveable or immoveable, tangible or intangible) received from the sale, exchange, transfer, collection or other disposition or substitution thereof.

(b)     "***Appurtenant Rights***" means all air rights, development rights, zoning rights, easements, rights-of-way, strips and gores of land, vaults, streets, roads, alleys, tenements,

2

passages, sewer rights, waters, water courses, water rights and powers, minerals, flowers, shrubs, crops, trees, timber and other emblements now or hereafter appurtenant to, or located on, under or above the Land, or any part or parcel thereof, and all ground leases, estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances, reversions, and remainders whatsoever, in any way belonging, relating or appertaining to the Land, or any part thereof.

(c)      "***Borrower***" shall have the meaning set forth in the initial paragraph hereof.

(d)      "***Chattel Paper***" means chattel paper (as defined in the UCC) arising from or in connection with the Project or the operation thereof.

(e)      "***Commercial Tort Claims***" means commercial tort claims (as defined in the UCC) arising from or in connection with the Project or the operation thereof.

(f)      "***Condemnation***" has the meaning set forth in <u>Section 7</u>.

(g)      "***Deposit Accounts***" means deposit accounts (as defined in the UCC) arising from or in connection with the Project or the operation thereof, and any other deposit accounts owned by Borrower.

(h)      "***Documents***" means documents (as defined in the UCC) arising from, in connection with or related to the Project or the operation thereof.

(i)      "***Equipment***" means equipment (as defined in the UCC) located at, used in or useful in connection with the Project or the operation thereof and shall include, without limitation, all beds, linen, televisions, carpeting, telephones, cash registers, computers, lamps, glassware, rehabilitation equipment, restaurant and kitchen equipment, and other trade fixtures and equipment located on, attached to or used in connection with the Land or the Project;

(j)      "***Event of Default***" shall have the meaning ascribed to it in <u>Section 6.1</u> of the Loan Agreement, and shall include the failure of Borrower to comply with the terms and covenants in this Mortgage beyond any applicable cure period set forth herein.

(k)      "***Fixtures***" means fixtures (as defined in the UCC) located at, used in or useful in connection with the Project or the operation thereof and includes, without limitation, the following: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; and exercise equipment.

(l) "**General Intangibles**" means general intangibles (as defined in the UCC) arising from, in connection with or related to the Project or the operation thereof, and includes, without limitation, all names under or by which the Project may be operated or known, and all trademarks, trade names, and goodwill relating to the Project.

(m) "**Goods**" means goods (as defined in the UCC) that are located at, used in or useful in connection with the Project or the operation thereof.

(n) "**Governmental Authority**" means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the use, operation or improvement of any part of the Land, the Improvements or the Project.

(o) "**Impositions**" means to the extent applicable, (i) any water and sewer charges which may be levied on all or any part of the Mortgaged Property, (ii) the premiums for fire and other hazard insurance, rent loss insurance, general and professional liability insurance, and such other insurance as Lender may require under any of the Loan Documents, (iii) the yearly Taxes (including real estate taxes and assessments), and (iv) amounts for other charges and expenses which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably estimated from time to time by Lender.

(p) "**Improvements**" means all buildings, Fixtures, structures and improvements of every nature whatsoever now or hereafter situated on the Land, including any future replacement and additions thereto and including the Project.

(q) "**Instruments**" means instruments, as such term is defined in the UCC, arising from, in connection with, or related to the Project or the operation thereof.

(r) "**Inventory**" means inventory (as defined in the UCC), located at, used in, or useful in connection with the Project or the operation thereof, including, without limitation, inventories of food, beverages and other consumables held by Borrower or its agents for sale or use at or from the Land or the Project, and soap, paper supplies, medical supplies, drugs and all other such goods, wares and merchandise held by Borrower or their agents for sale to or for consumption by residents or guests or patients of the Land or the Project and all such other goods returned to or repossessed by Borrower.

(s) "**Investment Property**" means investment property (as defined in the UCC) arising from, in connection with or related to the Project or the operation thereof.

(t) "**Land**" means the land described in Exhibits A1-A6 attached hereto and incorporated herein.

(u) "**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Land, the Project and/or Improvements, or any portions of the

4

Land, the Project and/or Improvements and all modifications, extensions or renewals thereof, including, without limitation, the Lease Agreement (as defined in the Loan Agreement).

(v) "*Lender*" shall have the meaning set forth in the initial paragraph hereof.

(w) "*Letter-of-Credit Rights*" means letter-of-credit rights (as defined in the UCC) arising from, in connection with or relating to the Project or the operation thereof.

(x) "*Loan*" shall have the meaning ascribed to it in the Recitals above.

(y) "*Loan Agreement*" means that certain Loan Agreement by and between Borrower and Lender of even date herewith.

(z) "*Loan Documents*" means the Note, this Mortgage, the Loan Agreement, the Assignment of Leases and Rents, any escrow agreements, perfection certificate, guaranty or indemnity, and all the other documents, certificates, instruments and agreements executed by Borrower, Guarantors or their Affiliates in connection with the Loan or to otherwise evidence or secure the Loan, and all renewals, supplements, or amendments thereto.

(aa) "*Loan Obligations*" shall have the meaning ascribed to it in the Loan Agreement.

(bb) "*Money*" means all monies, cash, rights to deposit or savings accounts or other items of legal tender obtained from or for use in connection with the Project or the operation thereof.

(cc) "*Mortgage*" shall have the meaning set forth in the initial paragraph hereof.

(dd) "*Mortgaged Property*" means all of the following property whether now owned or hereafter any time acquired:

(i) the Land and all Appurtenant Rights and Improvements;

(ii) all Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Investment Property, Leases, Letter-of-Credit Rights, Money, Permits, Personalty, Reimbursement Contracts, Rents and Supporting Obligations;

(iii) all contracts, options and other agreements for the sale of all or part of any of the property set forth in clauses (i) and (ii) above entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(iv) all amounts deposited with Lender to fund Impositions and all refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Mortgage is dated);

5

(v)     all awards, payments, earnings, royalties, issues, profits, liquidated claims, and proceeds (including proceeds of insurance and condemnation or any conveyance in lieu thereof), cash and noncash, from the sale, conversion (whether voluntary or involuntary), exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing; and

(vi)     any other property or assets, tangible or intangible, pledged or assigned to Lender under any Loan Documents;

provided, however that with respect to any items that are leased and not owned by Borrower, the term "Mortgaged Property" includes the leasehold interest only of Borrower together with any options to purchase any of said items and any additional or greater rights with respect to such items that Borrower may hereafter acquire.

(ee)     "***Note***" means that certain Promissory Note made by Borrower to Lender as of even date herewith.

(ff)     "***Operator***" shall have the meaning set forth in the initial paragraph hereof.

(gg)     "***Owner***" shall have the meaning set forth in the initial paragraph hereof.

(hh)     "***Permits***" means (i) the operating licenses for the Project, any certificate of need, and any other license, permit, approval or certificate that from time to time may be issued or is required to be issued by any Governmental Authority with respect to the construction, installation, occupation, or operation of the Project or any portion or component of any of the Project, the providing of any services by Borrower, the purchase, sale, dispensing, storage, prescription or use of Goods, drugs, medications or the like by Borrower, or any other operations or businesses of Borrower; (ii) certifications and eligibility for participation by Borrower, in respect to the operation of the Project and any related businesses or operations, in programs or arrangements of or reimbursement from any Person obligated on any account of Borrower, including all Third Party Payors' Programs; and (iii) all other licenses, permits and certificates used or useful in connection with the ownership, operation, use or occupancy of the Project.

(ii)     "***Personalty***" means all furniture, furnishings, Equipment, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible personal property (other than Fixtures) that are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements.

(jj)     "***Project***" means, individually and collectively, (i) the 83-bed skilled nursing and continuing care retirement community facility known as "Jefferson Hills Healthcare and Rehabilitation Center," located in the City of Clairton, County of Allegheny, Commonwealth of Pennsylvania (the "***Jefferson Project***"), (ii) the 67-bed skilled nursing facility known as "Beaver Healthcare and Rehabilitation Center," located in the City of Aliquippa, County of

Beaver, Commonwealth of Pennsylvania (the "***Beaver Project***"), (iii) the 75-bed skilled nursing and continuing care retirement community facility known as "Mulberry Healthcare and Rehabilitation Center," located in the City of Punxsutawney, County of Jefferson, Commonwealth of Pennsylvania (the "***Mulberry Project***"), (iv) the 131-bed skilled nursing and continuing care retirement community facility known as "Ridgeview Healthcare and Rehabilitation Center," located in the City of Curwensville, County of Clearfield, Commonwealth of Pennsylvania (the "***Ridgeview Project***"), (v) the 34-bed skilled nursing and 28-bed personal care facility known as "Lakeview Healthcare and Rehab and Lakeview Senior Care," located in the City of Smethport, County of McKean, Commonwealth of Pennsylvania (the "***Lakeview Project***"), and (vi) the 35-bed skilled nursing facility known as "Scottdale Healthcare & Rehabilitation Center," located in the City of Scottdale, County of Westmoreland, Commonwealth of Pennsylvania (the "***Scottdale Project***"), each located on the Land, and each together with any other general or specialized care facilities, if any, now or hereafter operated on the Land.

(kk)     "***Reimbursement Contracts***" means all third-party reimbursement or payment contracts for the Project which are now or hereafter in effect with respect to patients or residents qualifying for coverage under the same, including Medicaid and Medicare, and any successor program or other similar reimbursement program and all Third Party Payors' Programs.

(ll)     "***Rents***" means all rent and other payments of whatever nature from time to time payable pursuant to the Leases (including, without limitation, rights to payments earned under leases for space in the Project for the operation of ongoing retail businesses such as newsstands, barbershops, beauty shops, physicians' offices, pharmacies and specialty shops).

(mm)     "***Supporting Obligation***" means a supporting obligation (as defined in the UCC) arising from, in connection with, or related to the Project or the operation thereof.

(nn)     "***UCC***" means the Uniform Commercial Code as adopted in the Commonwealth of Pennsylvania.

(oo)     "***UCC Property***" shall have the meaning set forth in <u>Section 2</u>.

**Capitalized terms not defined herein shall have the meanings ascribed to them in the Loan Agreement.**

2.     **UCC SECURITY AGREEMENT**.

(a)     This Mortgage is also a security agreement under the UCC for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the UCC (the "***UCC Property***"), and Borrower hereby grants to Lender a security interest in the Mortgaged Property to secure the Loan Obligations. Lender is hereby authorized to file with the appropriate filing authority any financing statements, continuation statements and amendments, in such form as Lender may require to perfect or continue the perfection of this security interest. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require in its normal and customary operations. Without the prior written consent of Lender, Borrower shall not create or permit

7

to exist any other lien or security interest in any of the Mortgaged Property. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the UCC, in addition to all remedies provided by this Mortgage, the Loan Agreement or the other Loan Documents, or existing under applicable law, including but not limited to: the right to require Borrower to assemble such UCC Property and make it available to Lender at a place to be designated by Lender which is reasonably convenient to both parties; the right to take possession of the Personalty with or without demand and with or without process of law; and the right to sell and dispose of the same and distribute the proceeds according to law. The parties hereto agree that any requirement of reasonable notice shall be met if Lender sends such notice to Borrower at least ten (10) days prior to the date of sale, disposition or other event giving rise to the required notice, and that the proceeds of any disposition of any UCC Property may be applied by Lender first to the reasonable expenses in connection therewith, including reasonable attorneys' fees and legal expenses incurred, then to any fees and interest (including any items owed at the Default Rate), and then to payment of the Indebtedness. In exercising any remedies, Lender may exercise its remedies against the Mortgaged Property separately or together and in any order, without in any way affecting the availability of Lender's other remedies under applicable law.

(b)     With respect to the UCC Property that has become so attached to the Land that an interest therein arises under the laws of the Commonwealth of Pennsylvania, this Mortgage shall also constitute a financing statement and a fixture filing under the UCC and is to be filed for record in the real estate records in the county where the Project (including said fixtures) is situated. The mailing address of Borrower and the address of Lender from which information concerning the security interest may be obtained are set forth above. A carbon, photogenic or other reproduction of this Mortgage or any other financing statement relating to this Mortgage shall be sufficient as a financing statement for any of the purposes referred to in this Mortgage.

(c)     Owner is the record owner of the Land, and the addresses of Borrower and Lender are as set forth on the first page of this Mortgage. Borrower represents and warrants that it is a "registered organization" organized under the laws of its state of organization. Borrower covenants that it will not alter such registration without the prior written consent of Lender. Borrower further represents and warrants that its name is exactly as set forth in the first page of this Mortgage. Borrower also covenants that its name shall not be altered without the prior written consent of Lender. Borrower hereby acknowledges and agrees that this Mortgage is an authenticated record, and authorizes the filing of financing statements by Lender without the execution thereof by Borrower.

(d)     This Mortgage also constitutes a "fixture filing" for the purposes o the UCC upon all of the Mortgaged Property that is or is to become "fixtures" (as that term is defined in the UCC), upon being filed for record in the real estate records of the city or county wherein such fixtures are located. Information concerning the security interest herein granted may be obtained at the addresses of Debtor (Borrower) and Secured Party (Lender) as set forth in the first paragraph of this Mortgage.

3.     **MATURITY DATE AND PREPAYMENT OF NOTE.** The maturity date of the Note is the date set forth and defined as the "Maturity Date" therein. The Note may not be prepaid except as provided therein and in the Loan Agreement.

4876-6642-2815.7

4.      **PROTECTION OF LENDER'S SECURITY**.

(a)      If Borrower fails to perform any of its obligations under this Mortgage or any other Loan Document, or if any action or proceeding is commenced which purports to materially and adversely affect the Mortgaged Property, as determined by Lender in its sole discretion, Lender's security or Lender's rights under this Mortgage, including insolvency, code enforcement, civil or criminal forfeiture or fraudulent conveyance, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender deems necessary to perform such obligations of Borrower and to protect Lender's interest, including, without limitation, (i) disbursement of fees and out of pocket expenses of attorneys, accountants, inspectors and consultants, (ii) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (iii) procurement of the insurance coverages required under the Loan Documents, and (iv) payment of amounts which Borrower has failed to pay under the Loan Documents.

(b)      Any amounts disbursed by Lender under this Section, or under any other provision of this Mortgage that treats such disbursement as being made under this Section, shall be added to, and become part of the Indebtedness, shall be due and payable within ten (10) days after demand thereof and shall bear interest from disbursement until paid at the Default Rate.

(c)      Nothing in this Section shall require Lender to incur any expense or take any action.

5.      **NO OTHER LIENS OR ENCUMBRANCES**.  Borrower acknowledges that the existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance on the Mortgaged Property, or any part thereof, whether voluntary, involuntary or by operation of law, other than liens and encumbrances of Lender on the Mortgaged Property, are prohibited, unless otherwise permitted hereunder or by Lender in its sole and absolute discretion.

6.      **PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY**.  Borrower (a) shall not commit waste or permit impairment or deterioration of the Mortgaged Property; (b) shall not abandon the Project or any part thereof; (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair but subject to Borrower's right to receive insurance and condemnation proceeds, if any, as provided herein and in the Loan Documents; (d) shall keep the Mortgaged Property in good repair and condition as set forth in the Loan Documents; (e) shall replace Personalty and Fixtures with items of equal or better function and quality as set forth in the Loan Documents; and (f) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Mortgage.  Borrower shall not (and shall not permit any other Person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty or Fixtures in like or better quality.

9

7.	**CONDEMNATION**.

(a)	Borrower shall promptly notify Lender of any pending or threatened action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a "***Condemnation***"). Borrower shall appear in and prosecute or defend any proceeding relating to any Condemnation unless otherwise directed by Lender in writing. Upon the occurrence of an Event of Default and provided such Event of Default is continuing, Borrower authorizes and appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 7 shall require Lender to incur any expense or take any action. Except as provided in the Loan Documents, Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b)	Lender may apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness in the inverse order of maturity, with the balance, if any, to Borrower. Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note or any other Loan Document, or change the amount of such installments. Borrower agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require.

8.	**REMEDIES**.

(a)	Acceleration of Maturity. If an Event of Default shall have occurred, then the entire Indebtedness shall, at the option of Lender, immediately become due and payable without notice or demand, time being of the essence of this Mortgage, and no omission on the part of Lender to exercise such option when entitled to do so shall be construed as a waiver of such right.

(b)	Foreclosure. Lender may institute an action of mortgage foreclosure, or take such other action at law or in equity for the enforcement of this Mortgage and realization on the mortgage security or any other security herein or elsewhere provided for, as the law may allow, and may proceed therein to final judgment and execution for the entire unpaid balance of the principal debt, with interest at the rate(s) stipulated in the Note, together with all other sums due from Borrower in accordance with the provisions of the Note and this Mortgage, including all sums which have been loaned by Lender to Borrower after the date of this Mortgage, all sums which may have been advanced by lender for taxes, water or sewer rents, other lienable charges or claims, insurance or repairs or maintenance after the date of this Mortgage (including the period after the entry of any judgment in mortgage foreclosure or other judgment entered pursuant to this Mortgage or the Note), and all costs of suit, including reasonable counsel fees, Borrower authorizes Lender at its option to foreclose this

10

Mortgage subject to the rights of any tenants of the Mortgaged Property, and the failure to make any such tenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be asserted by Borrower as a defense to any proceedings instituted by Lender to recover the indebtedness secured hereby or any deficiency remaining unpaid after the foreclosure sale of the Mortgaged Property; provided, however, nothing herein contained shall prevent Borrower from asserting in any proceedings disputing the amount of the deficiency or the sufficiency of any bid at such foreclosure sale that any such tenants adversely affect the value of the Mortgaged Property.

(c)     Post-Judgment Remedies.  To the extent permitted by applicable law, Borrower authorizes Lender, at its option after entry of any judgment in mortgage foreclosure pursuant to this Mortgage and/or any judgment, by confession or otherwise, pursuant to the Note, to petition the court in which such judgment was entered to reassess damages and/or modify such judgment to include (i) all sums which may have been advanced or paid by Lender after the entry of such judgment for, or are otherwise due and payable for, taxes, water and sewer rents, other lienable charges or claims, reasonable attorneys' fees and costs, insurance for or repairs to or maintenance of the Mortgaged Property and (ii) additional accrued interest at the Default Rate (as defined in the Note).

(d)     Right to Enter and Take Possession.

(i)     If an Event of Default shall have occurred and be continuing, Borrower, upon demand of Lender, and in compliance with all laws of the Commonwealth of Pennsylvania (including laws relating to skilled nursing, assisted living and continuing care retirement communities), shall forthwith surrender to Lender the actual possession of the Mortgaged Property and, if and to the extent permitted by law, Lender itself, or by such officers or agents as it may appoint, may enter and take possession of all or any part of the Mortgaged Property without the appointment of a receiver or an application therefor, and may exclude Borrower and its agents and employees wholly therefrom, and take possession of the books, papers and accounts of Borrower relating thereto.

(ii)     If Borrower shall for any reason fail to surrender or deliver the Mortgaged Property or any part thereof after such demand by Lender, Lender may obtain a judgment or decree conferring upon Lender the right to immediate possession or requiring Borrower to deliver immediate possession of the Mortgaged Property to Lender.  Borrower shall pay to Lender, upon demand, all expenses of obtaining such judgment or decree, including reasonable costs and expenses actually incurred by Lender, its attorneys and agents, and all such expenses and costs shall, until paid, become part of the Indebtedness and shall be secured by this Mortgage and shall bear interest at the Default Rate;

(iii)     Upon every such entering or taking of possession, Lender may from time to time do the following as Lender determines to be in its best interest:

(1)     Hold, store, use, operate, manage and control the Mortgaged Property and conduct the business thereof;

11

(2)     Make any necessary or discretionary maintenance, repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase or otherwise acquire additional Fixtures, Personalty and Equipment;

(3)     Insure or keep the Mortgaged Property insured;

(4)     To the extent permitted by applicable law and subject to the general regulatory of the Pennsylvania Department of Health over skilled nursing facilities, manage and operate the Mortgaged Property and exercise all of the rights and powers of Borrower to the same extent as Borrower could in its own name;

(5)     Enter into any and all agreements with respect to the exercise by others of any of the powers herein granted to Lender, all as Lender from time to time may determine to be in its best interest; and

(6)     Collect and receive all the Rents and Accounts, including those past due as well as those accruing thereafter, and, after deducting (A) all reasonable expenses of taking, holding, managing and operating the Mortgaged Property (including compensation for the services of all persons employed for such purposes); (B) the reasonable cost of all such maintenance, repairs, renewals, replacements, additions, betterments, improvements, purchases and acquisitions; (C) the cost of such insurance deemed necessary by Borrower; (D) such taxes, assessments and other similar charges as Lender may at its option pay; (E) other proper and reasonable charges upon the Mortgaged Property or any part thereof; and (F) the reasonable fees, expenses and disbursements of the attorneys and agents of Lender, Lender shall apply the remainder of the monies and proceeds so received by Lender, first, to the payment of accrued interest, including interest at the Default Rate; second, to the payment of Impositions and to other sums required to be paid hereunder; and third, to the payment of overdue installments of principal and any other unpaid Indebtedness then due.

(iv)     Anything in this Section to the contrary notwithstanding, except for the gross negligence or willful misconduct of Lender in entering and taking possession of the Mortgaged Property pursuant to its rights under this Section, Lender shall not incur any liability as a result of any exercise by Lender of its rights under this Mortgage, and Lender shall be liable to account only for the Rents actually received by Lender.

(v)     Borrower agrees to promptly notify all of its account debtors, including the Medicaid and Medicare agencies and other account debtors pursuant to all Reimbursement Contracts, to the extent permitted under applicable law, to make payments to one or more such deposit accounts upon Lender's request and as designated by Lender, and Borrower agrees to provide any necessary endorsements

12

to checks, drafts and other forms of payment so that such payments will be properly deposited in such accounts.  Lender may require that the deposit accounts be established so as to comply with any applicable Medicaid, Medicare and other requirements applicable to payments of any accounts receivable.  Lender may cause moneys to be withdrawn from such deposit accounts and applied to the Indebtedness in such order as Lender may elect.  Borrower appoints Lender as Borrower's attorney-in-fact, which appointment is coupled with an interest and is irrevocable, to provide, after the occurrence of an Event of Default, any notice, endorse any check, draft or other payment for deposit, or take any other action which Borrower agrees to undertake in accordance with this Section and/or the Loan Documents.

(vi)     Whenever all the outstanding Indebtedness shall have been paid and all Events of Default shall have been cured, Lender shall surrender possession of the Mortgaged Property to Borrower, its successors and/or assigns.  The same right of taking possession, however, shall exist if any subsequent Event of Default shall occur and be continuing.

(e)     Performance by Lender.  Upon the occurrence of an Event of Default, Lender may, at its sole option, pay, perform or observe any Loan Obligations, and all payments made or costs or expenses incurred by Lender in connection therewith, with interest thereon at the Default Rate or at the maximum rate from time to time allowed by applicable law, whichever is less, shall be secured hereby and shall be repaid by Borrower to Lender within ten (10) days after demand of Lender for reimbursement.  Notwithstanding anything to the contrary herein, Lender shall have no obligation, explicit or implied, to pay, perform, or observe any of the Loan Obligations.

(f)     Receiver.  If any Event of Default shall have occurred and be continuing, Lender, upon application to a court of competent jurisdiction, shall be entitled as a matter of strict right, without notice and without regard to the sufficiency or value of any security for the Indebtedness or the solvency of any party bound for its payment, to the appointment of a temporary receiver to take possession of and to operate the Project and to collect and apply the Rents and Accounts.  The temporary receiver shall have all the rights and powers permitted under the laws of the state where the Land is located.  Upon application to a court of competent jurisdiction and compliance with the applicable laws of the state where the Land is located, such temporary receiver shall be appointed as a permanent receiver in accordance with applicable law.  Borrower shall pay unto Lender upon demand all expenses, including receiver's fees, reasonable attorneys' fees, costs and agent's compensation, incurred pursuant to the provisions of this Section, and upon Borrower's failure to pay the same, any such amounts shall be added to the Indebtedness and shall be secured by this Mortgage and the other Loan Documents.

(g)     Lender's Power of Enforcement.  If an Event of Default shall have occurred and be continuing, the Lender may, either with or without entry or taking possession as hereinabove provided or otherwise, proceed by suit or suits at law, in equity or any other appropriate proceeding or remedy (i) to enforce payment of the Note or the performance of any term thereof or any other right; (ii) to foreclose this Mortgage and to sell, as an entirety or in separate lots or parcels, the Mortgaged Property, as provided by applicable state law;

13

and (iii) to pursue any other rights or remedies available to it under law for the collection of debts and the enforcement of covenants and conditions such as those contained in the Loan Documents, all as the Lender shall deem most effectual for its benefit.

(h)  <u>Purchase by Lender</u>.  Upon any foreclosure sale, Lender may bid for and purchase the Mortgaged Property, either for its own account or through an agent, and shall be entitled to apply all or any part of the Indebtedness as a credit to the purchase price.

(i)  <u>Application of Proceeds of Sale</u>.  In the event of a foreclosure or other sale of all or any portion of the Mortgaged Property, the proceeds of said sale shall be applied, first, to the expenses of such sale and of all proceedings in connection therewith, including reasonable attorney's fees and expenses (and attorney's fees and expenses shall become absolutely due and payable whenever foreclosure is commenced); then to insurance premiums, liens, assessments, taxes and charges, including utility charges and any other amounts advanced by Lender hereunder, and interest thereon at the Default Rate; then to payment of the Indebtedness in such order of priority as Lender shall determine, in its sole discretion; and finally the remainder, if any, shall be paid to Borrower, or to the Person lawfully entitled thereto.

(j)  <u>Holding Over</u>.  In the event of any such foreclosure sale, (if Borrower shall remain in possession), Borrower shall be deemed a tenant at will holding over and shall forthwith deliver possession to the purchaser or purchasers at such sale or be summarily dispossessed according to provisions of law applicable thereto.

(k)  <u>Waiver of Appraisement, Valuation, Etc.</u> Borrower agrees, to the fullest extent permitted by law, that in case of an Event of Default, neither Borrower, nor any lessee, nor anyone claiming through or under Borrower will assert, claim or seek to take advantage of any appraisement, valuation, stay, extension, exemption or laws now or hereafter in force, in order to prevent or hinder the enforcement of foreclosure of this Mortgage, or the absolute sale of the Mortgaged Property, or the delivery of possession thereof immediately after such sale to the purchaser at such sale.  Borrower hereby releases and waives all rights under and by virtue of any homestead exemption.

(l)  <u>Discontinuance of Proceedings</u>.  In case Lender shall have proceeded to enforce any right, power or remedy under this Mortgage by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to Lender, then in every such case, Borrower and Lender shall be restored to their former positions and rights hereunder, and all rights, powers and remedies of Lender shall continue as if no such proceedings had occurred.

(m)  <u>Waiver</u>.

(i)  No delay or omission by Lender or by any holder of the Note to exercise any right, power or remedy accruing upon any default shall exhaust or impair any such right, power or remedy or shall be construed to be a waiver of any such default, or acquiescence therein, and every right, power and remedy given by this Mortgage or in any Loan Document to Lender may be exercised from time to

14

time and as often as may be deemed expedient by Lender. No consent or waiver expressed or implied by Lender to or of any breach or default by Borrower in the performance of the obligations of Borrower hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Borrower hereunder. Failure on the part of Lender to complain of any act or failure to act or failure to declare an Event of Default, irrespective of how long such failure continues, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers or remedies of Lender hereunder or in any Loan Document.

(ii)     No act or omission by Lender shall release, discharge, modify, change or otherwise affect the original liability under the Note, this Mortgage, other Loan Documents or any other obligation of Borrower or any subsequent purchaser of the Mortgaged Property or any part thereof, or any maker, co-signer, endorser, surety or guarantor, nor preclude Lender from exercising any right, power or privilege herein granted or intended to be granted in any Event of Default then existing or of any subsequent default, nor alter the lien of this Mortgage, except as expressly provided in an instrument or instruments executed by Lender. Without limiting the generality of the foregoing, Lender may, in its sole and absolute discretion;

(1)     Grant forbearance or an extension of time for the payment of all or any portion of the Indebtedness;

(2)     Take other or additional security for the payment of any of the Loan Obligations;

(3)     Waive or fail to exercise any right granted herein, in the Note or in the other Loan Documents;

(4)     Release any part of the Mortgaged Property from the security interest or lien of this Mortgage or otherwise change any of the terms, covenants, conditions or agreements of the Note, this Mortgage or the other Loan Documents;

(5)     Consent to the filing of any map, plat or replat affecting the Land;

(6)     Consent to the granting of any easement or other right affecting the Mortgaged Property;

(7)     Make or consent to any agreement subordinating the security title or lien hereof; or

(8)     Take or omit to take any action whatsoever with respect to the Note, this Mortgage, the other Loan Documents, the Mortgaged Property or any document or instrument evidencing, securing or in any way related to this Mortgage,

15

all without releasing, discharging, modifying, changing or affecting any such liability, or precluding Lender from exercising any such right, power or privilege with respect to the lien of this Mortgage.

(iii)    In the event of the sale or transfer by operation of law or otherwise of all or any part of the Mortgaged Property, Lender, without notice, is hereby authorized and empowered to deal with any vendee or transferee with respect to the Mortgaged Property or the Indebtedness, or with reference to any of the terms, covenants, conditions or agreements hereof, as fully and to the same extent as it might deal with the original parties hereto and without in any way releasing or discharging any liabilities, obligations or undertakings of Borrower, any guarantors of the Loan or others.

(iv)    Borrower waives and relinquishes any and all rights it may have, whether at law or equity, to require Lender to proceed to enforce or exercise any rights, powers and remedies it may have under the Loan Documents in any particular manner, in any particular order, or in any particular state or other jurisdiction. Borrower expressly waives and relinquishes any and all rights and remedies that Borrower may have or be able to assert by reason of the laws of the state of jurisdiction pertaining to the rights and remedies of sureties.

(v)    Borrower makes the arrangements, waivers and relinquishments set forth above knowingly and as a material inducement to Lender in making the Loan, after consulting with and considering the advice of independent legal counsel selected by Borrower.

(n)    <u>Suits to Protect the Mortgaged Property</u>.  Lender shall have power to institute and maintain such suits and proceedings as it may deem expedient:

(i)    to prevent any impairment of the Mortgaged Property by any acts which may be unlawful or constitute an Event of Default;

(ii)    to preserve or protect its interest in the Mortgaged Property and in the Rents and Accounts arising therefrom; or

(iii)    to restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order would materially impair the security hereunder or be prejudicial to the interest of Lender.

(o)    <u>Proofs of Claim</u>.  In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Borrower, its creditors or properties, Lender shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Lender allowed in such proceedings for the entire amount due and payable by Borrower under this

Mortgage at the date of the institution of such proceedings and for any additional amount which may become due and payable by Borrower hereunder after such date.

(p)    Setoff.  Upon the occurrence of an Event of Default, Lender may exercise the rights and remedies of setoff and/or banker's lien against the interest of Borrower in and to every account, deposit account, and other property of Borrower that is in the possession of Lender, any servicer or Investor, or any Person who then owns a participating interest in the Loan (except in all events, patient trust accounts), to the extent of the full amount of the Loan.

(q)    Foreclosure of Personalty.  Upon the happening of any and every Event of Default, Lender may proceed against the Personalty as well as the real property should Lender elect to cause any of the Mortgaged Property to be disposed of as personal property because the same is personal property under applicable law.  Lender may dispose of all or any part thereof in any manner now or hereafter permitted by the UCC or in accordance with any other remedy provided in law or in equity.  Any such disposition may be conducted by an employee or agent of Lender.  Both Borrower and Lender shall be eligible to purchase any part or all of such property at such disposition.  Any such disposition may be either public or private as Lender may so elect, in its sole discretion, subject to the provisions of the UCC. Lender shall have all of the rights and remedies of a secured party under the UCC. Expenses of retaking, holding, preparing for sale, selling or the like shall include Lender's reasonable and actual attorney's fees and legal expenses.  Upon the occurrence of any Event of Default, Borrower, upon demand of Lender, shall assemble such personal property and make it available to Lender at a place which is deemed to be reasonably convenient to both Lender and Borrower.  Lender shall give Borrower at least five (5) days' prior written notice (or a longer period if then required in accordance with the laws of the Commonwealth of Pennsylvania) of the time and place of any public sale or other disposition of such property or of the time at or after which any private sale or any other intended disposition is to be made, and if such notice is sent to Borrower, as the same is provided for the mailing of notices herein, it shall constitute reasonable notice to Borrower.

(r)    Other Remedies upon Default.  Upon the occurrence of an Event of Default, Lender is authorized, either by itself or by its agent to be appointed by it for that purpose or by a receiver appointed by a court of competent jurisdiction, to:

(i)    to the extent permitted by applicable law and subject to the general regulatory authority of the Pennsylvania Department of Health over skilled nursing facilities, enter into and upon and take and hold possession of any portion or all of the Mortgaged Property, both real and personal, and exclude Borrower and all other persons therefrom;

(ii)    operate and manage the Mortgaged Property and rent and lease the same;

(iii)    perform such reasonable acts of repair or protection as may be reasonably necessary or proper to conserve the value of the Mortgaged Property;

17

(iv)     collect any Rents and Accounts for the benefit and protection of Lender and from time to time apply or accumulate such Rents and Accounts in such order and manner as Lender or a receiver, in its sole discretion, shall consider advisable, to or upon the following: the expenses of receivership, if any; the proper costs of upkeep, maintenance, repair and/or operation of the Mortgaged Property; the repayment of any sums theretofore or thereafter advanced pursuant to the terms of this Mortgage; the interest then due or next to become due upon the Indebtedness secured hereby; the taxes and assessments upon the Mortgaged Property then due or next to become due; or upon the unpaid principal of such Indebtedness.

The collection or receipt of Rents or Accounts by Lender, its agent or receiver, after notice of default and notice of sale shall not affect or impair such default or notices or any sale proceedings predicated thereon. Any Rents or Accounts in the possession of Lender, its agent or receiver, at the time of sale and not theretofore applied as herein provided, shall be applied in the same manner and for the same purposes as the proceeds of the sale. Lender shall not be under any obligation to make any of the payments or do any of the acts referred to in this Section, and any of the actions referred to in this Section may be taken by Lender regardless of whether any notice of default or notice of sale has been given hereunder and without regard to the adequacy of the security for the Indebtedness.

(s)     Effect of Foreclosure on Leases. Lender shall have the right, at its option, to foreclose this Mortgage subject to the rights of any tenants of the Mortgaged Property, and the failure to make any tenants a party defendant to any foreclosure proceeding will not be asserted by the Borrower as a defense in any action or suit instituted to collect the Indebtedness or any deficiency remaining after foreclosure. Any such tenant whom Lender elects to not make a party or subject to any foreclosure action shall continue in possession of its leasehold for the unexpired term of its lease and shall attorn to Lender or other purchaser at the sale.

(t)     Compliance with Pennsylvania Mortgage Foreclosure Law. Without limiting the generality or efficacy of this Section 8 or any other provision of this Mortgage benefiting Lender, Borrower and Lender intend and believe that each provision in this Mortgage comports with any laws, rules or regulation governing the foreclosure of mortgage liens in Pennsylvania. If, however, any provision in this Mortgage or any other Loan Document shall be inconsistent with and unenforceable under any provision of the laws, rules or regulation governing the foreclosure of mortgage liens in Pennsylvania, the provisions of the laws, rules or regulation governing the foreclosure of mortgage liens in Pennsylvania shall take precedence over the provisions of this Mortgage or any other Loan Document, but shall not limit, waive, invalidate or render unenforceable any other provision of this Mortgage or any other Loan Document that can be construed in a manner consistent with the laws, rules or regulation governing the foreclosure of mortgage liens in Pennsylvania. Furthermore, if any provision of this Mortgage or any other Loan Document shall grant to Lender any rights or remedies upon default of Borrower which are more limited than the rights that would otherwise be vested in Lender or in mortgagees generally under the laws, rules or regulations governing the foreclosure of mortgage liens in Pennsylvania in the absence of said provision, Lender shall be vested with the rights granted by the laws, rules or regulations governing the foreclosure of mortgage liens in Pennsylvania to the fullest extent permitted by law.

9.    **REMEDIES CUMULATIVE**.  Each right and remedy provided in this Mortgage is distinct from all other rights or remedies under this Mortgage or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

10.    **FORBEARANCE**.

(a)    Lender may agree with Borrower, from time to time, at Lender's option and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of any guarantors of the Loan or other third party obligor:  extend the time for payment of all or any part of the Indebtedness, reduce the payments due under this Mortgage, the Note, or any other Loan Document, release anyone liable for the payment of any amounts under this Mortgage, the Note, or any other Loan Document, accept a renewal of the Note, modify the terms and time of payment of the Indebtedness, join in any extension or subordination agreement, release any Mortgaged Property, take or release other or additional security, modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note, or otherwise modify this Mortgage, the Note, or any other Loan Document.

(b)    Any forbearance by Lender in exercising any right or remedy under the Note, this Mortgage, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any insurance and/or condemnation proceeds shall not operate to cure or waive any Event of Default unless such payment has completely cured the Event of Default and Lender is satisfied in its sole discretion that it has sufficient security for the remaining Loan Obligations.

11.    **WAIVER OF STATUTE OF LIMITATIONS**.  Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Mortgage or to any action brought to enforce any Loan Document.

12.    **WAIVER OF MARSHALLING**.  Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Mortgage, the Note, any other Loan Document or applicable law. Subject to applicable law, Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies.  Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Mortgage waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an

19

entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Mortgage.

13. **FURTHER ASSURANCES**. Borrower shall execute, acknowledge, and deliver at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may reasonably require from time to time in order to assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Mortgage and the Loan Documents.

14. **ENVIRONMENTAL INDEMNIFICATION**. This Mortgage also secures the performance of all obligations due to Lender by Borrower and the other above named parties under that certain Environmental Indemnification Agreement of even date herewith executed by Borrower and others for the benefit of Lender. A release of this Mortgage shall not be construed as or be deemed to constitute a termination or a waiver or release of such Environmental Indemnification Agreement, which instead shall continue in existence and terminate by its own terms.

15. **ASSIGNMENT OF LEASES AND RENTS.** The terms and provisions of that certain separate Assignment of Leases and Rents executed by Borrower in favor of Lender of even date herewith are hereby incorporated by reference herein and made a part hereof as if fully set forth herein.

16. **EXPENSES AND PREPAYMENT PREMIUMS.** Immediately upon the conclusion of any legal proceedings in which Lender prevails, there shall become due and owing by Borrower all expenses incident to such proceedings, all court costs and all expenses incident to any foreclosure proceedings brought under this Mortgage or otherwise in connection with such proceeding (including without limitation auctioneer's fees), plus interest thereon at the Default Rate from the time incurred. In partial consideration for Lender agreeing to make the Loan to Borrower, Borrower agrees that upon the occurrence of an Event of Default and acceleration of the Indebtedness secured hereby, any tender of payment by or on behalf of Borrower of the amount necessary to satisfy all of such Indebtedness made at any time before, or after any foreclosure sale shall constitute an evasion of the payment terms of the Note and hereunder, and shall be deemed to be a voluntary prepayment, and such payment, to the extent permitted by law, shall be accompanied by the Exit Fee, as provided in the Loan Agreement, and Lender shall not be obligated to accept any such tender of payment unless such tender of payment includes such Exit Fee.

17. **ACCELERATION INTEREST.** Upon any acceleration of the Indebtedness pursuant to the terms of the Note, Borrower shall pay interest on all sums due hereunder at the Default Rate.

18. **LATE FEES.** If any payment of interest or principal payable under the Note is not made within three (3) calendar days after the date on which such payment becomes due and payable, Borrower shall thereupon automatically become obligated immediately to pay to Lender or other holder of the Note a late payment charge, for each month during which a payment delinquency exists, equal to the lesser of five percent (5%) of the amount of such payment or the maximum amount permitted by applicable law to defray the expenses incurred by Lender or other holder of the Note in handling and processing such delinquent payment and to compensate Lender for the loss of use of such delinquent payment.

4876-6642-2815.7

19.     **FUTURE ADVANCES.**  This Mortgage is an Open-End Mortgage as defined in 42 Pa.C.S.A. § 8143(f).  The maximum amount secured by this Open-End Mortgage is two hundred percent (200%) of the original principal amount of the Note, plus accrued but unpaid interest, fees, costs, and expenses, including advances for te payment of taxes and municipal assessments, maintenance charges, insurance premiums, costs incurred for the protection of the Mortgaged Property or the lien of this Mortgage, expenses incurred by the Lender by reason of an Event of Default, and other advances made as provided herein.  Without limitation of any other provisions of this Mortgage, Lender may make future advances, and this Mortgage shall secure repayment of such advances and the interest thereon, for the payment of taxes, assessments, maintenance charges, insurance premiums, or costs similar or dissimilar, incurred for the protection and preservation of the Mortgaged Property or for the lien of this Mortgage, expenses incurred by Lender by reason of default by Borrower, or advances made under a construction loan to enable the completion of the improvements for which the construction loan was originally made.

20.     **RECORDATION**.

(a)     Borrower forthwith upon the execution and delivery of this Mortgage and thereafter from time to time, will cause this Mortgage, and any security instrument creating a lien or evidencing the lien hereof upon the UCC Property and each instrument of further assurance, to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien hereof upon, and the interest of Lender in, the Mortgaged Property.

(b)     Borrower shall pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of this Mortgage, any mortgage or other security instrument supplemental hereto, any security instrument with respect to the UCC Property encumbered hereby and any instrument of further assurance and all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Note, this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the chattels or any instrument of further assurance.

21.     **GOVERNING LAW**.  This Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to principles of conflicts of laws, except that the internal laws of the State of New York (without regard to principles of conflicts of law) shall govern (a) those terms and conditions contained in the Note and the Loan Agreement which are incorporated by reference herein and (b) the resolution of issues arising under the Note and the Loan Agreement to the extent that such resolution is necessary to the interpretation of this Mortgage.  Borrower agrees that its assets shall be used first to satisfy all claims of creditors organized or domiciled in the United States and that no assets of Borrower in the United States shall be considered part of any foreign bankruptcy estate.

22.     **NOTICES**.  Any notice or other communication required or permitted to be given in connection with this Mortgage shall be given in accordance with <u>Section 8.8</u> of the Loan Agreement.

23.     **INDEMNIFICATION.**     BORROWER SHALL PROTECT, DEFEND, INDEMNIFY AND SAVE HARMLESS LENDER FROM AND AGAINST ALL LIABILITIES,

OBLIGATIONS, CLAIMS, DAMAGES, PENALTIES, CAUSES OF ACTION, COSTS AND EXPENSES (INCLUDING WITHOUT LIMITATION REASONABLE ATTORNEYS' FEES AND EXPENSES) IMPOSED UPON OR INCURRED BY OR ASSERTED AGAINST LENDER (EXCEPT IF ARISING AFTER LENDER TAKES POSSESSION OF THE MORTGAGED PROPERTY) BY REASON OF (A) OWNERSHIP OF THIS MORTGAGE, THE MORTGAGED PROPERTY OR ANY INTEREST THEREIN OR RECEIPT OF ANY RENTS; (B) ANY ACCIDENT, INJURY TO OR DEATH OF PERSONS OR LOSS OF OR DAMAGE TO PROPERTY OCCURRING IN, ON OR ABOUT THE MORTGAGED PROPERTY OR ANY PART THEREOF OR ON THE ADJOINING SIDEWALKS, CURBS, ADJACENT PROPERTY OR ADJACENT PARKING AREAS, STREETS OR WAYS; (C) ANY USE, NONUSE OR CONDITION IN, ON OR ABOUT THE MORTGAGED PROPERTY OR ANY PART THEREOF OR ON THE ADJOINING SIDEWALKS, CURBS, ADJACENT PROPERTY OR ADJACENT PARKING AREAS, STREETS OR WAYS; (D) ANY FAILURE ON THE PART OF BORROWER, AFTER EXPIRATION OF APPLICABLE GRACE PERIODS, TO PERFORM OR COMPLY WITH ANY OF THE TERMS OF THIS MORTGAGE OR THE LOAN DOCUMENTS; (E) ANY CLAIMS BY ANY BROKER, PERSON OR ENTITY CLAIMING TO HAVE PARTICIPATED IN ARRANGING THE MAKING OF THE LOAN EVIDENCED BY THE NOTE; (F) PERFORMANCE OF ANY LABOR OR SERVICES OR THE FURNISHING OF ANY MATERIALS OR OTHER PROPERTY IN RESPECT OF THE MORTGAGED PROPERTY OR ANY PART THEREOF; OR (G) THE FAILURE OF ANY PERSON TO FILE TIMELY WITH THE INTERNAL REVENUE SERVICE AN ACCURATE FORM 1099-B, STATEMENT FOR RECIPIENTS OF PROCEEDS FROM REAL ESTATE, BROKER AND BARTER EXCHANGE TRANSACTIONS, WHICH MAY BE REQUIRED IN CONNECTION WITH THIS MORTGAGE, OR TO SUPPLY A COPY THEREOF IN A TIMELY FASHION TO THE RECIPIENT OF THE PROCEEDS OF THE TRANSACTION IN CONNECTION WITH WHICH THIS MORTGAGE IS MADE. ANY AMOUNTS PAYABLE TO LENDER BY REASON OF THE APPLICATION OF THIS SECTION 23, SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND SHALL BEAR INTEREST AT THE DEFAULT RATE PROVIDED FOR IN THE NOTE FROM THE DATE OF DEMAND THEREFOR UNTIL PAID. THE OBLIGATIONS AND LIABILITIES OF BORROWER UNDER THIS SECTION 23 SHALL SURVIVE ANY TERMINATION, SATISFACTION, ASSIGNMENT, ENTRY OF A JUDGMENT OF FORECLOSURE OR EXERCISE OF A POWER OF SALE OR DELIVERY OF A DEED IN LIEU OF FORECLOSURE OF THIS MORTGAGE.

24. **JOINT AND SEVERAL LIABILITY**. If more than one Person signs this Mortgage as mortgagor or borrower, the obligations of such persons and entities shall be joint and several. The term "Borrower" shall include all such Persons. Each representation, covenant, undertaking and other obligation of Borrower shall apply to all such Persons individually and collectively.

25. **RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARIES**. The relationship between Lender and Borrower shall be solely that of creditor and debtors, respectively, and nothing contained in this Mortgage shall create any other relationship between Lender and Borrower. No creditor of any party to this Mortgage and no other Person shall be a third party beneficiary of this Mortgage or any other Loan Document.

4876-6642-2815.7

26.     **SEVERABILITY; AMENDMENTS**.  The invalidity or unenforceability of any provision of this Mortgage shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect.

27.     **ENTIRE AGREEMENT**.  This Mortgage contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Mortgage.

28.     **AMENDMENT**.  This Mortgage may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

29.     **ATTORNEYS' FEES.**  Notwithstanding anything to the contrary herein or in any other Loan Document, should Lender retain counsel for the purpose of enforcing or preventing the breach of any provision hereof, including but not limited to instituting or defending any action or proceeding to enforce any provision hereof, Borrower agrees to pay all charges owed to Lender pursuant to the Loan Documents (including, without limitation, all reasonable attorneys' fees, consultants' fees, experts' fees and the like) in connection with the collection and/or enforcement of the Loan Documents, whether or not suit is brought against Borrower.

30.     **WAIVER OF TRIAL BY JURY.**  EACH OF BORROWER AND LENDER (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE THAT IS TRIABLE OF RIGHT BY A JURY; AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL, AND THIS WAIVER IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A JURY TRIAL WOULD OTHERWISE EXIST.  BORROWER AND LENDER ARE AUTHORIZED TO SUBMIT THIS MORTGAGE TO ANY COURT HAVING JURISDICTION OVER THE SUBJECT MATTER AND THE PARTIES TO ANY LOAN DOCUMENT, SO AS TO SERVE AS CONCLUSIVE EVIDENCE OF BORROWER'S AND LENDER'S WAIVER OF THE RIGHT TO JURY TRIAL. FURTHER, BORROWER AND LENDER EACH CERTIFIES THAT NEITHER BORROWER'S NOR LENDER'S REPRESENTATIVES OR AGENTS HAVE REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ENFORCEMENT OF THIS WAIVER WILL NOT BE SOUGHT.

31.     **WAIVER OF AUTOMATIC STAY**.  TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, BORROWER HEREBY AGREES THAT, IN CONSIDERATION OF LENDER'S AGREEMENT TO MAKE THE LOAN AND IN RECOGNITION THAT THE FOLLOWING COVENANT IS A MATERIAL INDUCEMENT FOR LENDER TO MAKE THE LOAN, IN THE EVENT THAT BORROWER SHALL (I) FILE WITH ANY BANKRUPTCY COURT OF COMPETENT JURISDICTION OR BE THE SUBJECT OF ANY PETITION UNDER ANY SECTION OR CHAPTER OF TITLE 11 OF THE UNITED STATES CODE, AS AMENDED ("***BANKRUPTCY CODE***"), OR SIMILAR LAW OR STATUTE; (II) BE THE SUBJECT OF ANY ORDER FOR RELIEF ISSUED UNDER THE BANKRUPTCY CODE OR SIMILAR LAW OR STATUTE; (III) FILE OR BE THE SUBJECT OF ANY PETITION SEEKING ANY REORGANIZATION, ARRANGEMENT, COMPOSITION, READJUSTMENT, LIQUIDATION, DISSOLUTION, OR SIMILAR RELIEF UNDER ANY PRESENT OR FUTURE FEDERAL OR STATE ACT OR LAW RELATING TO BANKRUPTCY, INSOLVENCY, OR OTHER RELIEF

4876-6642-2815.7

FOR DEBTORS; (IV) HAVE SOUGHT OR CONSENTED TO OR ACQUIESCED IN THE APPOINTMENT OF ANY TRUSTEE, RECEIVER, CONSERVATOR, OR LIQUIDATOR; OR (V) BE THE SUBJECT OF AN ORDER, JUDGMENT OR DECREE ENTERED BY ANY COURT OF COMPETENT JURISDICTION APPROVING A PETITION FILED AGAINST BORROWER FOR ANY REORGANIZATION, ARRANGEMENT, COMPOSITION, READJUSTMENT, LIQUIDATION, DISSOLUTION, OR SIMILAR RELIEF UNDER ANY PRESENT OR FUTURE FEDERAL OR STATE ACT OR LAW RELATING TO BANKRUPTCY, INSOLVENCY OR RELIEF FOR DEBTORS, THEN, SUBJECT TO COURT APPROVAL, LENDER SHALL THEREUPON BE ENTITLED AND BORROWER HEREBY IRREVOCABLY CONSENTS TO, AND WILL NOT CONTEST, AND AGREES TO STIPULATE TO, RELIEF FROM ANY AUTOMATIC STAY OR OTHER INJUNCTION IMPOSED BY SECTION 362 OF THE BANKRUPTCY CODE, OR SIMILAR LAW OR STATUTE (INCLUDING, WITHOUT LIMITATION, RELIEF FROM ANY EXCLUSIVE PERIOD SET FORTH IN SECTION 1121 OF THE BANKRUPTCY CODE) OR OTHERWISE, ON OR AGAINST THE EXERCISE OF THE RIGHTS AND REMEDIES OTHERWISE AVAILABLE TO LENDER AS PROVIDED IN THE LOAN DOCUMENTS, AND AS OTHERWISE PROVIDED BY LAW, AND BORROWER HEREBY IRREVOCABLY WAIVES ITS RIGHTS TO OBJECT TO SUCH RELIEF.

32.     **SUCCESSORS AND ASSIGNS BOUND**.  This Mortgage shall bind, and the rights granted by this Mortgage shall inure to, the respective permitted successors and assigns of Lender and Borrower.

33.     **LOAN AGREEMENT GOVERNS.**  The Loan is governed by the terms and conditions set forth in the Loan Agreement, and in the event of any conflict between the terms of this Mortgage or the other Loan Documents and the terms of the Loan Agreement, the terms of the Loan Agreement shall control; provided, however, in the event there is any apparent conflict between any particular term or provision which appears in both the Loan Agreement and this Mortgage and it is possible and reasonable for the terms of both the Loan Agreement and this Mortgage to be performed or complied with, then, notwithstanding the foregoing, both the terms of the Loan Agreement and this Mortgage shall be performed or complied with.

34.     **MISCELLANEOUS**.  The captions and headings of the sections of this Mortgage are for convenience only and shall be disregarded in construing this Mortgage.  Any reference in this Mortgage to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Mortgage or to a section of this Mortgage.  All exhibits or schedules attached to or referred to in this Mortgage are incorporated by reference into this Mortgage.  Any reference in this Mortgage to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.  Use of the singular in this Mortgage includes the plural and use of the plural includes the singular.  As used in this Mortgage, the term "including" means "including, but not limited to."

[continued on following page]

IN WITNESS WHEREOF, the Borrower has caused this Mortgage to be executed by its duly authorized representative, effective as of the day and year first above written.

**BORROWER:**

**JEFFERSON HILLS ACQUISITION LLC,**
**BEAVER HEALTHCARE REAL ESTATE, LLC,**
**MULBERRY HEALTHCARE REAL ESTATE, LLC,**
**RIDGEVIEW HEALTHCARE REAL ESTATE, LLC,**
**LAKEVIEW HEALTHCARE REAL ESTATE, LLC,**
and
**SCOTTDALE HEALTHCARE REAL ESTATE, LLC,**
each a Delaware limited liability company

By: Guardian Acquisition, LLC, a Delaware limited liability company
Its: Manager

By: _____
Name: Yeshayahu Zidele
Title: Manager

STATE OF _New York_
COUNTY OF _New York_

Before me, _MARK ZAFRIN_, a Notary Public in and for said State and County aforesaid, duly commissioned and qualified, personally appeared YESHAYAHU ZIDELE, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be the Manager of Guardian Acquisition, LLC, a Delaware limited liability company, the Manager of **JEFFERSON HILLS ACQUISITION LLC, BEAVER HEALTHCARE REAL ESTATE, LLC, MULBERRY HEALTHCARE REAL ESTATE, LLC, RIDGEVIEW HEALTHCARE REAL ESTATE, LLC, LAKEVIEW HEALTHCARE REAL ESTATE, LLC,** and **SCOTTDALE HEALTHCARE REAL ESTATE, LLC,** the within-named bargainors, each a Delaware limited liability company, and that he, as such Manager being duly authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the limited liability companies by himself as such Manager.

WITNESS my hand and seal at office on this the _23_ day of _June_, 2022.

_____
Notary Public      MARK H ZAFRIN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02ZA6423457
Qualified in New York County
My Commission Expires 10-12-2025

My Commission Expires: _____

[continued on following page]

**JEFFERSON HILLS OPERATING LLC,**
**BEAVER HEALTHCARE OPERATING, LLC,**
**MULBERRY HEALTHCARE OPERATING, LLC,**
**RIDGEVIEW HEALTHCARE OPERATING, LLC,**
**LAKEVIEW HEALTHCARE OPERATING LLC,** and
**SCOTTDALE HEALTHCARE OPERATING, LLC,**
each a Delaware limited liability company

By: Bonamour Health Group, LLC, a Delaware limited
liability company
Its: Manager

By: _____
Name: Yeshayahu Zidele
Title: Manager

STATE OF *New York*
COUNTY OF *New York*

      Before me, _____, a Notary Public in and for said State and County aforesaid, duly commissioned and qualified, personally appeared SHAYA ZIDELE, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be the Manager of Bonamour Health Group, LLC, a Delaware limited liability company, the Manager of **JEFFERSON HILLS OPERATING LLC, BEAVER HEALTHCARE OPERATING, LLC, MULBERRY HEALTHCARE OPERATING, LLC, RIDGEVIEW HEALTHCARE OPERATING, LLC, LAKEVIEW HEALTHCARE OPERATING, LLC,** and **SCOTTDALE HEALTHCARE OPERATING, LLC,** the within-named bargainors, each a Delaware limited liability company, and that he, as such Manager being duly authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the limited liability companies by himself as such Manager

      WITNESS my hand and seal at office on this the **33** day of **June**, 2022.

_____
Notary Public

My Commission Expires:

_____

MARK H ZAFRIN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02ZA6423457
Qualified in New York County
My Commission Expires 10-12-2025

The address of the Mortgagee (Lender) under this Mortgage is:
750 Lexington Avenue,
New York, NY 10022
Attention: Matt Rawlsky

# EXHIBIT A
## TO
## OPEN-END MORTGAGE AND SECURITY AGREEMENT

## Description of the Land

**TRACT 1:**

All that certain lot or piece of ground situate in the Borough of Jefferson Hills, formerly the Borough of Jefferson, County of Allegheny and Commonwealth of Pennsylvania, being more particularly bounded and described as follows:

Beginning at a point in the centerline of Old Clairton Road (33 feet in width), formerly Pittsburgh and Elizabeth Public Road, which said point of beginning is North 55° 35' 12" West 85.03 feet from the dividing line of the larger tract of ground of which the within parcel was a part and property now or formerly of Weeks; thence continuing along land now or formerly of Robert S. Lindsay, et al, of which the within parcel was once a part the following four courses and distances:

1. South 37° 19' 43" West 138.87 feet to a point; thence

2. North 57° 10' 24" West 4.10 feet to a point; thence

3. South 32° 49' 36" West 118 feet to a point; thence

4. South 57° 10' 24" East 100 feet to a point on line of land now or formerly of Weeks;

Thence continuing along the same South 32° 49' 36" West 612.16 feet to a point, thence South 69° 15' West 443.52 feet to a point; thence South 62° 00' West 471.57 feet to a point; thence North 45° 10' West 330.00 feet to a point, thence along line of land now or formerly of Mae C. Stilley and land now or formerly of Charles B. Duke, North 48° 24' 40" East 1636.83 feet to a point in the centerline of Old Clairton Road, thence continuing through the same South 55° 35' 09" East 291.351 feet to a point at the place of beginning.

Being the same premises which Jefferson Hills Manor, LLC, a Pennsylvania Limited Liability Company by Deed dated October 28, 2004 and recorded November 30, 2004 in Allegheny County in Deed Book Volume 12273 Page 326 conveyed unto OHI Asset (PA) Trust, a Maryland business trust, in fee.

NOTE FOR INFORMATION: Being Parcel No. 767-A-50-0-1, of the City of Clairton, County of Allegheny.

**TRACT 2:**

ALL THAT CERTAIN lot or piece of ground situate in the Township of Hopewell, County of Beaver and Commonwealth of Pennsylvania, adjoining Lots Nos. 33 and 34 in the Second Addition to the Golfview Plan of Lots as made out by John W. Cochran and George Grady, as recorded in the Recorder's Office of Beaver County, Pennsylvania, in Plan Book Volume 5, Page 178, said parcel or tract of land being more particularly bounded and described as follows:

BEGINNING at a point on the centerline of a public road known as Golf Course Road at the dividing line between the tract herein described and Lot No. 33 in the Plan aforesaid; thence along said dividing line South 46° 20' 10" West, for a distance of 621.84 feet to a line of land now or formerly of Patterson; thence, along land now or formerly of Patterson, North 34° 28' 30" West, a distance of 410.85 feet to a point on lands now or formerly of William M. Johnston and Mary L. Johnston, his wife; thence, North 57° 25' 00" East, a distance of 469.33 feet to a point in the centerline of the public road aforesaid; thence, along said centerline of said public road, South 60° 32' 25" East, a distance of 329.59 feet to the place of beginning.

EXCEPTING AND RESERVING thereout and therefrom a right of way easement over and across a certain 20 foot tract leading from Golf Course Road in a Southwesterly direction along the Northerly boundary line of the tract herein described and being more fully bounded and described as follows:

BEGINNING at a point in the centerline of the public road known as Golf Course Road on the line dividing lands herein conveyed and lands now or formerly of William M. Johnston and Mary L. Johnston, his wife; thence, along the centerline of said public road, South 60° 32' 25" East, for a distance of 20 feet, more or less, to a point; thence, South 57° 25' 00" West, for a distance of 469.33 feet, more or less, to a point on the line of land now or formerly of Patterson; thence, North 34° 28' 30" West, a distance of 20 feet, more or less, to a point on lands now or formerly of the said Johnstons; thence, North 57° 25' 00" East, a distance of 469.33 feet to a point in the centerline of the public road aforesaid to a point, the place of beginning.

TOGETHER WITH the right of ingress, egress and regress over and across said right of way for the use of the parties hereto, their heirs, executors, administrators, successors and assigns, occupiers and tenants forever as a public easement.

ALSO, EXCEPTING AND RESERVING thereout and therefrom an easement or right of way being 15 feet in width and distance 410.85 feet across the Westerly boundary of the tract herein described and being more particularly bounded and described as follows:

BEGINNING at a point being the Westerly corner of the tract herein described and common to land now or formerly of Patterson; thence along land of Patterson, North 34° 28' 30" West, a distance of 410.85 feet to a point of lands now or formerly of William Johnston, et ux.; thence, North 57° 25' 00" East, a distance of 15 feet to a point; thence, South 34° 28' 30" East, a distance of 410.85 feet, more or less, to a point; thence, South 46° 20' 10" West, a distance of 15 feet to a point, the place of beginning.

TOGETHER WITH the right of ingress, egress and regress over and across said right of way for the use of the parties hereto, their heirs, executors, administrators, successors and assigns, occupiers and tenants forever as a public easement for the construction of a water line from Hall Street to the within described property.

ALSO, EXCEPTING AND RESERVING thereout and therefrom a parcel of land conveyed to Jack L. Danielson by deed from Golfview Manor Nursing Home, Inc., dated June 7, 1965 and recorded in Deed Book Volume 879, Page 143.

ALSO, EXCEPTING AND RESERVING thereout and therefrom a parcel of land conveyed to Jack L. Danielson and Henrietta Danielson, his wife, by deed from Golfview Manor Nursing Home, Inc., dated June 30, 1969 and recorded in Deed Book Volume 951, Page 948.

ALSO, EXCEPTING AND RESERVING thereout and therefrom a parcel of land conveyed to Jack L. Danielson and Henrietta Danielson, his wife, by deed from Golfview Manor Nursing Home, Inc., dated June 19, 1972 and recorded in Deed Book Volume 993, page 562.

BEING further described and in accordance with a survey by Bock & Clark, identified as Survey No. 13567, as follows:

BEGINNING at a point in the centerline of Golf Course Road, said point being the Northeasterly corner of lands herein described and the Northwesterly corner of lands now or formerly of Robert Warner; thence, along said lands of Warner, South 46° 20' 10" West, a distance of 200.03 feet to a point; thence, South 00° 47' 58" East, a distance of 73.12 feet to a point; thence, South 60° 32' 25" East, a distance of 44.00 feet to a point; thence, South 46° 20' 10" West, a distance of 355.84 feet to a point; thence, North 34° 28' 30" West, a distance of 410.85 feet to a point; thence, North 57° 25' 00" East, a distance of 469.33 feet to a point in the centerline of Golf Course Road; thence, along said centerline, South 60° 32' 25" East, a distance of 229.56 feet to the point of beginning.

BEING the same premises which Guardian Elder Care at Aliquippa, LLC, a Pennsylvania limited liability company, by Deed dated October 28, 2004, and recorded November 30, 2004, in Beaver County as Instrument No. 3226527, conveyed unto OHI Asset (PA) Trust, a Maryland Business Trust, in fee.

NOTE FOR INFORMATION: Being Parcel No. 65-006-0713.001, of the City of Aliquippa, County of Beaver.

**TRACT 3:**

PARCEL I:

ALL THAT CERTAIN lot or piece of ground situate in the Fourth Ward of the Borough of Punxsutawney, County of Jefferson and Commonwealth of Pennsylvania, bounded and described as follows:

BEGINNING at a point located along the Southern side of Mulberry Alley, said beginning point being the Northwestern corner of the parcel herein described; thence North 82°20' East along the Southern side of Mulberry Alley for a distance of 322.7 feet to a point at the corner of the intersection with Hawthorn Alley; thence South 1°12' East along the Western side of Hawthorn Alley (unimproved) for a distance of 322.0 feet to a point; thence North 77°31' West along land condemned by the United States of America for the Mahoning Creek Flood Control Project for a distance of 294.4 feet to a point; thence North 7°40' West along land now or formerly of J. Blair Blose et ux. for a distance of 78.6 feet; thence South 82°20' West, also along said land now or formerly of J. Blair Blose et ux. for a distance of 10 feet to a point; thence North °40' West also along said land now or formerly of J. Blair Blose for a distance of 140 feet to a point along the Southern side of Mulberry Alley, the place of beginning.

PARCEL II:

Beginning at the intersection of the South line of Mulberry Alley and the West line of lot now or formerly of J. Blair Blose and Lillie P. Blose (formerly Charles Kopp), this being the Northeast corner hereof; thence South 7°40' East along line of said lot now or formerly of J. Blair Blose and Lillie P. Blose, a distance of 140 feet to a point; thence North 82°20' East along lands now or formerly of J. Blair Blose and Lillie P. Blose, a distance of 10 feet to a point; thence South 7°40' East along other lands now or formerly of J. Blair Blose and Lillie P. Blose a distance of 134.5 feet to a point on Mahoning Creek; thence North 83°16' West a distance of 61.6 feet, more or less, to a point at lands now or formerly of heirs of Bernard Schneider; thence North 7°40' West along lands now or formerly of heirs of Bernard Schneider a distance of 261.5 feet to a point on the South line of Mulberry Alley; thence North 82°20' East along the South line of Mulberry Alley, distance of 50 feet to the place of beginning.

EXCEPTING THEREOUT AND THEREFROM all that certain lot or piece of ground acquired by the United States of America in connection with the Punzsutawney Flood Control Project by condemnation proceedings evidenced of record by Declaration of Taking recorded in Deed Book Volume 276, page 365.

PARCEL III:

Beginning at a point at the intersection of the East line of an unnamed 16 foot alley and the North line of a 20 foot alley known as Mulberry Alley, said point of beginning being the Southwest corner hereof; thence North 0°15' East along the East line of said 16 foot alley a distance of 26 feet to a point; thence North 82°20' East through land of which this parcel has heretofore been a part a distance of 50 feet, more or less, to a point at lot of land now or formerly of James E. Mitchell; thence South 3°34' East along said lot of land now or formerly of Mitchell a distance of 26 feet, more or less to the North line of the aforesaid Mulberry Alley; thence South 82°20' West along the North line of said Mulberry Alley a distance of 50 feet to the place of beginning.

PARCEL IV:

First Described:
Beginning at a steel pin in the Southern line of West Mahoning Street and the Western line of an unnamed alley; thence along the Western line of said unnamed alley South 151.34 feet to a steel pin in the Northern

line of Mulberry Alley; thence along the Northern line of Mulberry Alley South 82°20' West 42 feet to a steel pin at line of land of Blose; thence along the line of land of Blose the three following courses and distances: North 0°2' West 97.85 feet to a steel pin; North 82°20' East 4.70 feet to a steel pin; North 7°40' West 53 feet to a steel pin in the Southern line of West Mahoning Street; thence alongthe Southern line of West Mahoning Street North 82°20' East 44.5 feet to a steel pin, the place of beginning.

Second Described:

ALL THOSE CERTAIN lots or pieces of ground situate in the Fourth Ward of the Borough of Punxsutawney, County of Jefferson and Commonwealth of Pennsylvania, bounded and described as follows:

First Piece: Beginning at a post on West Mahoning Street corner of land formerly of G. R. Bell, now or formerly J. Blose et ux.; thence along East line of land now or formerly of said J. Blose et ux. 150 feet to a public alley; thence East along line of said alley 35 feet to corner of lot formerly of J. A. Minish, now or formerly Blose-McGregor Health Care Center, Inc.; thence North along line now or formerly of said Blose-McGregor Health Care Center, Inc. 150 feet to a post; thence West along line of West Mahoning Street 40 feet to place of beginning.

Second Piece: Bounded on the North by West Mahoning Street; on the East by lot now or formerly of M. Pistorius; on the South by Mulberry Alley (formerly Cranberry Alley); and on the West by lot now or formerly of L. Carlton, fronting 50 feet on West Mahoning Street and extending 150 feet, more or less, to Cranberry Alley.

PARCEL V:

ALL THAT CERTAIN lot or piece of ground situate in the Fourth Ward of the Borough of Punxsutawney, County of Jefferson and Commonwealth of Pennsylvania, bounded and described as follows:

BEGINNING at a steel pin in the Southern line of Mulberry Alley, said pin being the Northwestern corner of lot now or formerly of Francis DiCello; thence South 83° 3' West along the Southern line of Mulberry alley a distance of 60 feet to a steel pin; thence South 6° 57' East through lands of which this was a part a distance of 204.75 feet to a steel axle at line of land now or formerly occupied by the Borough of Punzsutawney for flood control purposes under a permanent easement; thence South 81°48' East along said land now or formerly of Punxsutawney Borough a distance of 62.16 feet to an axle, the Southwestern corner of land now or formerly of Francis DiCello; thence North 6° 57' West along the Western line of said land now or formerly of DiCello a distance of 221.0 feet to the steel pin in Mulberry Alley, the place of beginning.

PARCEL VI:

ALL THOSE CERTAIN lots or pieces of ground situate in the Borough of Punxsutawney, County of Jefferson and Commonwealth of Pennsylvania, bounded and described as follows:

First Piece: Beginning at a post on South side of West Mahoning Street at the Northeast corner of lot now or formerly belonging to M.C. Neale; thence North 82° 20' East along said West Mahoning Street 45 feet to a post on line of lands now or formerly of J. E. Mitchell; thence South 7° 30' East along last named lot 150 feet to a post at alley; thence South 82° 20' West along said alley 45 feet to a post at line now or formerly of M.C. Neale; thence North 7°40' West along last named lot 150 feet to place of beginning.

Second Piece: Beginning at a post on West Mahoning Street at corner of lot now or formerly belonging to Laura J. Robinson, thence North 82° 20' East along said Mahoning Street 50 feet to a post at line of First Piece; thence along said lot South 7° 40' East 150 feet to a post at an alley; thence along said alley South 82° 20' West 50 feet to a post at line now or formerly of Robinson; thence North 7° 40' West along said line 150 feet to the place of beginning.

Being the same premises which Guardian LTC Management, Inc., a Pennsylvania Corporation and the successor by merger to Guardian Elder Care, Inc. and Mulberry Square Elder Care and Rehabilitation Center, LLC, a Pennsylvania Limited Liability Company (Vendee) by Deed dated October 28, 2004, and effective November 1, 2004 and recorded November 30, 2004 in Jefferson County in Deed Book 319 Page 173 conveyed unto OHI Asset (PA) Trust, a Maryland Business Trust, in fee.

Corporate Charter Approval converting OHI Asset (PA) Trust to OHI Asset (PA) LP was recorded on March 4, 2015 in Instrument No. 1000362007652326.
Parcel VII:

ALL that certain piece, parcel and lot of land situate, lying and being in the Fourth Ward of the Borough of Punxsutawney, County of Jefferson, Commonwealth of Pennsylvania, bounded and described as follows, to-wit:

BEGINNING at the Northwest corner of said lot; thence North 82° 20' East along West Mahoning Street 40 feet to a post; thence South 3° 34' East along land now or formerly of James E. Mitchell, deceased, 150 1/3 feet to a post on alley; thence South 82° 20' West along said alley 50 feet to a post on another alley; thence North 0° 15' East along last mentioned alley 151 1/3 feet to Mahoning Street, the place of beginning, containing 6,750 square feet.

EXCEPTING therefrom a lot containing 1300 square feet, more or less, conveyed to Blose [McGregor] Medicare [Center], Inc., said conveyance being described in a deed recorded in Deed Book Volume 371, Page 416.

Being part of the same premises which the Estate of George S. Mooney, deceased, by Eleanor Leax Snyder, Clerk of the Orphans' Court of Jefferson County by Certificate of Award or Allotment of Real Estate dated February 1, 1966 and recorded February 1, 1966 in Jefferson County in Deed Book Volume 377 Page 578 conveyed unto Raymond E. Mooney, an undivided 1/4 interest, Almeada Haag, an undivided 1/4 interest and Sara Jane Mooney, an undivided 1/2 interest, in fee.

Being part of the same premises which Raymond E. Mooney, single by Deed dated March 29, 1966 and recorded May 4, 1966 in Jefferson County in Deed Book Volume 378 Page 491 conveyed unto Almeada Haag and Sara Jane Mooney, in fee. And the said Sara Jane Mooney died on September 22, 2004 leaving a Will probated and registered at Jefferson County as Will No. No. 3304-0284, wherein she appointed Almeada Mooney Haag as Executrix.

Being the same premises which Almeada Haag a/k/a Almeada Mooney Haag, a widow, individually, and as Executrix of the Estate of Sara Jane Mooney, deceased by Deed dated March 9, 2006 and recorded March 14, 2006 in Jefferson County in Deed Book Volume 378 Page 368 conveyed unto OHI Asset (PA) Trust, a Maryland Business Trust, in fee.

NOTE FOR INFORMATION: Being Parcel No. 24-002-0411, 24-002-0428, 24-002-0427, 24-002-0408A, 24-002-0425A,
24-002-0426, 24-002-0408B, 24-002-0422 and 24-002-0425, of the Borough of Punxsutawney, County of Jefferson.

**Tract 4:**

ALL THAT CERTAIN lot or piece of ground situate in the Borough of Curwensville, County of Clearfield and Commonwealth of Pennsylvania, more particularly bounded and described as follows:

BEGINNING at an iron pin on the Northeastern corner of Fourth Avenue (unopened) and McNaul Street (unopened); thence along the Eastern line of McNaul Street North 14° 57' East 413.11 feet to an iron pin at line of lands now or formerly of F. Lippert; thence along line of said lands and continuing along line of lands now or formerly of M. Hauck, South 65° 30' East, 681.44 feet to an iron pin on the Western line of Summit Street; thence along the Western line of Summit Street, South 14° 57' West 300.05 feet to an iron pin at the Northwestern corner of Fourth Avenue and Summit Street; thence along the Northern line of Fourth Avenue, North 75° 03' West 672 feet to an iron pin at the place of beginning.

Being the same premises which Curwensville Nursing Home, Inc., a Pennsylvania corporation by Deed dated October 28, 2004 and recorded November 30, 2004 in Clearfield County as Instrument No. 200419331 conveyed unto OHI Asset (PA) Trust, a Maryland business trust, in fee.

NOTE FOR INFORMATION: Being Parcel No. H09-691-00014, of the City of Curwensville, County of Clearfield.

**Tract 5:**

ALL THOSE CERTAIN lots or parcels of ground, situate in the Borough of Smethport, County of McKean and Commonwealth of Pennsylvania, bounded and described as follows:

FIRST:
BEGINNING at a post in the center of Marvin Creek Street, later Mill Street, and now West Willow Street, standing South 79° West, 30.3 perches form the Northeast corner of Mill house lot, it being the Northeast corner of Lot No. 14 by Ghordis Corwin to Emily Gleason; thence South 12.75 perches to a post, the Southeast corner of Lot No. 14; thence East 12 perches to a post corner; thence North 15.05 perches to a post in the center of Marvin Creek Street; thence by Marvin Creek Street 12.2 perches to the place of beginning.

EXCEPTING AND RESERVING thereout and therefrom all that certain lot or piece of ground bounded and described as follows;

BEGINNING in the center line of Mill Street at the Northwest corner of lands now or formerly of owned by C. Herzog; thence South along said Herzog's West line, 15.05 perches to Center Street; thence West along said Center Street 4 perches to a post; thence North on a line parallel with said Herzog's West line to the center of said Mill Street; thence North 79° East, along the center of said Mill Street 4 perches, more or less to the place of beginning.

SECOND:
BEGINNING at a one inch iron pipe set in the North bounds of Center Street, being the Southwest corner of a parcel or land deeded to David L. Petruzzi by Shirley Petruzzi, recorded in Deed Book Volume 499, Page 263 (erroneously stated as Page 163 in prior deed); thence by the North bounds of Center Street North, 89° 30' 55" West, 66.00 feet to a one inch pipe set marking the Southwest corner of the above described parcel; thence North 00° 11' 05" East, 94.21 feet to a one inch iron pipe set; thence South 89° 45' 00" East, and passing through the most Northerly edge of a large rock, distance of 66.11 feet to a one inch iron pipe set in the East line of the above mentioned David Petruzzi parcel; thence along said East line, South 00° 15' 00" West, 94.48 feet to the place of beginning.

THIRD:
BEGINNING at a post corner in the plot of Mechanicsburg on the South side of the Marvin Creek Road, being the Northwest corner of a lot deeded to Charles N. Cleveland on July 26,1855; thence West 12 perches along the line of said road to a post corner; thence South 10.7 perches to a post corner on Center Street; thence East along the line of said street, 11.8 perches to a post corner, being the Southwest corner of Lot No. 9 deeded to Charles N. Cleveland; thence North along line of Lot No. 9, 12.75 perches to the place of beginning.

AND

BEGINNING at the North line of Center Street at the Southwest corner of land conveyed to Emily A. Gleason by Ghordis Corwin and wife, being the foresaid described lot; running thence North by the West line of said first described Lot, 10.7 perches to the South line of Marvin Creek Street; thence Westerly by South line of Marvin Creek Street, 4.3 perches to the Northeast corner of the P. D. Hopkins lot; thence South by the East line of said P. D. Hopkins Lot, 9.9 perches to the North line of Center Street; thence East by said line 4.2 perches to the place of beginning.

EXCEPTING thereout and therefrom all that certain lot or piece of ground which was conveyed by R. C. Gleason to Herman E. Dunnijohn by deed dated April 11, 1902 and recorded in Deed Book Volume 118, Page 518, bounded and described as follows:

BEGINNING at a post in the South line of Mill Street at the Northeast corner of the lot S. S. Fry; thence South by said Fry's East line, 9.9 rods to the North line of Center Street; thence East by North line of Center Street, 2.95 rods to a post corner; thence North, 10.4 rods to a post in the South line of said Mill Street; thence Westerly by the South line of said Mill Street, 3 rods to the place of beginning.
This THIRD being more correctly described by survey made by R. M. Hulings R. E. in September 1970, as follows;

BEGINNING at the North boundary of Center Street at an iron pipe stake located, North 84° 23' West, 490 feet from the centerline of Mechanic Street, 25 feet at right angles from the centerline thereof; thence North 06° 05' East, 213.2 feet to an old iron pipe corner in the Southerly boundary of Willow Street; thence by the Southerly boundary of Willow Street, South 84° 57' West, 210.7 feet to an iron pipe stake; thence South 04° 56' West, 174.25 feet to an iron pipe stake in the Northerly boundary of Center Street; thence by the North boundary of Center Street, South 84° 23' East, 204 feet to the place of beginning.

BEING the same premises which Guardian LTC Management Inc., a Pennsylvania corporation s/b/m to Guardian Elder Care, Inc., and Lakeview Senior Care and Living Center, LLC, a Pennsylvania limited liability company, by Deed dated October 28, 2004, and recorded November 30, 2004, in McKean County in Record Book 478, Page 657, conveyed unto OHI Asset (PA) Trust, a Maryland Business Trust, in fee.

NOTE FOR INFORMATION: Being Parcel No. 15-005-607 and 15-005-605.01, of the City of Smethport, County of McKean.

**Tract 6:**

Parcel 1:

ALL THOSE CERTAIN lots or pieces of ground in the Township of East Huntingdon, County of Westmoreland and Commonwealth of Pennsylvania, being Lots Nos. 13, 14 and Part of Lot No. 15 in the North Scottdale Plan of Lots, Block 8, as recorded in the Office of the Recorder of Deeds of Westmoreland County, Pennsylvania, in Plan Book Volume 4, page 172, and being more particularly bounded and described as follows:

BEGINNING at a point located at the dividing line of Lots Nos. 13 and 12 in the North Scottdale Plan of Lots, Block 8, said point being located on the Westerly side of Overholt Street (also known as Overholt Road); thence from said point of beginning by the dividing line of Lots Nos. 12 and 13 in the aforesaid Plan, South 89° 02' West a distance of 120.00 feet to a point located on the Easterly side of a 20 foot alley; thence by the Easterly line of said 20 foot alley North 0° 58' West a distance of 110.00 feet; thence by line through Lot No. 15 in the aforesaid plan North 89° 02' East a distance of 40.00 feet to a point; thence continuing further by line through Lot No. 15 in the aforesaid plan North 67° 14' East a distance of 32.31 feet; thence continuing further by the same North 89° 02' East a distance of 50.00 feet to a point located on the Westerly
side of the aforesaid Overholt Street (also known as Overholt Road); thence by the Westerly line of the aforesaid Overholt Street (also known as Overholt Road) South 0° 58' East a distance of 122.00 feet to the point at the place of beginning.

Parcel 2:
ALL THOSE CERTAIN lots or pieces of ground in the Township of East Huntingdon, County of Westmoreland and Commonwealth of Pennsylvania, being Lots Nos. 18, 17, 16 and Part of 15 collectively referred to as Parcel B in the North Scottdale Plan of Lots, Block 8, as recorded in the Office of the Recorder of Deeds of Westmoreland County, Pennsylvania, in Plan Book Volume 4, page 172, and being more particularly bounded and described as follows:

BEGINNING at a point at the Northeasterly corner of Lot No. 18, said point being located on the Westerly side of a 60 foot street known and designated as Overholt Street; thence by said Westerly side of Overholt Street South 0° 58' East a distance of 173.09 feet to a point located in a 15 foot wide right of way which divides Parcel B and Parcel A in the referred to plan; thence by the centerline of the referred to right of way South 89° 02' West a distance of 50.00 feet to a point; thence continuing further by same South 67° 14' West a distance of 32.31 feet to a point; thence further by same South 89° 02' West, a distance of 40.00 feet to a point located on the Easterly side of a 20 foot alley; thence by the Easterly side of said 20 foot alley North 00° 58' West a distance of 177.38 feet to a point located on the Southern line of a 12 foot alley (unopened); thence by the Southerly side of the said unopened 12 foot alley North 85° 21' 30" East a distance of 120.25 feet to a point at the place of beginning.

Parcel 3:

ALL THAT CERTAIN lot or piece of ground in the Township of East Huntingdon, County of Westmoreland and Commonwealth of Pennsylvania, being Part of (Erroneously missing) Lot No. 19 and being described as Parcel C in the North Scottdale Plan of Lots, Block 8, as set forth in the Office of the Recorder of Deeds of Westmoreland County, Pennsylvania, in Plan Book Volume 4, page 172, and being more particularly bounded and described as follows:

BEGINNING at a point on the Southeasterly corner of L.R. 819 leading from Mount Pleasant to Scottdale and a 12 foot alley (unopened); thence along the Southerly line of the said 12 foot alley North 85° 21' 30" East a

distance of 43.70 feet to a point located on the Westerly line of a 20 foot alley (unopened); thence by the Westerly side of said 20 foot ally South 0° 58' East a distance of 320.00 feet to a point; thence by line through said Lot No. 19 in the aforesaid North Scottdale Plan of Lots North 77° 13' West a distance of 190.61 feet to a point located on the Easterly side of L.R. 819; thence by the Easterly side of L.R. 819 North 26° 32' East a distance of 306.52 feet to the point at the place of beginning.

Being the same premises which Guardian LTC Management, Inc., a Pennsylvania corporation and the successor by merger to Guardian Elder Care, Inc. and Scottdale Manor Rehabilitation Center, LLC, a Pennsylvania limited liability company ("Vendee") by Deed dated October 28, 2004 and recorded November 30, 2004 in Westmoreland County as Instrument No. 200411300069837 conveyed unto OHI Asset (PA) Trust, a Maryland business Trust, in fee.

NOTE FOR INFORMATION: Being Parcel No. 47-13-12-0-015, 47-13-12-0-014 and 47-13-12-0-013, of the City of Scottdale, County of Westmoreland.