# EXHIBIT 6

# LOAN AGREEMENT

THIS LOAN AGREEMENT (this "*Agreement*") is made as of June 27, 2022 by and among **JEFFERSON HILLS ACQUISITION LLC** ("*Jefferson Owner*"), **BEAVER HEALTHCARE REAL ESTATE, LLC** ("*Beaver Owner*"), **MULBERRY HEALTHCARE REAL ESTATE, LLC** ("*Mulberry Owner*"), **RIDGEVIEW HEALTHCARE REAL ESTATE, LLC** ("*Ridgeview Owner*"), **LAKEVIEW HEALTHCARE REAL ESTATE, LLC** ("*Lakeview Owner*"), and **SCOTTDALE HEALTHCARE REAL ESTATE, LLC**, each a Delaware limited liability company ("*Scottdale Owner*", and together with Jefferson Owner, Beaver Owner, Mulberry Owner, Ridgeview Owner and Lakeview Owner, individually and collectively, the "*Owner*"), **JEFFERSON HILLS OPERATING LLC** ("*Jefferson Operator*"), **BEAVER HEALTHCARE OPERATING, LLC** ("*Beaver Operator*"), **MULBERRY HEALTHCARE OPERATING, LLC** ("*Mulberry Operator*"), **RIDGEVIEW HEALTHCARE OPERATING, LLC** ("*Ridgeview Operator*"), **LAKEVIEW HEALTHCARE OPERATING LLC** ("*Lakeview Operator*"), and **SCOTTDALE HEALTHCARE OPERATING, LLC**, each a Delaware limited liability company ("*Scottdale Operator*", and together with Jefferson Operator, Beaver Operator, Mulberry Operator, Ridgeview Operator and Lakeview Operator, individually and collectively, the "*Operator*," and, collectively with Owner, the "*Borrower*")), and **BRAVO BRIDGE FUND LLC,** a Delaware limited liability company (together with its successors and assigns, "*Lender*").

RECITALS:

Borrower has requested that Lender make a loan to Borrower in the principal sum of up to $30,591,000.00 (the "*Loan*"), and Lender has agreed to make such Loan on the terms and conditions hereinafter set forth.

AGREEMENT:

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, it is hereby agreed as follows:

## ARTICLE I
## CERTAIN DEFINITIONS AND INTERPRETATION OF TERMS

**1.1    Definitions**. As used in this Agreement, the following terms shall have the following meanings unless the context hereof shall otherwise indicate:

(a)    "*Accounts*" has the meaning ascribed to it in the Mortgage.

(b)    "*Actual Management Fees*" means actual management fees paid or incurred in connection with operation of the Project.

(c)    "*Affiliate*" means, with respect to any Person, (i) each Person that controls, is controlled by or is under common control with such Person, (ii) each Person that, directly or indirectly, owns any part of or controls, whether beneficially or as a trustee, guardian or other fiduciary, any of the ownership interest of such Person, and (iii) each of such Person's officers, directors, members, managers, trustees, joint venturers and partners. For purposes of this definition, the term "controls," "is controlled by", or "is under common control with" includes the possession, direct or indirect, of the power to direct or cause the direction of the management policies of a Person or entity, whether through the ownership of voting securities, by contract or otherwise.

1

(d)     "***Allocated Loan Amount***" means an amount equal to 125% of (i) the loan proceeds allocated to any Released Project in a Permanent Financing secured by such Released Project, or (ii) if such Released Project is not being financed by a Permanent Financing, the fair market value of the Released Project, as determined by an MAI appraisal engaged by Lender and paid for by Borrower.

(e)     "***AR Documents***" has the meaning set forth in <u>Section 3.20</u>.

(f)     "***AR Lender***" has the meaning set forth in <u>Section 3.20</u>.

(g)     "***AR Loan***" has the meaning set forth in <u>Section 3.20</u>.

(h)     "***Assignment of Leases and Rents***" means that certain Assignment of Leases and Rents dated of even date herewith by Borrower for the benefit of Lender.

(i)     "***Assumed Management Fees***" means assumed management fees of five percent (5%) of net patient revenues of the Project (after contractual adjustments by Medicaid, Medicare or any Third-Party Payors' Programs).

(j)     "***Bank Secrecy Act***" means the Currency and Foreign Transactions Reporting Act of 1970, as amended.

(k)     "***Borrower Parties***" has the meaning set forth in <u>Section 4.23</u>.

(l)     "***CARES Act***" means the Coronavirus Aid, Relief, and Economic Security Act of 2020 (P.L. 116-136) and any amendments and extensions thereto.

(m)     "***Closing Date***" means the date of this Agreement.

(n)     "***CNH Term Loan***" has the meaning set forth in <u>Section 3.20</u>.

(o)     "***CNH Term Loan Documents***" has the meaning set forth in <u>Section 3.20</u>.

(p)     "***Code***" means the Internal Revenue Code of 1986, as amended.

(q)     "***COVID-19***" shall mean SARS-CoV-2 (severe acute respiratory syndrome coronavirus 2), coronavirus disease 2019 or COVID-19, or any mutation thereof.

(r)     "***Debt Service Coverage Ratio***" means a ratio in which the <u>first number</u> is the sum of "net pre-tax income" of Borrower from usual operations of the Project as set forth in the financial statements provided to Lender (without deduction for Actual Management Fees), calculated based upon the preceding twelve (12) months, <u>plus</u> Loan interest expense or Project lease expense to the extent deducted in determining net income and non-cash expenses or allowances for depreciation and amortization of the Project for such period, <u>less</u> (i) the greater of Assumed Management Fees or Actual Management Fees and (ii) an annual $375.00 per bed capital expenditure deduction for such period; and the <u>second number</u> is the <u>sum</u> of the principal amounts due (even if not paid) on the Loan (but which shall not include that portion associated with any balloon payment of the Loan) for the applicable period assuming a thirty (30) year amortization, calculated by Lender, <u>plus</u> the interest due on the Loan for the applicable period. In calculating "net pre-tax income," the following shall be excluded: Unusual or Infrequently Occurring Items, including CARES Act or COVID-19 related stimulus funds received by

2

Borrower. A one-time addback for COVID-19 related hero pay expenses shall be permitted. All other COVID-19 related expenses will be included in the calculation of "net pre-tax income" but will not be annualized. All calculations of income and expenses and other items of Borrower pursuant to this Section shall be made on a consolidated basis.

(s)      "***Debt Service Reserve***" has the meaning set forth in <u>Section 2.3</u>.

(t)      "***Default***" or "***default***" means the occurrence or existence of any event that, but for the giving of notice or expiration of time, or both, would constitute an Event of Default.

(u)      "***Default Rate***" has the meaning ascribed to it in the Note.

(v)      "***Equipment***" has the meaning ascribed to it in the Mortgage.

(w)      "***ERISA***" has the meaning set forth in <u>Section 3.16</u>.

(x)      "***Event of Default***" has the meaning set forth in <u>Section 6.1</u>.

(y)      "***Exit Fee***" means a fee due to Lender at repayment of the Loan (whether at or prior to the Maturity Date), unless waived by Lender pursuant to <u>Section 2.4</u>, equal to three percent (3.0%) of the Loan.

(z)      "***Federal Anti-Kickback Laws***" means Section 1128B(b) of the Social Security Act, 42 U.S.C. Section 1320a-7b(b).

(aa)      "***Fixed Charge Coverage Ratio***" means, for a specified period, the ratio of (i) net pre-tax income of Borrower from usual operations of the Project as set forth in the financial statements provided to Lender (without deduction for Actual Management Fees) calculated based upon the preceding twelve (12) months, <u>plus</u> Loan interest expense or Project lease expense to the extent deducted in determining net income and non-cash expenses or allowances for depreciation and amortization of the Project for such period, <u>less</u> (i) the greater of Assumed Management Fees or Actual Management Fees and (ii) an annual $375.00 per bed capital expenditure deduction for such period; to (ii) Fixed Charges.

(bb)      "***Fixed Charges***" means for a specified period, the sum of the following: (i) all payments of principal and interest made on Indebtedness, plus (ii) all scheduled payments of principal and interest payable in connection with this Loan, plus (iii) income tax paid by Borrower, plus (iv) dividends and distributions paid by Borrower, plus (v) the annual amount required under the Replacement Reserve Agreement, plus (vi) property tax paid by Borrower, plus (vii) insurance premiums paid by Borrower.

(cc)      "***GAAP***" means, as in effect from time to time, generally accepted accounting principles consistently applied as promulgated by the American Institute of Certified Public Accountants.

(dd)      "***Governmental Authority***" and "***Governmental Authorities***" mean, individually and collectively, all federal, state, municipal or other governmental bodies, courts, departments, commissions, boards, bureaus, agencies, instrumentalities, or arbitrators or any authority administering Third-Party Payors' Programs.

(ee)  "*Guarantors*" means, collectively, **SIMCHA HYMAN**, **YESHAYAHU ZIDELE** and **MORDECHAI ZIDELE**, each an individual, and **GUARDIAN ACQUISITION, LLC** and **BONAMOUR HEALTH GROUP, LLC**, each a Delaware limited liability company.

(ff)  "*HUD*" has the meaning set forth in <u>Section 4.25</u>.

(gg)  "*Impositions*" has the meaning ascribed to it in the Mortgage.

(hh)  "*Improvements*" has the meaning ascribed to it in the Mortgage.

(ii)  "*Indebtedness*" means the principal of, interest on, and all other amounts due at any time under, the Note, the Mortgage or any other Loan Document, including prepayment premiums, late charges, default interest, and advances to protect the security of the Mortgage.

(jj)  "*Indemnified Parties*" means Lender and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any trustee of any deed of trust or other security instrument, any Person in whose name the encumbrance created by the Mortgage is or will have been recorded, any Person who may hold or acquire or will have held a full or partial interest in the Loan (including, without limitation, any Investor or owner of any loan or securities backed or secured in whole or in part by the Loan) and any Servicer as well as the respective directors, officers, shareholder, partners, members, managers, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, without limitation, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Mortgaged Property, whether during the term of the Mortgage or as a part of or following a foreclosure of the Loan and including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

(kk)  "*Interim Management Agreement*" means, individually and collectively, those certain Interim Management and Sublease Agreements dated as of even date herewith by and among the former operators of the Jefferson Project, Mulberry Project, Ridgeview Project and Lakeview Project, and Jefferson Operator, Mulberry Operator, Ridgeview Operator and Lakeview Operator, respectively.

(ll)  "*Inventory*" has the meaning ascribed to it in the Mortgage.

(mm)  "*Investor*" has the meaning set forth in <u>Section 7.2</u>.

(nn)  "*Land*" has the meaning ascribed to it in the Mortgage.

(oo)  "*Lease Agreement*" means, individually and collectively, those certain Lease Agreements by and between each Owner and each Operator dated as of even date herewith.

(pp)  "*Leases*" has the meaning ascribed to it in the Mortgage.

(qq)  "*Lien*" means any voluntary or involuntary mortgage, security deed, deed of trust, lien, pledge, assignment, security interest, title retention agreement, financing lease, levy, execution, seizure, judgment, attachment, garnishment, charge, lien or other encumbrance of any kind, including those contemplated by or permitted in this Agreement and the other Loan Documents.

4869-0579-4078.12

(rr)    "***Loan Documents***" means, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases and Rents, any escrow agreements, certificates, guaranty or indemnity and all the other documents, instruments, perfection certificates and agreements executed by Borrower, Guarantors or their Affiliates in connection with the Loan or to otherwise evidence or secure the Loan, and all renewals, supplements and amendments thereto.

(ss)    "***Loan Obligations***" means the Indebtedness and all covenants, agreements and other obligations from time to time owing to, or for the benefit of, Lender pursuant to any of the Loan Documents.

(tt)    "***Managed Care Plans***" means any health maintenance organization, preferred provider organization, individual practice association, competitive medical plan, or similar arrangement, entity, organization, or Person.

(uu)    "***Marketable Securities***" means stocks, bonds and mutual fund shares that can be readily sold for cash on stock exchanges or over-the-counter markets.

(vv)    "***Maturity Date***" shall have the meaning ascribed to it in the Note.

(ww)    "***Medicaid***" means that certain program of medical assistance, funded jointly by the federal government and the states, for impoverished individuals who are aged, blind and/or disabled, and/or members of families with dependent children, which program is more fully described in Title XIX of the Social Security Act (42 U.S.C. §§ 1396 *et seq*.) and the regulations promulgated thereunder, or any successor program.

(xx)    "***Medicare***" means that certain federal program providing health insurance for eligible elderly and other individuals, under which physicians, hospitals, skilled nursing homes, home health care and other providers are paid for certain covered services they provide to the beneficiaries of such program, which program is more fully described in Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 *et seq*.) and the regulations promulgated thereunder, or any successor program.

(yy)    "***Mortgage***" means that certain Mortgage and Security Agreement of even date herewith from Borrower in favor of or for the benefit of Lender.

(zz)    "***Mortgaged Property***" has the meaning ascribed to it in the Mortgage.

(aaa)    "***Note***" means the Promissory Note of even date herewith payable by Borrower in favor of or for the benefit of Lender evidencing the Indebtedness, including all schedules, riders, allonges, addenda or amendments together with any renewals, replacements or extensions thereof.

(bbb)    "***Other Indebtedness***" means any of the following that are <u>not</u> Loan Obligations:

(i)    obligations for borrowed money;

(ii)    obligations, payment for which is being deferred by more than ninety (90) days, representing the deferred purchase price of property other than accounts payable arising in connection with the purchase of inventory customary in the trade and in the ordinary course of Borrower's business;

4869-0579-4078.12

(iii)     obligations, whether or not assumed, secured by Liens or payable out of the proceeds or production from the Accounts and/or property now or hereafter owned or acquired; and

(iv)     the amount of any other obligation (including obligations under financing leases) that would be shown as a liability on a balance sheet prepared in accordance with GAAP.

(ccc)     "*Participation*" has the meaning set forth in Section 7.1.

(ddd)     "*Permanent Financing*" has the meaning set forth in Section 4.25.

(eee)     "*Permits*" has the meaning ascribed to it in the Mortgage.

(fff)     "*Permitted Encumbrances*" has the meaning set forth in Section 5.2.

(ggg)     "*Person*" means any natural person, firm, trust, corporation, partnership, limited liability company, and any other form of legal entity.

(hhh)     "*Personal Liquidity*" means, for any Person, all of such Person's unencumbered cash accounts plus the value of such Person's unencumbered Marketable Securities, located in the United States.

(iii)     "*Project*" means, individually and collectively, (i) the 83-bed skilled nursing and continuing care retirement community facility known as "Jefferson Hills Healthcare and Rehabilitation Center," located at 448 Old Clairton Road, Clairton, Pennsylvania 15025 (the "*Jefferson Project*"), (ii) the 67-bed skilled nursing facility known as "Beaver Healthcare and Rehabilitation Center," located at 616 Golf Course Road, Aliquippa, Pennsylvania 15001 (the "*Beaver Project*"), (iii) the 75-bed skilled nursing and continuing care retirement community facility known as "Mulberry Healthcare and Rehabilitation Center," located at 411 West Mahoning Street, Punxsutawney, Pennsylvania 15767 (the "*Mulberry Project*"), (iv) the 131-bed skilled nursing and continuing care retiring community facility known as "Ridgeview Healthcare and Rehabilitation Center," located at 30 4ᵗʰ Avenue, Curwensville, Pennsylvania 16833 (the "*Ridgeview Project*"), (v) the 62-bed skilled nursing and personal care facility known as "Lakeview Healthcare and Rehab and Lakeview Senior Care," located at 15 West Willow Street, Smethport, Pennsylvania 16749 (the "*Lakeview Project*"), and (vi) the 35-bed skilled nursing facility known as "Scottdale Healthcare & Rehabilitation Center," located at 900 Porter Avenue, Scottdale, Pennsylvania 15683 (the "*Scottdale Project*"), each together with any other general or specialized care facilities, if any, now or hereafter operated on the Land.

(jjj)     "*Reimbursement Contracts*" has the meaning ascribed to it in the Mortgage.

(kkk)     "*Rents*" has the meaning ascribed to it in the Mortgage.

(lll)     "*Repair Reserve*" has the meaning set forth in Section 2.3(b) hereof.

(mmm) "*Repair Reserve Agreement*" has the meaning set forth in Section 2.3(b) hereof.

(nnn)     "*Replacement Reserve*" has the meaning set forth in Section 2.3(a) hereof.

4869-0579-4078.12

(ooo) "***Replacement Reserve Agreement***" has the meaning set forth in <u>Section 2.3(a)</u> hereof.

(ppp) "***Reserves***" means, collectively, the Debt Service Reserve, the Replacement Reserve, the Repair Reserve and the Tax and Insurance Escrow.

(qqq) "***Restricted Payment***" means (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any equity interest of any Borrower, (ii) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such equity interest, or on account of any return of capital to any Borrower's stockholders, partners or members (or the equivalent of any thereof), or any such equity interests, and (iii) any fees or compensation paid to any limited liability company manager of any Borrower in exchange for services rendered by such manager on behalf of a Borrower.

(rrr) "***Servicer***" has the meaning set forth in <u>Section 7.4</u>.

(sss) "***Servicing Agreement***" has the meaning set forth in <u>Section 7.4</u>.

(ttt) "***Servicing Requests***" has the meaning set forth in <u>Section 7.5</u>.

(uuu) "***Stock***" means all shares, options, warrants, general or limited partnership interests, membership interests, ownership interests, participations or other equivalents (regardless of how designated) in a corporation, limited liability company, partnership or other entity, whether voting or nonvoting, including, without limitation, common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended).

(vvv) "***Tangible Net Worth***" means the amount of a Person's assets less such Person's total liabilities, determined in accordance with GAAP, but excluding from assets (i) all assets relating to the Project, (ii) any amount in respect of goodwill and intangible assets (including, without limitation, goodwill, franchises, trademarks, copyrights, patents and service marks), (iii) debts owned to such Person by an Affiliate, and (iv) debts owed to such Person by an employee of an Affiliate.

(www) "***Tax***" or "***Taxes***" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, may become a lien, on the Land or the Improvements.

(xxx) "***Tax and Insurance Deposits***" shall have the meaning set forth in <u>Section 2.3(c)</u>.

(yyy) "***Tax and Insurance Escrow***" shall have the meaning set forth in <u>Section 2.3(c)</u>.

(zzz) "***Third-Party Payors' Programs***" has the meaning set forth in <u>Section 3.6</u>.

(aaaa) "***UCC***" has the meaning ascribed to it in the Mortgage.

(bbbb)  "***Unusual or Infrequently Occurring Items***" means material items of a character significantly different from the typical or customary business activities with respect to the Project that would not be expected to recur frequently and which would not be considered as recurring factors in any evaluation of the ordinary operating processes of the business of the Project, and which would be treated as unusual and/or infrequently occurring items under GAAP. For purposes of this Agreement, Unusual or Infrequently Occurring Items would include grants, payments, deferrals of costs and expenses, and other amounts received or deferred pursuant to the CARES Act or subsequent COVID-19 related legislation.

**1.2    Singular and Plural**.  Singular terms in this Agreement shall include the plural forms and vice versa, as applicable, of the terms defined.  The term "Borrower" shall include all Persons liable for all or any part of the Loan, jointly and severally.  Each representation, covenant, undertaking and other obligation of Borrower (herein, in the Note or in any Loan Document) shall apply to all such Persons individually and collectively.

**1.3    UCC Terms**.  Each term contained in this Agreement and defined in the UCC shall have the meaning given to such term in the UCC, unless the context otherwise indicates, and shall include, without limitation, the meaning set forth in this Agreement.

**1.4    Accounting Terms**.  All accounting terms used in this Agreement shall be construed in accordance with GAAP, except as otherwise specified.

**1.5    References**.  All references to other documents or instruments shall be deemed to refer to such documents or instruments as they may hereafter be extended, renewed, modified, or amended and all replacements and substitutions therefor, and all exhibits and schedules thereto.

## ARTICLE II
## GENERAL LOAN TERMS

**2.1    The Loan**.  Borrower agrees to borrow the Loan from Lender, and Lender agrees to make the Loan to Borrower, subject to Borrower's compliance with and observance of the terms, conditions, covenants, and provisions of this Agreement and the other Loan Documents, and Borrower makes the covenants, representations, and warranties herein and therein as a material inducement to Lender to make the Loan.

**2.2    Security for the Loan**. The Loan will be evidenced, secured and guaranteed by the Loan Documents.

**2.3    Escrows**.

(a)    <u>Replacement Reserve Escrow</u>.  Pursuant to a Replacement Reserve and Security Agreement of even date herewith by and between Lender and Borrower (the "***Replacement Reserve Agreement***"), Borrower shall establish and maintain a replacement reserve fund with Lender (the "***Replacement Reserve***").

(b)    <u>Repair Reserve Escrow</u>.  Pursuant to a Repair Reserve and Security Agreement (the "***Repair Reserve Agreement***") of even date herewith by and between Lender and Borrower, Borrower shall establish and maintain a reserve fund for repairs with Lender (the "***Repair Reserve***").

(c)    <u>Tax and Insurance Escrow</u>.

(i)     Concurrently with the execution and delivery of this Agreement, Borrower shall deposit with Lender the sum of $61,126.42, and on each date that a regularly scheduled payment of interest is due hereunder and under the Note, Borrower shall deposit the sum of $61,126.42 with Lender (which periodic deposit may be adjusted by Lender, upon written notice to Borrower, as reasonably necessary to account for increases in Taxes, other Impositions, charges and assessments and insurance premiums in respect of the Project and Borrower for the insurance coverage required hereunder over the term of this Agreement) (collectively, the "***Tax and Insurance Deposits***").  Lender shall deposit the Tax and Insurance Deposits, as received, into an account (the "***Tax and Insurance Escrow***") which meets the standards for custodial accounts as required by Lender from time to time.  Lender or a designated representative of Lender shall have the sole right to make withdrawals from such account.

(ii)     Amounts on deposit in the Tax and Insurance Escrow shall be disbursed by Lender to pay real estate taxes due and directly relating to the Project and to pay or reimburse Borrower for the payment of insurance premiums with respect to the Project.  Borrower shall notify Lender in writing of the amounts of such payments and dates on which such amounts would become delinquent or result in cancellation of any insurance policy.

(iii)     After payment in full of all Loan Obligations and release by Lender of the lien of the Mortgage, Lender shall disburse to Borrower all amounts remaining in the Tax and Insurance Escrow.

(d)     Debt Service Reserve.

(i)     Upon the closing of the Loan, Borrower shall deposit with Lender from the Loan proceeds the amount of Four Hundred Forty-Five Thousand Five Hundred and No/100 Dollars ($445,500.00) (the "***Debt Service Reserve***").  Borrower shall be entitled to request disbursements from the Debt Service Reserve for payment of interest due under the Loan Documents, provided that no Default or Event of Default exists.  Any such disbursements from the Debt Service Reserve for payment of interest due hereunder shall be funded directly to Lender for application toward such amounts.

(ii)     If not sooner terminated with Lender's written consent, the Debt Service Reserve shall be terminated, and Lender shall pay to Borrower all funds remaining in the Debt Service Reserve upon the earlier of (A) the payment in full of the Loan and all Indebtedness incurred in connection therewith or (B) the satisfaction of the following conditions, as determined by Lender in its sole discretion: (1) no Default or Event of Default exists; and (2) the Debt Service Coverage Ratio shall equal or exceed 1.45 to 1.00, calculated on a trailing twelve (12) months basis.

(iii)     If, prior to the release of the Debt Service Reserve contemplated in subsection (ii) above, the balance on deposit in the Debt Service Reserve falls below the amount determined by Lender to be necessary to cover three (3) months of debt service (a "***Reserve Deficit***"), then within fifteen (15) Business Days following receipt of written notice from Lender of the Reserve Deficit, Borrower shall, or shall cause Guarantor to, deposit with Lender funds sufficient to replenish the Debt Service Reserve and remedy the Reserve Deficit.

4869-0579-4078.12

(iv)     Notwithstanding anything in this Agreement to the contrary, Borrower shall not draw from the Debt Service Reserve prior to the termination of the Debt Service Reserve if Lender determines that Borrower is able to pay debt service hereunder in the ordinary course from the cash flow of the Project.

(e)     <u>Security Interest</u>.  Borrower hereby assigns, sells, transfers, pledges, sets over, and delivers to Lender and grants Lender a security interest in the Reserves, together with all instruments now or hereafter existing evidencing the Reserves or the accounts in which such funds are held as security for the Loan Obligations.  Borrower irrevocably authorizes Lender at any time to complete and file financing statements describing the Reserves and the nature of Lender's security interest, and containing such other information as Lender deems appropriate.  Borrower agrees to execute such other documents, make such other filings, and take such further actions as Lender may from time to time reasonably request to perfect Lender's security interests and rights in the Reserves.

(f)     <u>Payment Upon Default</u>.  Borrower hereby authorizes and empowers Lender, without further order, notice, or direction from or to Borrower upon the occurrence of any Event of Default to apply all or any part of the Reserves in full or partial payment of the Loan Obligations, whether or not then due, in such order, manner, and extent as Lender may elect.  Should Lender elect to withdraw any declaration of an Event of Default, then upon request of Lender, Borrower will, within fifteen (15) Business Days following such request, replenish any funds applied by Lender to the Loan Obligations from the Reserves.

**2.4     Loan Fees; Exit Fee**.  In consideration for making the Loan, Borrower shall pay Lender contemporaneously with closing the Loan an origination fee of one percent (1.0%) of the Loan amount.  Further, in consideration for making the Loan, upon the repayment of the Loan on or prior to the Maturity Date and as a condition to the release of the Mortgage and other Loan Documents, Borrower will pay the Exit Fee to Bravo Capital LLC ("***Bravo Capital***"); <u>provided, however,</u> Lender and Bravo Capital agree to waive the Exit Fee if (i) the Loan is repaid in full as a result of an FHA refinancing of the Loan by Bravo Capital or any successor thereto (it being acknowledged and agreed that Bravo Capital shall have the right to provide or not provide such FHA refinancing in its sole discretion), or (ii) the Project is otherwise eligible for an FHA refinancing, but Bravo Capital elects not to handle the FHA refinancing.  The Exit Fee and all other fees due to Lender shall be deemed to be fully earned and non-refundable on the date hereof.  Without limitation of the foregoing, Borrower shall provide all items and pay all amounts required by this Agreement and the other Loan Documents.  Bravo Bridge Fund LLC and Bravo Capital LLC are separate entities and Bravo Capital LLC is a third party beneficiary to this paragraph, entitled to all the rights and benefits hereof as if it were a direct party to the Agreement.

### ARTICLE III
### BORROWER'S REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make the Loan to Borrower, each Borrower represents and warrants to Lender as follows:

**3.1     Existence, Power and Qualification**.  Borrower is a duly organized and validly existing a limited liability company, duly qualified to do business and in good standing in the State of Delaware and registered to do business as a foreign limited liability company in the Commonwealth of Pennsylvania and also in every jurisdiction in which the transaction of its business makes its qualification necessary.  Borrower has the power to own the Project and the Mortgaged Property and to carry on its business as is now being conducted.

**3.2     Power and Authority**.   Borrower has full power and authority to borrow the indebtedness evidenced by the Note and to incur the Loan Obligations provided for herein, all of which have been authorized by all proper and necessary action.  All consents, approvals, authorizations, orders or filings of or with any court or governmental agency or body, if any, required for the execution, delivery and performance of the Loan Documents by Borrower and any Guarantor and the operation of their businesses as operated on the date hereof, been obtained or made.

**3.3     Pending Matters.**

(a)     Operations; Financial Condition.  There are no judgments, actions, proceedings or investigations outstanding, pending or threatened against or affecting or relating to Borrower or their Affiliates, or Guarantors relating to the Project, or the Project before any court, Governmental Authority, bureau or agency.  Borrower is not in violation of any agreement, the violation of which might reasonably be expected to have a material adverse effect on its business or assets.  Borrower is not in violation of any order, judgment, or decree of any court, or any statute or governmental regulation to which it is subject.

(b)     Land and Improvements.  There are no proceedings pending, or, to the best of Borrower's knowledge, threatened, to acquire through the exercise of any power of condemnation, eminent domain or similar proceeding any part of the Land, the Improvements or any interest therein, or to enjoin or similarly prevent or restrict the use of the Land or the operation of the Project in any manner.  None of the Improvements are subject to any unrepaired casualty or other damage.

**3.4     Accuracy of Financial Statements**.  All financial statements heretofore or hereafter provided by Borrower and Guarantors are and will be true and complete in all material respects as of their respective dates and fairly present the financial condition of Borrower and Guarantors, and there are no material liabilities, direct or indirect, fixed or contingent, as of the respective dates of such statements that are not reflected therein or in the notes thereto or in a written certificate delivered with such statements.  The annual and interim financial statements of Borrower heretofore provided by Borrower have been prepared in accordance with GAAP on an accrual basis method of accounting.  There has been no material adverse change in the financial condition, operations, or prospects of Borrower, Guarantors or the Project since the dates of such statements except as fully disclosed in writing with the delivery of such statements.  All financial statements of the operations of the Project heretofore or hereafter provided to Lender are and will be true and complete in all material respects as of their respective dates.

**3.5     Compliance with Laws.**

(a)     Laws, Rules and Regulations.  Borrower and the operation of the Project are in compliance in all material respects with all Permits and the applicable provisions of all laws, rules, regulations and published interpretations to which each of Borrower or the Project is subject, including, without limitation, the Americans with Disabilities Act and the regulations thereunder, and all laws, ordinances, rules and regulations relating to zoning, setback requirements and building codes.

(b)     Licensure.

(i)     The Jefferson Project is duly licensed as an 83-bed skilled nursing and continuing care retirement community facility under the applicable laws of the state where the Land is located and is currently operated as a skilled nursing and continuing care retirement community facility.

4869-0579-4078.12

(ii)     The Beaver Project is duly licensed as a 67-bed skilled nursing facility under the applicable laws of the state where the Land is located and is currently operated as a skilled nursing facility.

(iii)    The Mulberry Project is duly licensed as a 75-bed skilled nursing and continuing care retirement community facility under the applicable laws of the state where the Land is located and is currently operated as a skilled nursing and continuing care retirement community facility.

(iv)    The Ridgeview Project is duly licensed as a 131-bed skilled nursing and continuing care retirement community facility under the applicable laws of the state where the Land is located and is currently operated as a skilled nursing and continuing care retirement community facility.

(v)     The Lakeview Project is duly licensed as a 34-bed skilled nursing and 28-bed personal care facility under the applicable laws of the state where the Land is located and is currently operated as a skilled nursing and personal care facility.

(vi)    The Scottdale Project is duly licensed as a 35-bed skilled nursing facility under the applicable laws of the state where the Land is located and is currently operated as a skilled nursing facility.

(c)     <u>Permits</u>.  Borrower lawfully owns all of the Permits, and the Permits and the certificate of need for the Project, if applicable, (i) are in full force and effect, (ii) constitute all of the permits, licenses and certificates required for the use, operation and occupancy thereof as presently conducted, (iii) have not been pledged as collateral for any Other Indebtedness, (iv) are held free from any restriction or any encumbrance that would materially adversely affect the use or operation of the Project or Lender's security interest therein, and (v) are not provisional, probationary or restricted in any way.  In the event Lender acquires the Project through foreclosure or otherwise, neither Lender nor a subsequent manager, a subsequent lessee or any subsequent purchaser (through foreclosure or otherwise) must obtain a certificate of need prior to applying for and receiving a license to operate the Project and certification to receive Medicare and Medicaid payments (and its successor programs) for patients having coverage thereunder, provided that no additional service is added or bed complement is changed. No certificate of need is required for the operation of the Project.

(d)     <u>Bed Capacity</u>.  No waivers of any laws, rules, regulations, or requirements (including, but not limited to, minimum foot requirements per bed) are required for the Project to operate at the foregoing licensed bed capacity.  Borrower has neither permitted nor granted to any third party the right to reduce the number of licensed beds in the Project or to apply for approval to transfer the right to any or all of the licensed Project beds to any other location.

(e)     <u>Reimbursement Contracts</u>.  Subject to <u>Section 4.27</u>, all Reimbursement Contracts are in full force and effect with respect to the Project, and Borrower is in good standing with all the respective agencies governing such applicable Project licenses, program certification and Reimbursement Contracts.  Borrower is current in the payment of all so-called provider specific taxes, so-called bed taxes and/or other assessments with respect to Reimbursement Contracts.

(f)     <u>Medicare and Medicaid</u>.  If Borrower participates in the Medicare or Medicaid programs, subject to <u>Section 4.27</u>, (i) the Project is in compliance with all requirements for participation in Medicare and Medicaid (as applicable), including without limitation, the

4869-0579-4078.12

Medicare and Medicaid Patient Protection Act of 1987 and (ii) the Project is in conformance in all material respects with all insurance, reimbursement and cost reporting requirements and has current provider agreements that are in full force and effect under Medicare and Medicaid.

3.6     **Third Party Payors**.  There is no pending or, to Borrower's best knowledge, threatened revocation, suspension, termination, probation, restriction, limitation, or nonrenewal affecting Borrower or the Project or any participation or provider agreement with any third-party payor, including, without limitation, Medicare, Medicaid, Veteran's Administration, Blue Cross and/or Blue Shield, and any other private commercial insurance, Managed Care Plan and employee assistance program (such programs, the "*Third-Party Payors' Programs*") to which Borrower presently is subject in connection with the operation of the Project.  Any Medicare, Medicaid and private insurance cost reports and financial reports submitted by Borrower in connection with the operation of the Project are and will be materially accurate and complete and have not been and will not be misleading in any material respects.  No cost reports for the Project remain "open" or unsettled except as otherwise disclosed in writing to Lender.

3.7     **Governmental Proceedings and Notices**.  None of Borrower nor Guarantors (in connection with the operation of the Project) nor the Project is currently the subject of any proceeding by any governmental agency, and no notice of any violation has been received from any federal, state or local government or quasi-governmental body or agency or any administrative or investigative body that would, directly or indirectly, or with the passage of time:

(a)     have a material adverse impact on Borrower's ability to accept and/or retain residents or result in the imposition of a fine, a sanction, any lower rate certification or lower reimbursement rate for services rendered to eligible residents;

(b)     modify, limit or annul or result in the transfer, suspension, revocation or imposition of probationary use of any of the Permits; or

(c)     affect Borrower's participation in the Medicare or Medicaid programs or any other Third-Party Payors' Programs, or any successor programs thereto, at current rate certifications.

3.8     **Physical Plant Standards**.  The Project and the use thereof comply in all material respects with all, and no waivers with respect to the Project exist of any, applicable local, state and federal building codes, fire codes, health care, nursing/assisted living/senior housing facility (as applicable) and other similar regulatory rules.

3.9     **Pledge of Receivables**.  Borrower has not pledged its Accounts or any part thereof as collateral security for any Other Indebtedness; however, Lender agrees to permit Operator to obtain accounts receivable financing, subject to (i) Lender's approval of the accounts receivable loan documents and (ii) Lender's execution of an intercreditor agreement with the lender of the accounts receivable loan, all in a form satisfactory to Lender in its sole discretion.

3.10     **Payment of Taxes and Property Impositions**.  Borrower has filed or will file prior to delinquency all federal, state, and local tax returns that it is required to file and has paid or will pay prior to delinquency, and made adequate provision for the payment of, all Taxes and assessments that are shown pursuant to such returns or are required to be shown thereon, including, without limitation, provider Taxes that are due and owing as of the date hereof.  All such returns are and will be complete and accurate in all material respects.  Borrower has paid or made adequate provision for the payment of all applicable water and sewer charges, ground rents (if applicable) and Taxes with respect to the Land and/or the Improvements that are due and owing as of the date hereof.

**3.11    Title to Mortgaged Property**.  Owner has good and marketable title to all of the Mortgaged Property, subject to no Lien, mortgage, pledge, encroachment, zoning violation, or encumbrance, except Permitted Encumbrances that do not materially interfere with the security intended to be provided by the Mortgage or the current use or operation of the Land and the Improvements or the current ability of the Project to generate net operating income sufficient to service the Loan.  All Improvements situated on the Land are situated wholly within the boundaries of the Land.

**3.12    Priority of Mortgage**.  The Mortgage constitutes a valid first Lien against the real and personal property described therein, prior to all other Liens, including those that may hereafter accrue, excepting only Permitted Encumbrances that do not and will not materially and adversely affect (a) the ability of Borrower to pay in full the principal of and interest on the Note when due, (b) the security (and its value) intended to be provided by the Mortgage or (c) the current use of the Land and the Improvements.

**3.13    Location of Chief Executive Offices**.  Borrower's chief executive offices are located at 448 Old Clairton Road, Clairton, PA 15025, and Borrower has no other place(s) of business other than at the location of the Land.

**3.14    Disclosure**.  All information furnished or to be furnished by Borrower or Guarantors to Lender in connection with the Loan or any of the Loan Documents is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide Lender with true and accurate knowledge of the subject matter.

**3.15    Trade Names**.  None of Borrower nor (i) the Jefferson Project, which currently operates under the trade name "Jefferson Hills Healthcare and Rehabilitation Center," (ii) the Beaver Project, which currently operates under the trade name "Beaver Healthcare and Rehabilitation Center," (iii) the Mulberry Project, which currently operates under the trade name "Mulberry Healthcare and Rehabilitation Center," (iv) the Ridgeview Project, which currently operates under the trade name "Ridgeview Healthcare and Rehabilitation Center," (v) the Lakeview Project, which currently operates under the trade name "Lakeview Healthcare and Rehab and Lakeview Senior Care," nor (vi) the Scottdale Project, which currently operates under the trade name "Scottdale Healthcare & Rehabilitation Center," have changed its name, been known by any other name or been a party to a merger, reorganization or similar transaction within the last five (5) years.

**3.16    ERISA**.  As of the date hereof and throughout the term of this Agreement,

(a)    No Borrower is an "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**_ERISA_**"), subject to Title I of ERISA, and none of the assets of Borrower constitute "plan assets" (within the meaning of Department of Labor Regulation Section 2510.3-101) of one or more such plans, and

(b)    No Borrower is a "governmental plan" within the meaning of Section 3(32) of ERISA, and transactions by or with Borrower is not be subject to state statutes regulating investments of, and fiduciary obligations with respect to, governmental plans.

(c)    The execution and delivery of the Loan Documents and the borrowing of indebtedness hereunder do not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

**3.17    Ownership**.  As of the closing of the Loan, the ownership interests of Borrower and of each of the Persons owning an interest in Borrower is correctly and accurately set forth on Schedule 3.17.

All such ownership interests are validly issued, fully paid and non-assessable, and there exists no pledge, Lien, option or encumbrance with respect to any such ownership interest.

**3.18    Solvency**.  All entities comprising Borrower are each solvent for purposes of 11 U.S.C. § 548, and the borrowing of the Loan will not render any such entity insolvent for purposes of 11 U.S.C. § 548.

**3.19    Management Agreement; Leases**.  There exist no Leases (as defined in the Assignment of Leases and Rents) with respect to the Project other than the Lease Agreement (as defined herein), resident or patient occupancy agreements or leases in the ordinary course of business on Borrower's standard forms, or as set forth in Schedule 3.19 attached hereto.  A patient census showing payor source, certified to be true and correct as of the end of the month immediately prior to the date of this Agreement, is attached as Schedule 3.19 hereto.  There exist no management agreements, administrative services agreements, support services agreements, or similar consulting services agreements in effect at any Project.

**3.20    Other Indebtedness**.  Borrower has no outstanding Other Indebtedness, secured or unsecured, direct or contingent (including any guaranties), other than the indebtedness that represents trade payables or accrued expenses incurred in the ordinary course of business of owning and operating the Mortgaged Property that are not more than ninety (90) days outstanding, other than (i) certain accounts receivable financing (the "***AR Loan***") pursuant to certain loan documents (the "***AR Documents***") executed between Operator and CNH Finance Fund I, L.P., a Delaware limited partnership (the "***AR Lender***"), and (ii) a certain term loan in the amount of $1,300,000.00 (the "***CNH Term Loan***") pursuant to a Term Promissory Note and related documents between Operators and certain Affiliates and AR Lender (the "***CNH Term Loan Documents***").  Furthermore, no other obligations incurred by Borrower after the date hereof will be secured (senior, subordinate or *pari passu*) by any Mortgaged Property.

**3.21    Other Obligations**.  Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Mortgaged Property is otherwise bound, other than obligations incurred in the ordinary course of the operation of the Mortgaged Property and other than obligations under the Mortgage and the other Loan Documents.

**3.22    Fraudulent Conveyances**.  Borrower (a) has not entered into this Agreement or any of the other Loan Documents with the actual intent to hinder, delay, or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and mature.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**3.23    No Change in Facts or Circumstances**.  All information in any application for the Loan submitted to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan application or request for the Loan are complete and accurate in all

material respects.  There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate as of the date hereof.

**3.24    Fraud and Abuse**.

(a)    <u>Anti-Kickback Law</u>.  Neither Borrower nor its agents have offered or given any remuneration or thing of value to any Person to encourage referral to the Project in violation of the Federal Anti-Kickback Laws nor has Borrower or its agents solicited or received any remuneration or thing of value in exchange for Borrower's agreement to make referrals or to purchase goods or services for the Project in violation of the Federal Anti-Kickback Laws.

(b)    <u>Relationships</u>.  No physician or other healthcare practitioner has an ownership interest in, or financial relationship with, the Borrower or the Project or any arrangement whereby the skilled nursing facility compensates a physician for "designated health services".  Borrower is not and has not been in violation of the physician self-referral statute, codified at 42 U.S.C. §1395nn.

(c)    <u>Required Adjustments.</u>  In the event that the Project has participated in Medicare or Medicaid and cost reports were required in connection with such participation, all cost report periods for all Project payors have been closed and settled, and all required adjustments have been fully paid and/or implemented.

(d)    <u>Compliance Program.</u>  Borrower has established and implemented a compliance program meeting the elements set forth in Section 6102 of the Patient Protection and Affordable Care Act of 2010, as amended by the Healthcare Reconciliation Act 2010.

(e)    <u>Corporate Integrity Agreements</u>.  Borrower is not a party to any corporate integrity agreement or any similar agreement with the Office of Inspector General of the Department of Health and Human Services or any other governmental office or agency.

**3.25    Collective Bargaining Agreements; Strikes**.  Other than as set forth on <u>Schedule 3.25</u>, no collective bargaining agreements, union contracts or other labor or employment agreements exist or are being negotiated or threatened, and no strike, labor dispute, slowdown or work stoppage exists or is threatened with respect to the Project or the business of the Project.

**3.26    COVID-19 Procedures**.  Borrower has implemented infection control procedures at the Project in compliance with the recommendations of the Centers for Disease Control and other applicable Governmental Authorities for preventing and containing outbreaks of COVID-19.

**3.27    CARES Act Programs**.  <u>Schedule 3.27</u> contains a list of the governmental programs established pursuant to the CARES Act that Borrower or the Project participate in, along with a description of the monetary amount received, owed or deferred by Borrower in connection therewith.  Any amounts borrowed by Borrower pursuant to the Paycheck Protection Program established under Division A, Title I of the CARES Act have been forgiven in their entirety.  Borrower has not participated in the Medicare Accelerated or Advanced Payment Programs, nor has Borrower deferred payment of any taxes owed in connection with the Project.

**3.28    No Infected Residents**.  There are not more than 3 residents of the Project who have tested positive for COVID-19 within the prior fourteen (14) days or who continue to exhibit symptoms of COVID-19 following a positive test.

16

## ARTICLE IV
## AFFIRMATIVE COVENANTS OF BORROWER

Each Borrower agrees with and covenants unto Lender that it shall comply with and do the following until the Loan Obligations have been paid in full:

**4.1**    **Payment of Loan and Performance of Loan Obligations**.  Borrower shall duly and punctually pay or cause to be paid the principal and interest of the Note in accordance with its terms and duly and punctually pay and perform or cause to be paid or performed all Loan Obligations hereunder and under the other Loan Documents.

**4.2**    **Maintenance of Existence**.  Borrower shall maintain its existence as a Delaware limited liability company in good standing under the laws of the jurisdiction of its organization or formation, and, in each jurisdiction in which the character of the property owned by it or in which the transaction of its business makes qualification necessary, maintain good standing and qualification to do business.

**4.3**    **Taxes; Operating Expenses; Right to Contest**.

(a)    Subject to the provisions of <u>Section 4.3(c)</u> and <u>Section 4.3(d)</u>, Borrower shall make accurate provision for the payment in full of all current tax liabilities of all kinds including, without limitation, federal and state income taxes, franchise taxes, payroll taxes, provider taxes (to the extent necessary to participate in and receive maximum funding pursuant to Reimbursement Contracts), Taxes, all required withholding of income taxes of employees, all required old age and unemployment contributions, and all required payments to employee benefit plans, and pay the same prior to delinquency or the addition of any interest, fine, penalty or cost for nonpayment.

(b)    Borrower shall pay or cause to be paid the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)    As long as no default has occurred or is continuing, Borrower shall not be obligated to pay, or cause to be paid, Taxes, to the extent that sufficient Tax deposits are held by Lender specifically for the purpose of paying such Taxes.  If a default exists, Lender may exercise any rights Lender may have with respect to Tax deposits without regard to whether Taxes are then due and payable; <u>provided, however</u>, that if Lender elects not to pay the Taxes for which it has collected Tax deposits, Lender shall give Borrower written notice of such election ten (10) days prior to the date the Taxes are due and payable.

(d)    Borrower, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Taxes, if:

(i)    Borrower notifies Lender prior to commencement or expected commencement of such proceedings;

(ii)    The Mortgaged Property or any part thereof is not in danger of being sold or forfeited or subject to any Lien;

(iii)    Borrower deposits with Lender reserves sufficient to pay the contested Taxes, if requested by Lender; and

17

(iv)     Borrower furnishes whatever security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Taxes, as additional security which shall in no event exceed 125% of the contested Taxes.

(e)     If requested by Lender or upon receipt during any time that Taxes are required to be reserved under <u>Section 4.3(d)</u>, Borrower shall promptly deliver to Lender a copy of all notices of, and invoices for, Taxes, and if Borrower pays any Taxes directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

**4.4**     **Insurance**.

(a)     <u>Required Coverage</u>.  Borrower shall maintain, at its expense, the following insurance coverages and policies with respect to the Mortgaged Property and the Project, which coverages and policies must be acceptable to Lender in its sole discretion:

(i)     Comprehensive "all risk" insurance, including coverage for windstorms and hail, in an amount equal to the greater of (A) 100% of the full replacement cost of the Project, which replacement cost shall be determined by the "Insurable Value" or "Cost Approach to Value" reflected in the most recent Lender approved appraisal for the Project, without deduction for depreciation or (B) the amount of the Indebtedness.  Such insurance shall also include (i) agreed insurance amount endorsement waiving all co-insurance provisions, (ii) an "Ordinance or Law Coverage" endorsement if the Project or the use thereof shall constitute a legal non-conforming structure or use and (iii) a maximum deductible of $25,000.00.

(ii)     Commercial general liability insurance against claims for personal injury, bodily injury, death or property damage, in or about the Project to be on a so-called "occurrence" basis for at least $1,000,000 per occurrence and $3,000,000.00 in the aggregate per annum (or a higher amount if mandated by law).

(iii)     Professional liability insurance against claims for personal injury, bodily injury or death, in or about the Project to be on a so-called "occurrence" basis for at least $1,000,000 per occurrence and $3,000,000 in the aggregate (or a higher amount if mandated by law).

(iv)     Business interruption income insurance for the Project in an amount equal to 100% of the net income plus carrying costs and extraordinary expenses of the Project for a period of twelve (12) months as projected by Lender containing a ninety (90) day extended period of indemnity endorsement.

(v)     Flood Hazard insurance if any portion of the Improvements is located in a federally designated "special flood hazard area" and in which flood insurance is available.  In lieu thereof, Lender will accept proof, satisfactory to it in its sole discretion, that the Improvements are not within the boundaries of a designated area.  Prior to closing the Loan, Borrower must provide an executed flood certificate to Lender.

(vi)     Workers' compensation insurance, if applicable and required by state law, subject to applicable state statutory limits, and employer's liability insurance with a limit of $1,000,000.00 per accident and per disease per employee with respect to the Project.

4869-0579-4078.12

(vii)     Boiler and machinery breakdown insurance, including property damage coverage and time element coverage in an amount equal to 100% of the full replacement cost, without deduction for depreciation, of the Project housing the machinery, if steam boilers, pipes, turbines, engines or any other pressure vessels are in operation with respect to the Project.  Such insurance coverage shall include a "joint loss" clause if such coverage is provided by an insurance carrier other than that which provides the comprehensive "all risk" insurance described above.

(viii)     During the period of any construction and/or renovation of capital improvements with respect to the Project or any new construction at the Project, builder's risk insurance for any improvements under construction and/or renovation, including, without limitation, costs of demolition and increased cost of construction or renovation, in an amount equal the amount of the general contract plus the value of any existing purchase money financing for improvements and materials stored on or off the Land, including "soft cost" coverage.

(ix)     Such other insurance coverage as may be deemed necessary in the reasonable discretion of Lender.

(b)     _Renewals and Replacements_.  Borrower shall be required to provide Lender with original renewals or replacements of such insurance policies or certificates during the term of the Loan.

(c)     _Earthquake Insurance_.  If the Project is located in a seismically active area or an area prone to geologic instability and mine subsidence, Lender may require an inspection by a qualified structural or geological engineer satisfactory to Lender, and at Borrower's expense.  The Project must be structurally and geologically sound and capable of withstanding normal seismic activity or geological movement.  Lender reserves the right to require earthquake insurance or Maximum Probable Loss insurance on a case by case basis in amounts determined by Lender.

(d)     _Terms and Deductibles_.  All insurance policies shall have a term of not less than one (1) year and shall be in the form and amount and with deductibles as, from time to time, shall be acceptable to Lender it its sole discretion.

(e)     _Non-contributory Mortgagee Endorsements_.  All such policies shall provide for loss payable solely to Lender and shall contain a standard "non-contributory mortgagee" endorsement or its equivalent relating, among other things, to recovery by Lender notwithstanding the negligent or willful acts or omissions of a Borrower and notwithstanding (i) occupancy or use of the Project for purposes more hazardous than those permitted by the terms of such policy, (ii) any foreclosure or other action taken by Lender pursuant to the Mortgage upon the occurrence of an Event of Default thereunder, or (iii) any change in title or ownership of the Project.

(f)     _Rating of Insurance Carrier_.  All insurance policies must be written by a licensed insurance carrier in the state in which the Project is located, and such insurance carrier must have a long-term senior debt rating of at least "A" by Standard and Poor's Rating Service; provided, that if the initial principal balance of the Loan is in excess of $25,000,000.00, such insurance carrier must have a long-term senior debt rating of at least "AA" by Standard & Poor's Rating Service.

(g)  **Lender as Named Insured**.  All liability insurance policies must name BRAVO BRIDGE FUND LLC, a Delaware limited liability company, and its successors and/or assigns as their interests may appear, as additional insureds, and all property insurance policies must name BRAVO BRIDGE FUND LLC, a Delaware limited liability company, and its successors and/or assigns as their interests may appear as the named mortgage holder entitled to all insurance proceeds.  Lender shall have the right, without Borrower's consent, by notice to the insurance company, to change the additional insured and named mortgagee endorsements in connection with any sale of or securitization of the Loan.

(h)  **Notice of Cancellation or Modification**.  All insurance policies for the above required insurance must provide for thirty (30) days prior written notice of cancellation or material modification to Lender.

(i)  **Payment of Premium; No Separate Insurance**.  With respect to insurance policies that require payment of premiums annually, not less than thirty (30) days prior to the expiration dates of the insurance policies obtained pursuant to this Agreement, Borrower shall pay such amount, except to the extent Lender is escrowing sums therefor pursuant to the Loan Documents and such escrowed sums are sufficient to pay such annual premiums.  Not less than thirty (30) days prior to the expiration dates of the insurance policies obtained pursuant to this Agreement, originals or certified copies of renewals of such policies (or certificates evidencing such renewals) bearing notations evidencing the payment of premiums or accompanied by other evidence satisfactory to Lender of such payment, which premiums shall not be paid by Borrower through or by any financing arrangement, shall be delivered by Borrower to Lender at its address set forth in the Mortgage.  Borrower shall not carry separate insurance, concurrent in kind or form or contributing in the event of loss, with any insurance required under this Agreement or the other Loan Documents.  If the limits of any policy required hereunder are reduced or eliminated due to a covered loss, Borrower shall pay the additional premium, if any, in order to have the original limits of insurance reinstated, or Borrower shall purchase new insurance in the same type and amount that existed immediately prior to the loss.

(j)  **Procurement of Insurance by Lender**.  If Borrower fails to maintain and deliver to Lender the original policies or certificates of insurance required by this Agreement, Lender may, at its option, procure such insurance, and Borrower shall pay or, as the case may be, reimburse Lender for, all premiums thereon promptly, upon demand by Lender, with interest thereon at the Default Rate from the date paid by Lender to the date of repayment and such sum shall constitute a part of the Loan Obligations.

(k)  **Blanket or Umbrella Policies**.  The insurance required by this Agreement may, at the option of Borrower, be effected by blanket and/or umbrella policies issued to Borrower and to an Affiliate of Borrower covering the Project and the properties of such Affiliate; provided that, in each case, the policies otherwise comply with the provisions of this Agreement and allocate to the Project, from time to time, the coverage specified by this Agreement, without possibility of reduction or coinsurance by reason of, or damage to, any other property (real or personal) named therein.  If the insurance required by this Agreement shall be effected by any such blanket or umbrella policies, Borrower shall provide certificates of insurance evidencing such coverages, or at Lender's request, shall furnish to Lender original policies or certified copies thereof, with schedules attached thereto showing the amount of the insurance provided under such policies which is applicable to the Project.

(l)  **Limitation of Liability of Lender**.  Neither Lender nor its agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained

under this Agreement; it being understood that (i) Borrower shall look solely to its insurance company for the recovery of such loss or damage, (ii) such insurance company shall have no rights of subrogation against Lender, its agents or employees or Affiliates, and (iii) Borrower shall use its best efforts to procure from such insurance company a waiver of subrogation rights against Lender. If, however, such insurance policies do not provide for a waiver of subrogation rights against Lender (whether because such a waiver is unavailable or otherwise), then Borrower hereby agrees, to the extent permitted by law and to the extent not prohibited by such insurance policies, to waive its rights of recovery, if any, against Lender, its agents, employees and Affiliates, whether resulting from any damage to the Project, any liability claim in connection with the Project or otherwise. If any such insurance policy shall prohibit Borrower from waiving such claims, then Borrower must obtain from such insurance company a waiver of subrogation rights against Lender.

(m)     Appointment of Lender as Attorney-in-fact.     Borrower appoints Lender as Borrower's attorney-in-fact to cause the issuance of an endorsement of any insurance policy to bring Borrower into compliance herewith and, as limited above, at Lender's sole option, to make any claim for, receive payment for, and execute and endorse any documents, checks or other instruments in payment for loss, theft, or damage covered under any such insurance policy; provided, however, that in no event will Lender be liable for failure to collect any amounts payable under any insurance policy.

(n)     Assignment of Insurance Proceeds.     After damage to or destruction of the Mortgaged Property (or any part thereof), the net proceeds of insurance (after payment of Lender's reasonable costs and expenses in connection with the collection and administration thereof) shall be assigned to Lender with authorization to apply all or a portion thereof to the outstanding principal balance of the Loan or to release all or a portion thereof to Borrower, at Lender's option in its sole discretion. Notwithstanding the foregoing, in the event of a Minor Casualty (as defined below), Lender shall make the insurance proceeds (after payment of Lender's costs and expenses) available to Borrower, which proceeds shall be used by Borrower to pay for the repair, restoration and replacement of the damaged Mortgaged Property, provided (i) that no Event of Default or circumstance that with the passage of time is reasonably likely to become an Event of Default exists, (ii) Borrower promptly commences and diligently pursues restoration of the Mortgaged Property, and (iii) Borrower complies with all conditions that Lender may reasonably impose on the release of the insurance proceeds, in accordance with Lender's standard policies and procedures. "*Minor Casualty*" means the damage or destruction of a portion of the Mortgaged Property valued at no more than ten percent (10%) of the appraised value of the individual Project that has suffered damage or destruction, as evidenced by the MAI appraisals delivered to Lender in connection with the Loan.

**4.5     Reporting Requirements**.

(a)     Borrower shall provide Lender, or cause to be provided to Lender, the following financial statements and information on a continuing basis during the term of the Loan:

(i)     Annual Financial Statements of Borrower and Project.     Within ninety (90) days after the end of the fiscal year of Borrower, audited financial statements of Borrower and the Project, if different, prepared in accordance with GAAP consistently applied and certified by a nationally recognized accounting firm or independent certified public accounting firm acceptable to the Lender, which statements shall include a balance sheet and statements of income and expenses and cash flow, all as of the end of such year.

(ii)     Annual Financial Statements of Guarantors.  Within ninety (90) days after the end of each calendar year, the personal financial statements of the Guarantors in a format substantially the same as the statements provided to the Lender prior to the date hereof, which statements shall include a balance sheet, statements of income and expenses and cash flow and a schedule of real estate owned, all as of the end of such year, certified as true and correct by Guarantors.

(iii)    Monthly Financial Statements of Borrower and Project.  Within thirty (30) days after the end of each calendar month, financial statements of each of Borrower and the Project, if different (all such statements prepared on a GAAP accrual basis), which statements shall (A) include a balance sheet and statement of income and expenses and a statement of cash flow for the year through the month then ended and (B) be certified in writing by the respective chief financial officers of Borrower to be true and correct.

(iv)    Accounts Payable, Accounts Receivable and Census.  Within ten (10) days after the end of each calendar month of Borrower, a report of all accounts payable of Borrower and the Project and an aged accounts receivable report of the Project and monthly census information of the Project in sufficient detail to show patient-mix on a daily average basis for such month.

(v)     Medicare/Medicaid Cost Reports.  Within ten (10) days of filing or receipt (i) all Medicare and Medicaid cost reports and any amendments thereto filed with respect to the Project, if any, and (ii) all responses, audit reports, or inquiries with respect to such cost reports if such responses, audit reports or inquiries could have or reflect an adverse effect on reimbursement.

(vi)    Licensure Survey Reports.  Within ten (10) days of receipt, copies of all licensure and certification survey reports and statements of deficiencies (with plans of correction attached thereto); provided, however, that if such survey report or statement of deficiencies indicates that any action is pending or being considered to downgrade the Project to a substandard category, to ban admissions or to withhold payments for new admissions, then Borrower shall deliver a copy of such report or statement to Lender immediately and shall deliver a copy of any plans of correction upon submission to the appropriate agency.

(vii)   Notices of Licensure or Medicare/Medicaid Downgrade or Revocation. Within three (3) days of receipt, any and all notices (regardless of form) from any and all licensing and/or certifying agencies that any Permit or the Medicare or Medicaid certification of the Project or the certification or right to participate in any other Third Party Payors' Program is being downgraded to a substandard category, revoked, or suspended, or that action is pending or being considered to downgrade to a substandard category, revoke, or suspend any Permit or certification and within the time period required by the particular agency for furnishing a plan of correction also furnish or cause to be furnished to Lender a copy of the plan of correction generated from such survey or report for the Project.

(viii)  Medicare and Medicaid Rate Calculation Worksheet.  Within ten (10) days of receipt, a copy of each Medicare and Medicaid rate calculation worksheet (or the equivalent thereof) from the applicable agency, if applicable.

4869-0579-4078.12

(ix)     Pro Forma Operating Budget.  Within thirty (30) days prior to the end of the fiscal year of Borrower, a pro forma operating budget for the Project for the following fiscal year, which shall be subject to Lender's reasonable approval.

(x)     Tax Returns.  Within thirty (30) days after filing, all tax returns of Borrower and Guarantors, each of which shall be filed by Borrower and Guarantors, as applicable, on a timely basis.

(xi)     Quarterly Compliance Certificate.  Within thirty (30) days after the end of each fiscal quarter of Borrower, a compliance certificate in the form attached hereto as Exhibit A executed by a financial officer of each Borrower.

(xii)     Payment of Provider Bed Taxes.  Evidence of payment by Borrower of any applicable provider bed taxes or similar taxes for each period such taxes are due, which taxes Borrower agrees to pay.

(xiii)     Payment of Payroll Taxes.  Evidence of payment by Borrower of applicable payroll taxes and similar taxes for each period such taxes are due, which taxes Borrower agrees to pay and not defer without Lender's prior consent.

(xiv)     Occupancy.  Within fifteen (15) days of the end of each month, Borrower shall deliver to Lender monthly occupancy reports certified by an officer of the Borrower showing the average daily occupancy rate for the month just ended.

(xv)     Form 940 and 941.  Within thirty (30) days of filing, Borrower shall deliver to Lender copies of Form 940 and Form 941 for the Project filed with the Internal Revenue Service.

(xvi)     Other Information.  Such other financial information of Borrower and Guarantors at such times as Lender shall deem necessary.

**4.6     Corrections of Deficiencies**.  Borrower shall correct any deficiency identified pursuant to 4.5(a)(vi) or (vii) above within the earlier of (a) sixty (60) days or (b) the date required by the licensure and certification agency.

**4.7     Books and Records**.  Borrower shall keep and maintain at all times at the Project (or at its offices in 448 Old Clairton Road, Clairton, PA 15025) complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the results of the operation of the Project, and copies of all written contracts, leases and other instruments that affect the Mortgaged Property, which books, records, contracts, leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender (upon reasonable advance notice, which for such purposes only may be given orally, except in the case of an emergency or following an Event of Default, in which case no advance notice shall be required); provided, however, that if an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon demand all books, records, contracts, leases and other instruments relating to the Project or its operation.

**4.8     Payment of Indebtedness; Notice**.

(a)     Borrower shall duly and punctually pay or cause to be paid all Other Indebtedness now owing or hereafter incurred by Borrower in accordance with the terms of such Other Indebtedness, except such Other Indebtedness that is being contested in good faith and with

respect to which any execution against property of Borrower has been effectively stayed and for which reserves and collateral for the payment and security thereof have been established in sufficient amounts as determined by Lender in its sole discretion.

(b)     Borrower shall immediately, but no later than five (5) days after receipt, provide to Lender copies of any notices received by Borrower indicating any failure to pay any amounts due on any Other Indebtedness or any other default related thereto, including, without limitation, any notices received from AR Lender relating to any failure to pay any amounts due or any other default.

**4.9     Records of Accounts; Control Agreements**.  Borrower shall maintain all records, including records pertaining to the Accounts of Borrower, at the Project or the principal place of business of Borrower as set forth in this Agreement.  Borrower shall enter into such deposit account control agreements and deposit account instruction and services agreements (collectively, the "***Control Agreements***") as Lender may, in its sole discretion, require, and Borrower shall not redirect the deposit of funds from any Account that is subject to a Control Agreement during the term of the Loan without the prior written consent of Lender in its sole discretion.

**4.10     Conduct of Business**.  Borrower shall conduct the operation of the Project at all times in a manner consistent with the level of operation of the Project as of the date hereof, including without limitation, the following:

(a)     to maintain the standard of care for the residents of the Project at all times at a level necessary to ensure quality care for the residents of the Project in accordance with customary and prudent industry standards;

(b)     to operate the Project in a prudent manner and in compliance with applicable laws and regulations relating thereto and cause all Permits, Reimbursement Contracts, and any other agreements necessary for the use and operation of the Project or, if applicable, as may be necessary for participation in the Medicaid, Medicare, or other applicable Third Party Payors' Programs to remain in effect without reduction in the number of licensed beds authorized for use in the Medicaid, Medicare, or other applicable reimbursement programs;

(c)     to maintain sufficient Inventory and Equipment of types and quantities at the Project to enable Borrower to perform operations of the Project adequately;

(d)     to keep all Improvements and Equipment located on or used or useful in connection with the Project in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needed and proper repairs, renewals, replacements, additions, and improvements thereto to keep the same in good operating condition;

(e)     to maintain sufficient cash in order to satisfy the working capital needs of the Project; and

(f)     to keep all required Permits current and in full force and effect.

**4.11     Debt Service Coverage Requirements**.

(a)     Commencing upon release of the Debt Service Reserve, Borrower shall achieve and maintain, and within thirty (30) days after the end of each fiscal quarter of Borrower, provide

evidence to Lender of the achievement of, compliance with a Debt Service Coverage Ratio of 1.45 to 1.0, based on a rolling twelve (12) month period, tested quarterly.

(b)     If Borrower fails to achieve or provide evidence of achievement of the Debt Service Coverage Ratio for the Project, Borrower shall deposit with Lender within thirty (30) days of such failure additional cash or other liquid collateral in an amount that, when added to the first number of the Debt Service Coverage Ratio calculation, would have resulted in the Debt Service Coverage Ratio having been satisfied (the "***DSCR Default Cure***").  Borrower shall be entitled to exercise the DSCR Default Cure no more than two (2) times during the term of the Loan without Lender's written consent.  Any additional cash or liquid collateral deposited by Borrower hereunder in order to achieve the required Debt Service Coverage Ratio for the Project and cure any existing default with respect thereto will be held by Lender in a standard custodial account and shall constitute additional collateral for the Loan Obligations (and Borrower hereby grants to Lender a security interest therein), and, upon the occurrence of an Event of Default, may be applied by Lender, in such order and manner as Lender may elect, to the reduction of the Loan Obligations.  Borrower shall not be entitled to any interest earned on such additional collateral. Provided that there is no outstanding Default or Event of Default, such additional collateral that has not been applied to the Loan Obligations will be released by Lender at such time as Borrower provides Lender with evidence that the required Debt Service Coverage Ratio requirements outlined above have been achieved and maintained (without regard to any cash deposited pursuant to this <u>Section 4.11</u>) for two (2) consecutive fiscal quarters.

**4.12     Fixed Charge Coverage Ratio Requirements.**

(a)     Borrower shall achieve and maintain, and within thirty (30) days after the end of each fiscal quarter of Borrower, provide evidence to Lender of the achievement of, compliance with a Fixed Charge Coverage Ratio of 1.00 to 1.00, based on a rolling twelve (12) month period, tested quarterly.

(b)     If Borrower fails to achieve or provide evidence of achievement of the Fixed Charge Coverage Ratio for the Project, Borrower shall deposit with lender within thirty (30) days of such failure additional cash or other liquid collateral in an amount that, when added to the first number of the Fixed Charge Coverage Ratio calculation would have resulted in the Fixed Charge Coverage Ratio having been satisfied (the "***FCCR Default Cure***").  Borrower shall be entitled to exercise the FCCR Default Cure no more than two (2) times during the term of the Loan without Lender's written consent.  Any additional cash or liquid collateral deposited by Borrower hereunder in order to achieve the required Fixed Charge Coverage Ratio for the Project and cure any existing default with respect thereto will be held by Lender in a standard custodial account and shall constitute additional collateral for the Loan Obligations (and Borrower hereby grants to Lender a security interest therein), and, upon the occurrence of an Event of Default, may be applied by Lender, in such order and manner as Lender may elect, to the reduction of the Loan Obligations.  Borrower shall not be entitled to any interest earned on such additional collateral. Provided that there is no outstanding Default or Event of Default, such additional collateral that has not been applied to the Loan Obligations will be released by Lender at such time as Borrower provides Lender with evidence that the required Fixed Charge Coverage Ratio requirements outlined above have been achieved and maintained (without regard to any cash deposited pursuant to this <u>Section 4.12</u>) for two (2) consecutive fiscal quarters.

**4.13     Guarantors Personal Liquidity and Tangible Net Worth**.

(a)      Guarantors shall collectively maintain at all times until payment in full of all Loan Obligations, Tangible Net Worth of not less than Thirty Million Five Hundred Ninety-One Thousand and No/100 Dollars ($30,591,000.00) tested annually within thirty (30) days following the end of each calendar year.

(b)      Guarantors shall collectively maintain at all times until payment in full of all Loan Obligations, Personal Liquidity of not less than Three Million Fifty-Nine Thousand One Hundred and No/100 Dollars ($3,059,100.00).  Borrower will deliver or cause to be delivered to Lender, within thirty (30) days following the end of each calendar quarter, verification of Guarantors' Personal Liquidity in the form of bank statements or brokerage statements, generally satisfactory to Lender in its sole discretion.

**4.14     Updated Appraisals**.  Borrower authorizes Lender to obtain a credit report on Borrower and/or an appraisal of the Project at any time, at Borrower's expense.  Notwithstanding the foregoing, if an Event of Default does not exist at the time Lender orders such credit report or appraisal, the fees and expenses of the same shall be borne by Borrower no more frequently than once per every twelve (12) months.

**4.15     Comply with Covenants and Laws**.  Borrower shall comply in all material respects with all laws, ordinances, regulations and requirements of any governmental body or authority and all recorded, lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements and covenants pertaining to health and safety, construction of Improvements, zoning and land use, Leases, the Americans with Disabilities Act and regulations promulgated thereunder, and laws, ordinances, rules and regulations relating to zoning, health, building codes, setback requirements, Medicaid and Medicare laws, and shall keep the Permits for the Project in full force and effect.  Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section.  Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Project that could endanger residents or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the Lien created by this Agreement or Lender's interest in the Mortgaged Property.  Borrower represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**4.16     Certificate of Need and Permits**.  Borrower shall maintain, without allowing lapse, the all required Permits in full force and effect.

**4.17     Notice of Fees or Penalties**.   Borrower shall immediately notify Lender, upon Borrower's knowledge thereof, of the assessment by any state or, if applicable, any Medicare, Medicaid, health or licensing agency of any fines or penalties against Borrower or the Project, in excess of $10,000.

**4.18     Compliance Program**.  In the event that the Project participates in Medicaid, Borrower shall at all times maintain a compliance program consistent with the elements set forth in Section 6102 of the Patient Protection and Affordable Care Act of 2010, as amended by the Healthcare Reconciliation Act 2010, as amended from time to time.  Upon Lender's request, Borrower shall (a) provide a copy of such written compliance program, (b) identify its program compliance officer, and (c) summarize its training and other activities conducted pursuant to such program during the preceding year.

**4.19     Loan to Value**.  At all times during the term of the Loan, Borrower shall cause all amounts outstanding on the Loan to be no greater than 85.00% of the as-is appraised value of the Project as determined by an MAI appraisal engaged by Lender.

4.20    **Termite Bond**.  Borrower shall provide a termite inspection report on an annual basis for the Project.  If at any time a report reveals the presence of termites at the Project, then Borrower shall make such necessary repairs to restore Improvements at the Project to the condition as it existed prior to any termite damage and shall obtain and thereafter maintain a termite repair and replacement bond for the Project subject to Lender's approval.

4.21    **Estoppel Certificate**.  Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any Person designated by Lender, as of the date of such statement:

(a)    that the Loan Documents are unmodified and in full force and effect (or, if there have been any modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications);

(b)    the unpaid principal balance of the Note;

(c)    the date to which interest under the Note has been paid;

(d)    that Borrower is not in default in paying the Indebtedness or, to the best of Borrower's knowledge, in performing or observing any of the covenants or agreements contained in this Agreement or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail);

(e)    that the representations and warranties contained herein and in the other Loan Documents are true and correct with the same effect as though made on the date of such certificate;

(f)    to the best of Borrower's knowledge, whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and

(g)    any additional facts reasonably requested by Lender.

4.22    **Capital Expenditures.**  Borrower shall maintain the Project in good condition and make minimum capital expenditures for the Project in each fiscal year, in an amount not less than the sum required by the Replacement Reserve and Security Agreement, commencing the first year of the Loan term and continuing throughout the Loan term.

4.23    **Economic Sanctions, Anti-Money Laundering and Anti-Corruption.**

(a)    None of Borrower, any Affiliate, any Guarantor, nor to Borrower's knowledge, any Person having a controlling interest in any of them (collectively, the "***Borrower Parties***") is in violation of, and the Borrower Parties shall remain in compliance with:

(i)    any applicable anti-money laundering laws, including those contained in the Bank Secrecy Act; and

(ii)    any applicable anti-drug trafficking, anti-terrorism, or anti-corruption laws, whether civil or criminal.

(b)    None of the Borrower Parties is a Person:

27

(i)　that is charged with, or has received actual notice that he, she or it is under investigation for, any violation of any such laws;

(ii)　that has been convicted of any violation of, has been subject to civil penalties pursuant to, or had any of its property seized or forfeited under, any such laws; or

(iii)　with whom any United States Person, any entity organized under the laws of the United States or its constituent states or territories, or any entity, regardless of where organized, having its principal place of business within the United States or any of its territories, is prohibited from transacting business of the type contemplated by this Agreement and the other Loan Documents under any other applicable law.

(c)　None of the Borrower Parties is in violation of, and all the Borrower Parties shall comply with, any obligation to maintain appropriate internal controls as required by the governing laws of the jurisdiction of such Person as are necessary to ensure compliance with the economic sanctions, anti-money laundering, and anti-corruption laws of the United States and the jurisdiction where the Person resides, is domiciled or has its principal place of business.

(d)　The Borrower Parties are, and shall remain, in compliance with all applicable economic sanctions laws administered by the Office of Foreign Assets Control, the United States Department of State, or the United States Department of Commerce.

**4.24　Inspections**.  Lender, its agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during reasonable business hours, or at any other reasonable time after reasonable advance notice, except in an emergency or during the continuance of an Event of Default, in which instances, no advance notice shall be required.

**4.25　HUD Engagement; Eligibility**.  Throughout the term of the Loan, Lender and its Affiliates shall have an exclusive right, but not an obligation, to represent Borrower in the application to the United States Department of Housing and Urban Development ("***HUD***") for an FHA mortgage insurance commitment offered on market terms and conditions for similarly situated projects owned by similar borrowers as a permanent take-out for the Loan ("***Permanent Financing***") and shall have the right to fund the insured mortgage loan through the sale of a GNMA mortgage-backed security or private-label security to be issued by Lender.  Borrower agrees to close on such Permanent Financing provided that it is in an amount sufficient to repay the Loan and otherwise offered on market terms and conditions for similarly situated projects owned by similar borrowers.  Simultaneously with the execution of this Agreement, and as a condition to closing the Loan, Borrower shall execute an engagement letter authorizing Lender to prepare a HUD application for submission to the Secretary of HUD for Permanent Financing (the "***Application***").  No later than the date that is six (6) months prior to the Maturity Date, Borrower shall fund all fees and costs (including, but not limited to, updated appraisals, engineering reports and other due diligence reports customarily required by HUD) necessary for preparation, processing and submission of the Application, as reasonably determined by Lender.  Borrower agrees to cooperate with Lender and its Affiliates in the timely preparation and filing of the Application and to execute such documentation as may be customarily required by HUD for the closing of a Permanent Financing.  Throughout the term of the Loan, Borrower, Guarantors and their Affiliates shall not permit any circumstance to persist which, in the reasonable discretion of Lender, could render the Loan ineligible for HUD Permanent Financing.

**4.26　Post-Closing Actions**.

(a)     Within one hundred twenty (120) days following the date hereof, Borrower shall cause the CNH Term Loan to be repaid in full and terminated.

(b)     Within ninety (90) days following delivery by Partner Engineering of the results of the Freedom of Information Act requests Partner has made relating to the Projects (the "***FOIA Requests***"), Borrower shall cause all remediation recommended by Partner based on the results of the FOIA Requests to be completed in a good and workmanlike manner.

(c)     On or before July 1, 2022, Borrower shall deliver or cause to be delivered to Lender fully-executed versions of each of the following documents, in each case satisfactory to Lender in its sole and absolute discretion: (i) Control Agreements, (ii) AR Documents, (iii) CNH Term Loan Documents, and (iv) that certain Intercreditor Agreement by and among Borrowers, Lender, AR Lender and Bonamour Health Group, LLC, a Delaware limited liability company ("***Bonamour***"), in all cases acceptable to Lender in its sole and absolute discretion.

(d)     On or before July 1, 2022, Borrower shall deliver to Lender a comprehensive list of all bank accounts held in the name of or for the benefit of any Borrower and Bonamour, together with a comprehensive cash flow chart clearly indicating the flow of funds among the accounts relating to Borrower and Bonamour, in each case satisfactory to Lender in its sole and absolute discretion.

(e)     On or before July 1, 2022, Borrower shall deliver or cause to be delivered to Lender a revised ALTA/NSPS survey for the following Projects, each satisfactory to Lender in its sole and absolute discretion: (i) the Beaver Project, (ii) the Mulberry Project, and (iii) the Ridgeview Project.

(f)     On or before July 1, 2022, Borrower shall deliver or cause to be delivered to Lender a revised zoning compliance report for the following Projects, each satisfactory to Lender in its sole and absolute discretion: (i) the Beaver Project, (ii) the Mulberry Project, (iii) the Ridgeview Project, and (iv) the Lakeview Project.

(g)     On or before July 1, 2022, Borrower shall deliver or cause to be delivered to Lender an assignment of the Interest Rate Cap issued by Canadian Imperial Bank of Commerce to Bonamour, assigning Bonamour's rights thereunder to Borrower hereunder, such assignment to be satisfactory to Lender in form and substance in its sole and absolute discretion.

(h)     On or before July 1, 2022, Borrower shall deliver or cause to be delivered to Lender a fully-executed Estoppel and Security Agreement by and among Operator, Lender, Jefferson Hills Manor, LLC, Guardian Elder Care at Aliquippa, LLC, Mulberry Square Elder Care and Rehabilitation Center, LLC, Curwensville Nursing Home, LLC, Lakeview Senior Care and Living Center, LLC, and Scottdale Manor Rehabilitation Center, LLC, each a Pennsylvania limited liability company, such Estoppel and Security Agreement to be satisfactory to Lender in form and substance in its sole and absolute discretion.

(i)     On or before July 1, 2022, Borrower shall deliver or cause to be delivered evidence of the filing of record of certain UCC-3 Financing Statement Amendments as set forth below with the Pennsylvania Secretary of State (the "***PA SOS***") by S&T Bank, as secured party, amending the collateral description of the following UCC-1 Financing Statements in a manner satisfactory to Lender in its sole and absolute discretion:

4869-0579-4078.12

<ol type="1">
<li>(1)      UCC-3 Financing Statement Amendment to amend that certain UCC-1 Financing Statement # 2016030401568 filed with the PA SOS by S&T Bank, as secured party, naming Jefferson Hills Manor, LLC and Lakeview Senior Care and Living Center, LLC, as debtors;</li>
<li>(2)      UCC-3 Financing Statement Amendment to amend that certain UCC-1 Financing Statement # 2016030401559 filed with the PA SOS by S&T Bank, as secured party, naming Guardian Elder Care at Aliquippa, LLC, as debtor;</li>
<li>(3)      UCC-3 Financing Statement Amendment to amend that certain UCC-1 Financing Statement # 2016030401576 filed with the PA SOS by S&T Bank, as secured party, naming Mulberry Square Elder Care and Rehabilitation Center, LLC and Scottdale Manor Rehabilitation Center, LLC, as debtors; and</li>
<li>(4)      UCC-3 Financing Statement Amendment to amend that certain UCC-1 Financing Statement # 2016030401538 filed with the PA SOS by S&T Bank, as secured party, naming Curwensville Nursing Home, Inc., as debtor.</li>
</ol>

(j)      On or before July 1, 2022, Borrower shall deliver to Lender (i) a copy of the Certificate of Formation of Adesse Holdings LLC, a Delaware limited liability company ("***Adesse Pledgor***"), as certified by the Office of the Secretary of State of the State of Delaware (the "***DE SOS***") as being a true and correct copy of such Certificate of Formation as filed with the DE SOS, (ii) a certificate of good standing of the Adesse Pledgor issued by the DE SOS and dated within thirty (30) days of the date hereof, (iii) a copy of the Operating Agreement of Adesse Pledgor, executed by the Member(s) and Manager(s) thereof, as applicable, (iv) a resolution of the Member(s) and/or Manager(s) authorizing the execution, delivery, and performance by Simcha Hyman, on behalf of, and as Authorized Signatory of Adesse Pledgor, of that certain Assignment and Pledge of Membership Interests dated as of even date herewith, securing Borrower's obligations hereunder, and (v) a certificate of the Manager or a duly-appointed and authorized officer of Adesse Pledgor certifying the truth and correctness of each of the foregoing documents, in each case subject to Lender's satisfaction in its sole and absolute discretion.

(k)      On or before July 1, 2022, Borrower shall deliver to Lender (i) a copy of the Certificate of Formation of Jefferson Hill Investor LLC, a Delaware limited liability company ("***Jefferson Hill Pledgor***"), as certified by the DE SOS as being a true and correct copy of such Certificate of Formation as filed with the DE SOS, (ii) a certificate of good standing of the Jefferson Hill Pledgor issued by the DE SOS and dated within thirty (30) days of the date hereof, (iii) a copy of the Operating Agreement of Jefferson Hill Pledgor, executed by the Member(s) and/or Manager(s) authorizing the execution, delivery, and performance by Chaim E. Puretz, on behalf of, and as Authorized Signatory of Jefferson Hill Pledgor, of that certain Assignment and Pledge of Membership Interests dated as of even date herewith, securing Borrower's obligations hereunder, and (v) a certificate of the Manager or a duly-appointed and authorized officer of Jefferson Hill Pledgor certifying the truth and correctness of each of the foregoing documents, in each case subject to Lender's satisfaction in its sole and absolute discretion.

(l)      On or before July 1, 2022, Borrower shall deliver or cause to be delivered to Lender a legal opinion of counsel covering Adesse Pledgor and Jefferson Hill Pledgor, satisfactory to Lender and its counsel in their sole and absolute discretion.

4869-0579-4078.12

**4.27    Licensure and Certification**.  Operator has submitted an application for a change of ownership and licensure of the Project to the Pennsylvania Department of Health or Department of Human Services, as applicable.  Operator shall deliver to Lender copies of all Permits in the name of the Operator within sixty (60) days of the Closing Date. Within one hundred twenty (120) days of the Closing Date, Operator shall deliver to Lender evidence satisfactory to Lender of full licensure and Medicare and Medicaid certification of the Project in the name of the Operator, along with evidence satisfactory to Lender of the redirection of all governmental receivables to depository accounts in the name of Operator and subject to a Deposit Account Instruction and Services Agreement with Lender.

**4.28    Operational Experience**.  If Lender, in its sole and absolute discretion, determines that Borrower lacks sufficient ownership and/or operational experience to qualify for Permanent Financing with HUD, Borrower shall, within one hundred twenty (120) days of Borrower's receipt of written notice of such determination, add Simcha Hyman and/or, at Lender's election, another owner and operator with sufficient experience to satisfy the requirements for Permanent Financing with HUD, to the ownership and operational teams responsible for the Project.  Simcha Hyman, by his acknowledgment hereof, agrees to join in the ownership and operation of Borrower and the Project if required by Lender.

**4.29    Interim Management**.  Borrower shall maintain the Interim Management Agreement in full force and effect until such time as each of Jefferson Operator, Mulberry Operator, Ridgeview Operator and Lakeview Operator have each received its license in its name to operate the Jefferson Project, Mulberry Project, Ridgeview Project and Lakeview Project, respectively.

<div align="center">

**ARTICLE V**
**NEGATIVE COVENANTS OF BORROWER**

</div>

Borrower agrees with and covenants unto Lender that it shall comply with the following until the Loan Obligations have been paid in full:

**5.1    Assignment of Licenses and Permits**.  Borrower shall not assign or transfer any of its interest in any Permits or any Reimbursement Contracts (including rights to payment thereunder) pertaining to the Project, or assign, transfer, or remove or permit any other Person to assign, transfer, or remove any records pertaining to the Project including, without limitation, resident records, medical and clinical records (except for removal of such patient records as directed by the resident owning such records), without Lender's prior written consent, which consent may be granted or refused in Lender's sole discretion.

**5.2    No Liens; Exceptions**.  Borrower shall not create, incur, assume or suffer to exist any Lien upon or with respect to the Project, any of its properties, rights, income or other assets relating thereto, including, without limitation, the Mortgaged Property whether now owned or hereafter acquired, other than the following permitted Liens ("***Permitted Encumbrances***"):

    (a)    Liens at any time existing in favor of Lender;

    (b)    Liens that are listed in <u>Schedule 5.2</u> attached hereto;

    (c)    Inchoate Liens arising by operation of law for the purchase of labor, services, materials, equipment or supplies, provided payment shall not be delinquent and, if such Lien is a lien upon any of the Land or Improvements, such Lien must be fully disclosed to Lender and bonded off and removed from the Mortgaged Property within thirty (30) days of its creation, in a manner reasonably satisfactory to Lender; or

<div align="center">31</div>

(d) Liens for current year's taxes, assessments or governmental charges or levies provided payment thereof shall not be deferred or delinquent, subject to the right to contest as set forth in Section 4.3.

(e) Liens on Accounts of the Project arising out of the AR Loan and the CNH Loan, provided that Lender has (i) approved of the AR Loan Documents and the CNH Loan Documents and (ii) executed an intercreditor agreement with the AR Lender, which intercreditor agreement shall be subject to approval by Lender in its sole discretion.

**5.3     Maintain Single Purpose Entity Status**.  Each Borrower shall not:

(a) Engage in any business or activity other than the ownership, operation and maintenance of the Mortgaged Property and activities directly related thereto;

(b) Acquire or own any material assets other than the Mortgaged Property;

(c) Merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's prior written consent;

(d) Fail to preserve its existence as a limited liability company validly existing and in good standing under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Lender, materially amend, modify, terminate or fail to comply with the provisions of its organizational documents;

(e) Own any subsidiary or make any investment in, any Person without the prior written consent of Lender;

(f) Commingle the funds and other assets of Borrower with those of any partner, any member, any shareholder, any Affiliate or any other Person;

(g) Incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Loan and trade payables not more than ninety (90) days old and accrued expenses incurred in the ordinary course of business;

(h) Fail to maintain its records, and books of account separate and apart from those of its members, managers, partners and shareholders and Affiliates, the Affiliates of any of its members, managers, partners and shareholders, and any other Person;

(i) Enter into any contract or agreement with any of its members, managers, partners and shareholders or Affiliates, or the Affiliates of any of its members, managers, partners and shareholders, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties, except as such contracts or agreements that are equal to or better than the terms obtained from a third party;

(j) Seek its dissolution or winding up in whole, or in part;

(k) Maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any of its members, shareholders, or partners (as applicable) and Affiliates, the Affiliates of any of its members, shareholders, or partners (as applicable), or any other Person;

32

(l) Hold itself out to be responsible for the debts of another Person;

(m) Make any loans or advances to any third party, including any of its members, managers, partners and shareholders or Affiliates, or the Affiliates of any of its members, managers, partners and shareholders;

(n) Fail to file its own tax returns except to the extent the Guarantors, as the taxpayers for a consolidated taxpayer group of which such Borrower is a member, file such returns and each Borrower reconciles and pays its own tax liabilities directly or by reimbursement to the Guarantors;

(o) Fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or its registered trade name, in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that it is responsible for the debts of any third party (including any of its members, managers, partners and shareholders or Affiliates, or any general partner, principal or Affiliate thereof); or

(p) Fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

**5.4    Change of Business or Use**.

(a) Except as approved by Lender in writing, Borrower shall not (i) make or allow any material change in the nature of its business as it is being conducted as of the date hereof;  (ii) convert any part of the Project to any other commercial use, except for the commercial use of providing ancillary services to the Project; or (iii) initiate or acquiesce in a change in the zoning classification of or any of the Permits for the Project or the Mortgaged Property.

(b) Borrower shall not enter into any management agreement for the Project or enter into any lease for the Project, unless Borrower (i) notifies Lender and provides Lender a copy of the proposed lease agreement or management agreement; (ii) obtains Lender's written consent thereto, which consent may be withheld in Lender's sole and absolute discretion; and (iii) obtains and provides Lender with a subordination agreement and assignment agreement in form satisfactory to Lender, as determined by Lender in its sole discretion, from such manager or lessee subordinating to all rights of Lender.

**5.5    Changes in Accounting**.  Borrower shall not change its methods of accounting except for changes required by GAAP, provided that such change does not have the effect of curing or preventing what would otherwise be an Event of Default had such change not taken place.

**5.6    ERISA**.  Borrower shall not:

(a) Agree to, enter into or consummate any transaction that would render it unable to confirm that (i) it is not an "employee benefit plan" as defined in Section 3(32) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) it is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) less than twenty-five percent (25%) of each of its outstanding class of equity interests are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2);

(b)        Engage in a non-exempt prohibited transaction described in Section 406 of ERISA or Section 4975 of the Code, as such sections relate to Borrower, or in any transaction that would cause any obligation or action taken or to be taken hereunder (or the exercise by Lender of any of its rights under the Loan Documents) to be a non-exempt prohibited transaction under ERISA.

5.7     **Transactions with Affiliates**.  Borrower shall not enter into any transaction with a Person that is an Affiliate of Borrower, except upon terms and conditions that are substantially similar to those that would be available on an arms-length basis with third parties, except for such contracts or agreements that are equal to or better for the Borrower than the terms obtained from a third party.

5.8     **Place of Business**.  Borrower shall not change its chief executive office or its principal place of business without first giving Lender at least thirty (30) days prior written notice thereof and promptly providing Lender such information and amended financing statements as Lender may reasonably request in connection therewith.

5.9     **Acquisitions**.  Borrower shall not directly or indirectly purchase, lease, manage, own, operate, or otherwise acquire any property or other assets (or any interest therein) that are not used in connection with the operation of the Project and subject to Lender's first priority security interests.

5.10    **Restricted, Dividends, Distributions, Advances and Redemptions**.  At any time that a Default or an Event of Default exists, or if such distribution would cause a Default or an Event of Default or would exceed the cash flow of Borrower or the Project as shown on financial statements required to be delivered to Lender hereunder, Borrower shall not (a) declare or pay any Restricted Payment to its members, managers, partners and shareholders; (b) make any loans or advances to any third party, including any of its members, managers, partners, shareholders or Affiliates, or the Affiliates of any of its members, managers, partners and shareholders; (c) purchase, redeem, retire, or otherwise acquire for value, any ownership interests in Borrower now or hereafter outstanding; or (d) return any capital to its members, managers, partners and shareholders.  Borrower shall take none of the foregoing actions at any time prior to the release of the Debt Service Reserve pursuant to the terms of <u>Section 2.3(d)</u> hereof.

5.11    **Confidentiality**.  Borrower shall not disclose the contents of this Agreement or the other Loan Documents to any third party (including, without limitation, any financial institution or intermediary) without Lender's prior written consent, other than to Borrower's officers and advisors on a need-to-know basis.  Borrower agrees to inform all such persons who receive information concerning this Agreement that such information is confidential and may not be disclosed to any other person.  Lender reserves the right to review and approve all materials that Borrower prepares that contain Lender's name or describe this Agreement.

5.12    **Transfers**.  None of the following are permitted without the express written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion, or except as expressly permitted in the other Loan Documents:

(a)        a sale, assignment, transfer or other disposition (whether voluntary, involuntary or by operation of law) of (i) any of the Mortgaged Property; (ii) any ownership interest in either Borrower; or (iii) any ownership interest in any entity that directly or indirectly has an ownership interest in either Borrower or the Project;

(b)        the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law) on (i) any of the Mortgaged Property; (ii)

34

any ownership interest in either Borrower; or (iii) any ownership interest in any entity that directly or indirectly has an ownership interest in either Borrower or the Project;

      (c)    the issuance or other creation of an ownership interest (such as corporate Stock, a partnership interest or a membership interest) in either of the Borrower or in any entity that directly or indirectly has an ownership interest in the Borrower, including the issuance of any warrants, options or commitments to do any of the foregoing;

      (d)    the withdrawal, retirement, removal or involuntary resignation of any of the partners, members or managers of either of the Borrower or of any entity that directly or indirectly has an ownership interest in either of the Borrower;

      (e)    the merger, dissolution, liquidation, division, consolidation or conversion of either Borrower or any entity that directly or indirectly has an ownership interest in either Borrower or the Project.

**5.13    AR Loan and CNH Term Loan**.  Borrower shall not amend, or permit the amendment of, the terms of the AR Loan, the AR Documents, the CNH Term Loan or the CNH Term Loan Documents without the prior written consent of Lender in its sole discretion.

**5.14    COVID-19**. Borrower shall at all times maintain in place infection control procedures in compliance with guidance and regulations issued by the Centers for Disease Control and other Governmental Authorities.  If at any time one or more residents of the Project test positive for COVID-19, Borrower shall promptly notify Lender of such positive case(s) and shall follow all guidance and regulations issued by applicable Governmental Authorities for the treatment, isolation and quarantine of infected and exposed residents and staff members.

**5.15    CARES Act**. Borrower shall not participate in any program established under the CARES Act or otherwise, pursuant to which Borrower receives funds that are subsequently subject to repayment or recoupment, or defers payment of taxes or other amounts owed by Borrower, without the prior written consent of Lender, which may be given or withheld in its sole discretion.  Notwithstanding the foregoing, to the extent that Borrower has or shall receive emergency grant payments from any Governmental Authority that are not subject to recoupment provided that the funds are used for approved COVID-19 related purposes, Borrower shall be permitted to accept and use such funds for approved purposes and shall complete all necessary attestations required for the acceptance and use of such funds.

<div align="center">

**ARTICLE VI**
**DEFAULT**

</div>

**6.1    Events of Default**.  The occurrence of one or more of the following shall constitute an "***Event of Default***" hereunder:

      (a)    The failure by Borrower to pay any installment of principal, interest or other payments due to Lender required under any of the Loan Documents within ten (10) days after the same becomes due; provided that no such ten (10) day grace period shall apply to failure by Borrower to pay the Loan Obligations in full on the Maturity Date, and such failure shall constitute an immediate Event of Default;

      (b)    Any failure by Borrower to maintain the Debt Service Coverage Ratio pursuant to Section 4.11 or the Fixed Charge Coverage Ratio pursuant to Section 4.12;

(c)     Any failure by Guarantor to satisfy the Personal Liquidity and Tangible Net Worth requirement set forth in <u>Section 4.13</u>;

(d)     Failure of Borrower to comply with any of the terms, covenants or conditions set forth in <u>Article VII</u> within ten (10) days after notice thereof, which notice shall contain all documentation that Borrower is being asked to deliver;

(e)     Any failure by Borrower to provide and maintain in full force and effect the insurance coverage required by this Agreement;

(f)     A failure of Borrower to comply with the provisions of <u>Section 5</u> of the Mortgage or the violation by Borrower of any covenant set forth in <u>Article V</u> of this Agreement;

(g)     The commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of all or any part of the Mortgaged Property or otherwise impair the Lien created by the Mortgage or Lender's interest in the Mortgaged Property if not cured prior to forfeiture;

(h)     The failure by Borrower to deliver or cause to be delivered the financial statements and information set forth in this Agreement within the times required;

(i)     The filing by Borrower or any Guarantor of a voluntary petition, or the adjudication of any of the aforesaid Persons, or the filing by any of the aforesaid Persons of any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or if any of the aforesaid Persons should seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator for itself or of all or any substantial part of its property or of any or all of the rents, revenues, issues, earnings, profits or income thereof, or the mailing of any general assignment for the benefit of creditors or the admission in writing by any of the aforesaid Persons of its inability to pay its debts generally as they become due;

(j)     The entry by a court of competent jurisdiction of an order, judgment, or decree approving a petition filed against Borrower or any Guarantor which petition seeks any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency, or other relief for debtors, which order, judgment or decree remains unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or the appointment of any trustee, receiver or liquidator of any of the aforesaid Persons or of all or any substantial part of its properties or of any or all of the rents, revenues, issues, earnings, profits or income thereof which appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive);

(k)     Any certificate, statement, representation, warranty, audit or review heretofore, herein or hereafter furnished by or on behalf of Borrower or any Guarantor or any of their respective officers, directors, members, Affiliates, or trustees pursuant to or in connection with this Agreement or any Loan Documents or as an inducement to Lender to make the Loan to Borrower, (i) proves to have been false in any material respect at the time when the facts therein set forth were stated or certified, or (ii) proves to have omitted any substantial contingent or unliquidated liability or claim against Borrower or any Guarantor, or (iii) on the date of execution of this Agreement there shall have been any materially adverse change in any of the acts

36

previously disclosed by any such certificate, statement, representation, warranty or audit, which change shall not have been disclosed to Lender in writing at or prior to the time of such execution;

(l)     The failure of Borrower to correct or cause to have corrected, within the time deadlines set by any applicable Medicare, Medicaid or licensing agency, any deficiency that could result in the following actions by such agency with respect to the Project:  (i) a termination or restriction of any Reimbursement Contract or any Permit; or (ii) a ban on new admissions generally or, if applicable, on admission of patients otherwise qualifying for Medicare or Medicaid coverage;

(m)     The assessment against Borrower or the Project of any fines or penalties by any state or any Medicare, Medicaid, health or licensing agency having jurisdiction over such Persons or the Project in excess of $50,000.00 with regard to the Project, the Borrower or any other facility managed or operated by the Borrower should be assessed fines or penalties by any state health or licensing agency having jurisdiction over the Borrower or such facilities in excess of $50,000.00 in the aggregate; provided, however, that the assessment of such fines shall not be an Event of Default hereunder so long as (i) such assessment has been remedied or cured within the time period allowed by such state or Medicare, Medicaid, health or licensing agency for remedy or cure and all licenses necessary for the operation of the Project remain in full force and effect, or (ii) such assessment has been properly appealed within thirty (30) days from the receipt of notice of the assessment, all Permits necessary or useful for the operation of the Project remain in full force and effect, and the Person against whom the assessment has been made either has full insurance coverage for the assessment, has sufficient reserves for the payment in full of the assessment, or has bonded off the full potential amount of the assessment;

(n)     Operator shall at any time: (i) have any material Permit revoked, suspended or denied; (ii) have its Medicaid agreement revoked, suspended or denied or a stop placement issued against such Operator under the state Medicaid program; (iii) have its Medicare agreement revoked, suspended or denied or a stop placement issued against such Operator under the federal Medicare program; or (iv) have any action, suit or proceeding filed or initiated against it for the purpose of, or which could have the result of, any of the foregoing described in items (i), (ii) or (iii) of this subsection;

(o)     A final judgment is rendered by a court of law or equity against Borrower or Guarantor or that impacts the Project in excess of $50,000.00, and the same remains undischarged for a period of thirty (30) days, unless such judgment is either (i) fully covered by collectible insurance and such insurer has within such period acknowledged such coverage in writing, or (ii) although not fully covered by insurance, enforcement of such judgment has been effectively stayed, such judgment is being contested or appealed by appropriate proceedings and Borrower or Guarantor as the case may be, has established reserves adequate for payment in the event such Person is ultimately unsuccessful in such contest or appeal and evidence thereof is provided to Lender;

(p)     The occurrence of any material adverse change in the financial condition or prospects of any Borrower or Guarantor, or the existence of any other condition that, in Lender's reasonable determination, constitutes a material impairment of any such Person's ability to operate the Project, or of such Person's ability to perform their respective obligations under the Loan Documents, that is not remedied within thirty (30) days after written notice;

(q)     Any Guarantor or any other person liable for the Loan Obligations shall be adjudged incompetent, or a conservator, custodian or guardian be appointed to handle his affairs, or such Guarantor or such other person shall die;

(r)     This Agreement, the Mortgage, any Control Agreement or any other Loan Document shall be canceled, terminated, revoked or rescinded otherwise than in accordance with the terms thereof or with the express prior approval of Lender, or any action at law, suit in equity or other legal proceeding to cancel, revoke or rescind any Loan Document shall be commenced by or on behalf of Borrower or any other Person that is party thereto, or any court or any other governmental or regulatory authority or agency of competent jurisdiction shall make a determination that, or issue a judgment, order, decree or ruling to the effect that any one or more of the Loan Documents is illegal, invalid or unenforceable in accordance with the terms thereof;

(s)     Lender's loss, in part or in whole, of any benefits granted to it under any guaranty of Guarantors provided in connection with the Loan for any reason, including but not limited to losses arising from the giving of any notice or the filing of any action by any person to: (i) challenge any term of any such guaranty, or (ii) limit, reduce, or discharge any liability or obligation of any Guarantor;

(t)     A default occurs under the Lease Agreement, and such default has not been cured within the applicable time period for cure applicable to such default set forth in the Lease Agreement;

(u)     Any exercise by the holder of any debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable;

(v)     The failure by Borrower to pay any Other Indebtedness within ten (10) days after the same becomes due, subject to the provisions of Section 4.8(a);

(w)     The failure of Borrower to provide to Lender any notice required by Section 4.8(b) in the time period set forth therein;

(x)     The failure of Borrower to comply with the terms of Section 4.25 or Section 4.26 in the time periods set forth therein;

(y)     The failure of Borrower to comply with the terms of Section 4.27 or Section 4.28 in the time periods set forth therein;

(z)     The occurrence of any event or existence of any condition caused by or permitted to exist by Borrower, Guarantor or its Affiliates, after the expiration of any applicable notice and cure period, which renders the Loan ineligible for Permanent Financing, as determined by Lender in its reasonable discretion;

(aa)     The failure of Borrower to properly and timely perform or observe any other Loan Obligation, including, without limitation, any covenant or condition set forth in this Agreement, the Mortgage, the Replacement Reserve Agreement, the Repair Reserve Agreement, or any other Loan Document, which failure is not cured within any applicable cure period, or, if no cure period is specified therefor, is not cured within thirty (30) days after notice to Borrower of such Default; or

(bb)     The occurrence of any default or event of default under the Interim Management Agreement.

**6.2     Notice Provisions upon Bankruptcy**.  Notwithstanding anything in this <u>Article VI</u>, all requirements of notice shall be deemed eliminated if Lender is prevented from declaring an Event of Default by bankruptcy or other applicable law.  The cure period, if any, shall then run from the occurrence of the Event of Default rather than from the date of notice.

**6.3     Remedies**.  Upon the occurrence of any Event of Default, Lender shall be entitled to exercise all rights of Lender under any Loan Documents or at law, equity or otherwise.  Lender's remedies in the event of an Event of Default shall include, but are not limited to, those remedies set forth in <u>Section 8</u> of the Mortgage.

<div align="center">

**ARTICLE VII**
**LOAN PARTICIPATION AND SERVICING**

</div>

**7.1     Right to Participate Loan**.  Borrower hereby acknowledges that Lender may, at any time, sell, transfer, convey or assign the Loan, the Loan Documents, and any or all rights thereunder with respect to the Loan, grant participations, pledge or assign as collateral, or issue securities evidencing a beneficial interest in the Loan, including in an offering or private placement (any of the foregoing referred to herein as a "***Participation***").

**7.2     Provision of Information**.  Borrower hereby acknowledges that Lender may forward to each purchaser, transferee, assignee, lender, servicer, participant or investor in the Loan (each, an "***Investor***") or prospective Investor all documents and information Lender has with respect to the Loan and the Mortgaged Property as Lender deems necessary or desirable.  Borrower and Guarantors shall furnish and consent to Lender furnishing to each Investor or prospective Investor all information concerning the Loan, the Mortgaged Property, all leases, if any, of portions of the Project and the financial condition of Borrower and Guarantors, in such form, substance and detail as Lender, such Investor or prospective Investor may request; <u>provided however</u>, that no sensitive financial information regarding Guarantors who are individuals will be disclosed or published in such a manner as to make it public information.  Upon any Participation or assignment of the Loan, Borrower and Guarantors shall provide an estoppel certificate to the Investor or any prospective Investor in form and content satisfactory to Lender, such Investor or such prospective Investor, together with such other documents as Lender may reasonably require.

**7.3     Cooperation of Borrower**.

(a)     Borrower shall cooperate with Lender's good faith efforts to facilitate the consummation of any Participation, including, without limitation, by:

(i)     amending and delivering, or causing the amendment and delivery of, any of the Loan Documents, including the bifurcation of the Loan, and executing such additional documents, instruments and agreements as may be reasonably required by Lender in connection with a Participation; <u>provided, however,</u> that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (A) change the Interest Rate (as such term is defined in the Note) or the stated maturity or the amortization of principal as set forth herein or in the Note or (B) modify or amend any other material term of the Loan Documents;

4869-0579-4078.12

(ii)     making such representations, warranties and covenants, as may be reasonably requested by Lender for the Participation; and

(iii)    providing any other information and materials reasonably required in the Participation.

(b)     In the event Borrower fails to amend and deliver to Lender the Loan Documents set forth in Section 7.3(a) above within ten (10) days following the request by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower hereby ratifying all that such attorney shall do by virtue thereof.

**7.4     Servicing**.  At the option of Lender, the Loan may be serviced by Lender or by a servicer/trustee (the "**Servicer**") selected by Lender, and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Lender and Servicer.  Borrower shall be responsible for payment of any servicing fee due to the Servicer under the Servicing Agreement.

**7.5     Administrative Fees.**  Lender shall have the right to charge reasonable administrative fees during the term of the Loan in connection with any servicing requests made by or on behalf of Borrower requiring Lender's evaluation, preparation and processing of any such requests ("**Servicing Requests**"); provided, however, that administrative fees shall not be charged for routine servicing matters contemplated by the Loan Documents, which routine matters include the following:  processing payments; processing insurance and UCC continuation documentation; processing escrow draws; review of tenant leases and amendments thereto, management agreements and amendments thereto, subordination, non-disturbance and attornment agreements and tenant estoppels on standard forms approved by Lender without material modifications.  Such administrative fees shall apply to requests for matters not permitted or contemplated by the Loan Documents, including, without limitation: requests for transfers or assignments; requests for partial releases; requests for review of new easements and loan modifications, but shall not apply to matters addressed by Section 5.12, which section will have its own separate requirements for fees, costs, expenses and attorneys' fees.  In connection with any Servicing Requests initiated by or on behalf of Borrower, Lender shall also be entitled to reimbursement for reasonable professional fees it incurs for such administration, including without limitation, fees of architects, engineers and attorneys (whether (i) employed by Lender or its Affiliates or (ii) engaged by Lender or its Affiliates as independent contractors).

**ARTICLE VIII**
**MISCELLANEOUS**

**8.1     Limitation on Interest**.  All agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of acceleration of the maturity of any indebtedness governed hereby or otherwise, shall the interest contracted for, charged or received by Lender exceed the maximum amount permissible under applicable law.  If, from any circumstance whatsoever, interest would otherwise be payable to Lender in excess of the maximum lawful amount, the interest payable to Lender shall be reduced to the maximum amount permitted under applicable law; and, if from any circumstance the Lender shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of the principal of the Loan and not to the payment of interest, or, if such excessive interest exceeds the unpaid balance of principal of the Loan and all lawful interest, fees and charges, such excess shall be refunded to Borrower.  All interest paid or

agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full period until payment in full of the principal of the Loan (including the period of any renewal or extension thereof) so that interest thereon for such full period shall not exceed the maximum amount permitted by applicable law.  The provisions of this Section shall control all agreements between the Borrower and Lender.

**8.2    Waiver; Standard of Conduct**.  No remedy conferred upon, or reserved to, Lender in this Agreement or any of the other Loan Documents is intended to be exclusive of any other remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing in law or in equity.  Exercise of or omission to exercise any right of Lender shall not affect any subsequent right of Lender to exercise the same.  No course of dealing between Borrower and Lender or any delay on Lender's part in exercising any rights shall operate as a waiver of any of Lender's rights.  No waiver of any default or Event of Default under this Agreement or any of the other Loan Documents shall extend to or shall affect any subsequent or other, then existing, default or Event of Default or shall impair any rights, remedies or powers of Lender.  Unless expressly provided herein to the contrary in any specific instance, whenever a right, action or decision (including granting or withholding consent) by Lender specifies that the same is in Lender's discretion or its "sole discretion," or in any instance when no standard is specified, then such right, action or decision may be exercised in Lender's sole and absolute discretion.

**8.3    Costs and Expenses**.

(a)    Borrower will bear all Taxes, fees and expenses (including reasonable and actual attorneys' fees and expenses of counsel for Lender) in connection with the Loan, the Note, the preparation of this Agreement and the other Loan Documents (including any amendments hereafter made), and in connection with any modifications thereto and the recording of any of the Loan Documents.

(b)    If, at any time, a Default occurs, or Lender becomes a party to any suit or proceeding in order to protect its interests or priority in any collateral for any of the Loan Obligations or its rights under this Agreement or any of the Loan Documents, or if Lender is made a party to any suit or proceeding by virtue of the Loan, this Agreement or any Mortgaged Property and as a result of any of the foregoing, Lender employs counsel to advise or provide other representation with respect to this Agreement, or to collect the balance of the Loan Obligations, or to take any action in or with respect to any suit or proceeding relating to this Agreement, any of the other Loan Documents, any Mortgaged Property, Borrower or Guarantors, or to protect, collect or liquidate any of the security for the Loan Obligations, or attempt to enforce any security interest or Lien granted to Lender by any of the Loan Documents, then in any such events, all of the reasonable and actual attorneys' fees arising from such services, including attorneys' fees for preparation of litigation and in any appellate or bankruptcy proceedings, and any expenses, costs and charges relating thereto shall constitute additional obligations of Borrower to Lender payable on demand of Lender.  Until paid, all such expenses, costs and charges shall bear interest at the Default Rate, and shall be secured by the Mortgage and other Loan Documents.

(c)    Without limiting the foregoing, Borrower shall pay all recording and filing fees, revenue or documentary stamps or taxes, intangibles taxes, and other Taxes, expenses and charges payable in connection with this Agreement, any of the Loan Documents, the Loan Obligations, or the filing of the Mortgage and any financing statements or other instruments required to effectuate the purposes of this Agreement, and should Borrower fails to do so, Borrower agrees to reimburse Lender for the amounts paid by Lender, together with penalties or

interest, if any, incurred by Lender as a result of underpayment or nonpayment. Such amounts shall constitute a portion of the Loan Obligations, shall be secured by the Mortgage and shall bear interest at the Default Rate from the date advanced until repaid.

**8.4    Performance of Lender**. At its option, upon Borrower's failure to do so within the time period required and after notice, if any is expressly required, Lender may make any payment or do any act on Borrower's behalf that Borrower or others are required to do to remain in compliance with this Agreement or any of the other Loan Documents, and Borrower agrees to reimburse Lender, on demand, for any payment made or expense incurred by Lender pursuant to the foregoing authorization, including, without limitation, reasonable attorneys' and other professionals' fees, and until so repaid any sums advanced by Lender shall constitute a portion of the Loan Obligations, shall be secured by the Mortgage and shall bear interest at the Default Rate from the date advanced until repaid.

**8.5    Indemnification**. Borrower shall, at its sole cost and expense, protect, defend, indemnify and hold harmless the Indemnified Parties from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense) imposed upon or incurred by or asserted against Lender or such Indemnified Party by reason of:

(a)    ownership of the Note, the Mortgage, the Mortgaged Property or any interest therein or receipt of any Rents or Accounts;

(b)    any amendment to, or restructuring of, the Loan Obligations and/or any of the Loan Documents;

(c)    any and all lawful action that may be taken by Lender or Servicer in connection with the enforcement of the provisions of the Mortgage or the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, Guarantors and/or any partner, joint venturer, member or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding;

(d)    any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Land, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways;

(e)    any use, nonuse or condition in, on or about the Land, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways;

(f)    any failure on the part of Borrower or Guarantors to perform or comply with any of the terms of this Agreement or any of the other Loan Documents;

(g)    any claims by any broker or other Person claiming to have participated in arranging the making of the Loan evidenced by the Note;

(h)    any failure of the Land and/or Improvements to be in compliance with any applicable laws;

(i)　　performance of any labor or services or the furnishing of any materials or other property with respect to the Land, the Improvements or any part thereof;

(j)　　the failure of any Person to file timely with the Internal Revenue Service an accurate Form 1099-b statement for recipients of proceeds from real estate, broker and barter exchange transactions that may be required in connection with the Loan or the Mortgage, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which the Loan is made;

(k)　　any misrepresentation made to Lender or Indemnified Party in this Agreement or in any of the other Loan Documents;

(l)　　any fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners, members, Affiliates, or managers or Guarantors in connection with (i) the application for or creation of the Loan, (ii) any financial statement, financial report, certification, or other report or information required under this Agreement required to be provided to Lender by Borrower or (iii) any request for Lender's consent to any proposed action;

(m)　　any Tax on the making and/or recording of the Mortgage, the Note or any of the other Loan Documents;

(n)　　the violation of any requirements of the Employee Retirement Income Security Act of 1974, as amended;

(o)　　any fines or penalties assessed or any corrective costs incurred by Lender if the Project or any part of the Land and/or Improvements is determined to be in violation of any covenants, restrictions of record, or any applicable laws, ordinances, rules or regulations; or

(p)　　the enforcement by any of the Indemnified Parties of the provisions of this Section 8.5.

Any amounts payable to Lender by reason of the application of this Section 8.5, shall become immediately due and payable, and shall constitute a portion of the Loan Obligations, shall be secured by the Mortgage, and other Loan Documents and shall accrue interest at the Default Rate. The obligations and liabilities of Borrower under this Section 8.5 shall survive any termination, satisfaction, assignment, entry of a judgment of foreclosure or exercise of a power of sale or delivery of a deed in lieu of foreclosure of the Mortgage.

**8.6　　Headings**. The headings of the Sections of this Agreement are for convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

**8.7　　Survival of Covenants**. All covenants, agreements, representations and warranties made herein and in certificates or reports delivered pursuant hereto shall be deemed to have been material and relied on by Lender, notwithstanding any investigation made by or on behalf of Lender, and shall survive the execution and delivery to Lender of the Note and this Agreement.

**8.8　　Notices, etc.** Any notice or other communication required or permitted to be given in connection with this Agreement or the other Loan Documents (if not otherwise specified therein) shall be in writing and shall be made by email (confirmed on the date the email is sent by one of the other

methods of giving notice provided for in this Section) or by hand delivery, by Federal Express or other similar overnight delivery service, or by certified mail, unrestricted delivery, return receipt requested, postage prepaid, addressed to the receiving party at the appropriate addresses set forth below (or to the addresses set forth by the parties to the other Loan Documents in such other Loan Documents, if the notice is in connection with such other Loan Documents) or to such other address or addresses as may be hereafter specified by written notice by such receiving party. Notice shall be considered given as of the earliest of the date of the email or the hand delivery, one (1) calendar day after delivery to Federal Express or similar overnight delivery service, or three (3) calendar days after the date of mailing, independent of the date of actual delivery or whether delivery is ever in fact made, as the case may be, provided the giver of notice can establish the fact that notice was tendered as provided herein. If notice is tendered pursuant to the provisions of this Section and is refused by the intended recipient thereof, the notice, nevertheless, shall be considered to have been given and shall be effective as of the date herein provided.

If to Borrower:

    c/o Guardian Acquisition, LLC
    448 Old Clairton Road
    Clairton, PA 15025
    Email: zidele25@gmail.com
    Attn: Yeshayahu Zidele

    c/o Bonamour Health Group, LLC
    448 Old Clairton Road
    Clairton, PA 15025
    Email: zidele25@gmail.com
    Attn: Yeshayahu Zidele

with a copy to:

    Offit Kurman
    590 Madison Avenue
    New York, NY 10022
    Email: Mark.Zafrin@ofitkurman.com
    Attn: Mark Zafrin, Esq.

If to Lender:

    Bravo Bridge Fund LLC
    750 Lexington Avenue
    New York, NY 10022
    Email: ak@bravocapital.com
    Attn: Aaron Krawitz

with a copy to:

    Bradley Arant Boult Cummings LLP
    1110 Market Street, Suite 302
    Chattanooga, TN 37402
    Email: mokelley@bradley.com

**8.9**	**Benefits**.  All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.  No Person other than Borrower, Lender, any Investor and Lender's successors or assigns shall be entitled to rely upon this Agreement or be entitled to the benefits of this Agreement.

**8.10**	**Supersedes Prior Agreements; Counterparts**.  This Agreement and the instruments referred to herein supersede and incorporate all representations, promises and statements, oral or written, made by Lender in connection with the Loan.  This Agreement may not be varied, altered, or amended except by a written instrument executed by an authorized officer of Lender.  This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument.

**8.11**	**Loan Agreement Governs**.  The Loan is governed by the terms and provisions set forth in this Agreement and the other Loan Documents and in the event of any irreconcilable conflict between the terms of the other Loan Documents and the terms of this Agreement, the terms of this Agreement shall control; provided, however, that in the event that there is any apparent conflict between any particular term or provision that appears in both this Agreement and the other Loan Documents and it is possible and reasonable for the terms of both this Agreement and the Loan Documents to be performed or complied with, then, notwithstanding the foregoing, both the terms of this Agreement and the other Loan Documents shall be performed and complied with.

**8.12**	**Controlling Law**.  The parties hereto agree that the validity, interpretation, enforcement and effect of this agreement shall be governed by, and construed in accordance with, the laws of the state of New York, and the parties hereto submit (and waive all rights to object) to non-exclusive personal jurisdiction in New York County, the State of New York for the enforcement of any and all obligations under the Loan Documents, except that if any such action or proceeding arises under the constitution, laws or treaties of the United States of America, or if there is a diversity of citizenship between the parties thereto, so that it is to be brought in a United States District Court, it shall be brought in the United States District Court for the Southern District of New York or any successor federal court having original jurisdiction.  Borrower and Guarantor hereby expressly waive any defense of forum non conveniens.

**8.13**	**Waiver Of Jury Trial**.  BORROWER, GUARANTOR AND LENDER HEREBY WAIVE ANY RIGHT THAT ANY OF THEM MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE LOAN, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF LENDER AND/OR BORROWER WITH RESPECT TO THE LOAN DOCUMENTS OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF EITHER PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  BORROWER AND GUARANTOR AGREE THAT LENDER MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED AGREEMENT OF BORROWER IRREVOCABLY TO WAIVE ITS RIGHTS TO TRIAL BY JURY AS AN INDUCEMENT TO LENDER TO MAKE THE LOAN, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER (WHETHER OR NOT MODIFIED HEREIN) BETWEEN BORROWER AND GUARANTORS AND LENDER SHALL INSTEAD BE

TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

## ARTICLE IX

**9.1** **Partial Release**. Lender may, in its sole discretion, release an individual Project (a "***Released Project***") and provide to Borrower a termination of the Mortgage encumbering the Released Project upon satisfaction of the following conditions:

(a) Borrower provides not less than thirty (30) days prior written notice of its request to release the Released Project;

(b) No default or no Event of Default shall have occurred and be continuing under the terms of this Agreement or the other Loan Documents;

(c) Borrower pays to Lender the Allocated Loan Amount for the Released Project and a pro-rated portion of the Exit Fee, to be calculated based upon the payoff amount in proportion to the then-outstanding principal balance of the Loan, to the extent the Exit Fee is not waived pursuant to Section 2.4;

(d) After application of the Allocated Loan Amount for the Released Project, all amounts outstanding on the Loan shall be no greater than 85.00% of the appraised value of the Project continuing to secure the Loan, as determined by an MAI appraisal engaged by Lender and paid for by Borrower;

(e) Borrower shall provide evidence to Lender that the Debt Service Coverage Ratio shall be at least 1.45 to 1.00 after the release of the Released Project and payment of the Allocated Loan Amount;

(f) Borrower shall have paid all actual costs and expenses, including reasonable attorneys' fees and costs of third party reports, of Lender in facilitating and documenting the release of the Released Project; and

(g) The Guaranty shall remain in full force and effect in accordance with its terms so long as any Loan Obligations remain outstanding, as evidenced by Guarantors' ratification thereof in form and substance satisfactory to Lender.

**[continued on following page]**

**IN WITNESS WHEREOF**, Borrower and Lender have caused this Agreement to be duly executed by their respective authorized representatives as of the date first above written.

**BORROWER:**

**JEFFERSON HILLS ACQUISITION LLC,**
**BEAVER HEALTHCARE REAL ESTATE, LLC,**
**MULBERRY HEALTHCARE REAL ESTATE, LLC,**
**RIDGEVIEW HEALTHCARE REAL ESTATE, LLC,**
**LAKEVIEW HEALTHCARE REAL ESTATE, LLC,** and
**SCOTTDALE HEALTHCARE REAL ESTATE, LLC,**
each a Delaware limited liability company

By:     Guardian Acquisition, LLC, a Delaware limited liability company
Its:     Manager

By: _____
Name: Yeshayahu Zidele
Title: Manager

**JEFFERSON HILLS OPERATING LLC,**
**BEAVER HEALTHCARE OPERATING, LLC,**
**MULBERRY HEALTHCARE OPERATING, LLC,**
**RIDGEVIEW HEALTHCARE OPERATING, LLC,**
**LAKEVIEW HEALTHCARE OPERATING LLC,** and
**SCOTTDALE HEALTHCARE OPERATING, LLC,**
each a Delaware limited liability company

By:     Bonamour Health Group, LLC, a Delaware limited liability company
Its:     Manager

By: _____
Name: Yeshayahu Zidele
Title: Manager

ACKNOWLEDGED AND AGREED:

**GUARANTORS:**

_____
**SIMCHA HYMAN**

_____
**YESHAYAHU ZIDELE**

_____
**MORDECHAI ZIDELE**

**GUARDIAN ACQUISITION, LLC,**
a Delaware limited liability company

By: _____
Name: Yeshayahu Zidele
Title: Manager

**BONAMOUR HEALTH GROUP, LLC,**
a Delaware limited liability company

By: _____
Name: Yeshayahu Zidele
Title: Manager

ACKNOWLEDGED AND AGREED:

**GUARANTORS:**

_____
**SIMCHA HYMAN**

_____
**YESHAYAHU ZIDELE**

_____
**MORDECHAI ZIDELE**

**GUARDIAN ACQUISITION, LLC,**
a Delaware limited liability company

By: _____
Name: Yeshayahu Zidele
Title: Manager

**BONAMOUR HEALTH GROUP, LLC,**
a Delaware limited liability company

By: _____
Name: Yeshayahu Zidele
Title: Manager

ACKNOWLEDGED AND AGREED:

**GUARANTORS:**

_____

**SIMCHA HYMAN**

_____

**YESHAYAHU ZIDELE**

_____

**MORDECHAI ZIDELE**

**GUARDIAN ACQUISITION, LLC,**
a Delaware limited liability company

By: _____
Name: Yeshayahu Zidele
Title: Manager

**BONAMOUR HEALTH GROUP, LLC,**
a Delaware limited liability company

By: _____
Name: Yeshayahu Zidele
Title: Manager

**LENDER:**

**BRAVO BRIDGE FUND LLC,** a Delaware limited
liability company

By: _____
Name:  Matthew Rawlsky
Title:   Authorized Signatory

**SCHEDULE 3.17**
**TO**
**LOAN AGREEMENT**

**Ownership Interests In Borrower**

**Owner**

| **Borrower** | **Holder** | **Percentage Membership Interests** |
|---|---|---|
| Jefferson Hill Acquisition LLC | Shaya Zidele | 27.5% |
| | Mordechai Zidele | 27.5% |
| | Jefferson Hill Investor LLC | 30% |
| | Adesse Holdings LLC | 15% |
| Beaver Healthcare Real Estate, LLC | Shaya Zidele | 27.5% |
| | Mordechai Zidele | 27.5% |
| | Jefferson Hill Investor LLC | 30% |
| | Adesse Holdings LLC | 15% |
| Mulberry Helathcare Real Estate, LLC | Shaya Zidele | 27.5% |
| | Mordechai Zidele | 27.5% |
| | Jefferson Hill Investor LLC | 30% |
| | Adesse Holdings LLC | 15% |
| Ridgeview Healthcare Real Estate, LLC | Shaya Zidele | 27.5% |
| | Mordechai Zidele | 27.5% |
| | Jefferson Hill Investor LLC | 30% |
| | Adesse Holdings LLC | 15% |
| Lakeview Healthcare Real Estate, LLC | Shaya Zidele | 27.5% |
| | Mordechai Zidele | 27.5% |
| | Jefferson Hill Investor LLC | 30% |
| | Adesse Holdings LLC | 15% |
| Scottdale Healthcare Real Estate, LLC | Shaya Zidele | 27.5% |
| | Mordechai Zidele | 27.5% |
| | Jefferson Hill Investor LLC | 30% |
| | Adesse Holdings LLC | 15% |

**Operator**

| Borrower | Holder | Percentage Membership Interests |
|---|---|---|
| Jefferson Hills Operating LLC | Shaya Zidele | 50% |
| | Mordechai Zidele | 50% |
| Beaver Healthcare Operating, LLC | Shaya Zidele | 50% |
| | Mordechai Zidele | 50% |
| Mulberry Healthcare Operating, LLC | Shaya Zidele | 50% |
| | Mordechai Zidele | 50% |
| Ridgeview Healthcare Operating, LLC | Shaya Zidele | 50% |
| | Mordechai Zidele | 50% |
| Lakeview Healthcare Operating, LLC | Shaya Zidele | 50% |
| | Mordechai Zidele | 50% |
| Scottdale Healthcare Operating, LLC | Shaya Zidele | 50% |
| | Mordechai Zidele | 50% |

**SCHEDULE 3.19**
**TO**
**LOAN AGREEMENT**

**LEASES**

None.

**SCHEDULE 3.25**
**TO**
**LOAN AGREEMENT**

**Collective Bargaining Agreements**

None.

**SCHEDULE 3.27**
**TO**
**LOAN AGREEMENT**

**CARES Act Programs**

See attached.

# Schedule 4.01(l) – Stimulus

HHS Stimulus:

| | | | Phase 1 GENERAL 4/10/2020 | Phase 1 GENERAL 4/17/2020 | Phase 1 GENERAL 4/24/2020 | 4.9 Bil TARGETED 5/22/2020 | Phase 1 GENERAL 6/15/2020 | 2.5 Bil TARGETED 8/27/2020 | Phase 2 GENERAL 9/8/2020 | Phase 2 GENERAL 9/14/2020 | Gen Disb Phase 2 GENERAL 10/29/2020 10/30/2020 | Sept Incentive TARGETED 11/2/2020 11/30/2020 | October Incentive TARGETED 12/9/2020 | November Incentive TARGETED 1/25/2021 | December Incentive TARGETED 2/12/2021 | Rural Distribution 11/23/2021 | Phase 4 11/23/2021 | Total | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 42 | Beaver Healthcare and Rehabilitation Center Jefferson Hills Healthcare and Rehabilitation Center | Beaver Healthcare & Rehabilitation Center - Aliquippa Jefferson Hills Healthcare and Rehabilitation Center | 35,321.75 | | 83,682.93 | 217,500.00 | | 107,150.00 | | | | - | 17,225.14 | 66,654.75 | - | 7,476.61 | 9,412.03 | 544,423.21 | 83,543.39 |
| 22 | Lakeview Healthcare and Rehabilitation Center | Lakeview Healthcare and Rehabilitation Center -SNF | 28,554.23 | | 95,848.50 | 257,500.00 | | 130,350.00 | | | | - | 33,235.23 | - | 107,646.38 | 5,068.87 | 9,412.03 | 667,615.24 | 122,127.28 |
| 37 | Mulberry Square Healthcare and Rehabilitation Center | Mulberry Healthcare and Rehabilitation Center | 81,125.21 | | | 135,000.00 | | 59,300.00 | | | | 1,722.22 | 9,164.70 | 24,060.39 | | 112,494.01 | 41,704.02 | 464,570.55 | 178,258.42 |
| 32 | Ridgeview Healthcare and Rehabilitation Center | Mulberry Healthcare and Rehabilitation Center - SNF | 75,717.06 | | 34,064.95 | 237,500.00 | | 118,750.00 | | | | 2,897.16 | - | 76,463.28 | - | 172,798.78 | 41,704.02 | 759,895.25 | 290,966.08 |
| 60 | Scottdale Healthcare and Rehabilitation Center | Ridgeview Healthcare and Rehabilitation Center | 100,188.04 | | 71,260.97 | 377,500.00 | | 199,950.00 | | | | 15,005.72 | 27,330.89 | 121,773.11 | 133,524.88 | 317,965.40 | 9,412.03 | 1,373,911.04 | 582,675.42 |
| 35 | | Scottdale Healthcare and Rehabilitation Center | 60,646.62 | | 25,258.78 | 137,500.00 | 2,018.62 | 60,750.00 | | | | - | 25,698.81 | 34,989.82 | - | 14,611.92 | 41,704.02 | 403,178.59 | 91,305.76 |
| | | | 381,552.91 | - | 310,116.13 | 1,362,500.00 | 2,018.62 | 676,250.00 | - | - | - | 19,625.10 | 112,654.77 | 323,941.35 | 241,171.26 | 630,415.59 | 153,348.15 | 4,213,593.88 | 1,348,876.35 |

PA Stimulus:

| | | | 7/1/2020 | 6/30/2021 | 9/14/2020 | 12/3/2021 | |
|---|---|---|---|---|---|---|---|
| | | | **Intial PA - Funding** | **PA SNF Funding** | **PC - Funding** | | |
| 42 | Beaver Healthcare and Rehabilitation Center | Beaver Healthcare & Rehabilitation Center  - Aliquippa | 218,403.89 | 220,603.93 | | | 439,007.82 |
| 22 | Jefferson Hills Healthcare and Rehabilitation Center | Jefferson Hills Healthcare and Rehabilitation Center -SNF | 277,743.63 | 280,550.35 | | | 558,293.98 |
| 37 | Lakeview Healthcare and Rehabilitation Center | Lakeview Healthcare and Rehabilitation Center | 83,067.52 | 83,869.72 | | | 166,937.24 |
| 32 | Mulberry Square Healthcare and Rehabilitation Center | Mulberry Healthcare and Rehabilitation Center - SNF | 248,742.56 | 251,253.50 | | | 499,996.06 |
| 60 | Ridgeview Healthcare and Rehabilitation Center | Ridgeview Healthcare and Rehabilitation Center | 399,977.03 | 403,972.43 | | | 803,949.46 |
| 35 | Scottdale Healthcare and Rehabilitation Center | Scottdale Healthcare and Rehabilitation Center | 72,028.22 | 72,701.43 | | | 144,729.65 |
| 37 | Lakeview Healthcare and Rehabilitation Center | Lakeview Senior Living | | - | 21,710.40 | 13,292.52 | 35,002.92 |
| | | | 1,299,962.85 | 1,312,951.36 | 21,710.40 | 13,292.52 | 2,647,917.13 |

**SCHEDULE 5.2**
**TO**
**LOAN AGREEMENT**

**Permitted Encumbrances**

**Form of Annual Compliance Certificate**


**BRAVO BRIDGE FUND LLC**
750 Lexington Avenue
New York, NY 10022
Attention: Matt Rawlsky

Re:    Loan Agreement dated _____, 2022 (together with amendments, if any, the "***Loan Agreement***"), by and among **JEFFERSON HILLS ACQUISITION LLC** ("***Jefferson Owner***"), **BEAVER HEALTHCARE REAL ESTATE, LLC** ("***Beaver Owner***"), **MULBERRY HEALTHCARE REAL ESTATE, LLC** ("***Mulberry Owner***"), **RIDGEVIEW HEALTHCARE REAL ESTATE, LLC** ("***Ridgeview Owner***"), **LAKEVIEW HEALTHCARE REAL ESTATE, LLC** ("***Lakeview Owner***"), and **SCOTTDALE HEALTHCARE REAL ESTATE, LLC**, each a Delaware limited liability company ("***Scottdale Owner***", and together with Jefferson Owner, Beaver Owner, Mulberry Owner, Ridgeview Owner and Lakeview Owner, individually and collectively, the "***Owner***"), **JEFFERSON HILLS OPERATING LLC** ("***Jefferson Operator***"), **BEAVER HEALTHCARE OPERATING, LLC** ("***Beaver Operator***"), **MULBERRY HEALTHCARE OPERATING, LLC** ("***Mulberry Operator***"), **RIDGEVIEW HEALTHCARE OPERATING, LLC** ("***Ridgeview Operator***"), **LAKEVIEW HEALTHCARE OPERATING LLC** ("***Lakeview Operator***"), and **SCOTTDALE HEALTHCARE OPERATING, LLC**, each a Delaware limited liability company ("***Scottdale Operator***", and together with Jefferson Operator, Beaver Operator, Mulberry Operator, Ridgeview Operator and Lakeview Operator, individually and collectively, the "***Operator***," and, collectively with Owner, the "***Borrower***"), and **BRAVO BRIDGE FUND LLC,** a Delaware limited liability company (together with its successors and assigns, "***Lender***")

The undersigned officer of the above named Borrower, does hereby certify that for the fiscal year ending December 31, 20\_\_\_\_:

1.     No Default or Event of Default has occurred or exists except _____.

2.     Borrower has achieved a Debt Service Coverage Ratio of _____ to 1.0, based on a rolling twelve (12) month period.

3.     Borrower has achieved a Fixed Charge Coverage Ratio of _____ to 1.0, based on a rolling twelve (12) month period.

4.     The outstanding principal balance of all Indebtedness of Borrower is $_____, consisting of the following:

**[Describe each debt and the balance thereof.]**

5.        All representations and warranties made by Borrower in the Loan Agreement and in other Loan Documents are true and correct in all material respects as though given on the date hereof, except _____.

6.        Borrower represents and warrants that the answers to the following questions are true and correct:

    a)   Have you had a survey in the prior three (3) months?  Yes/No

    b)   How many tags were given?  _____

    c)   Were there any tags higher than an "F" tag?  Yes/No

    d)   Have you cleared the cycle?  Yes/No

    e)   How many residents of the Project have tested positive for COVID-19 during the past fourteen (14) days?  _____

7.        All information provided herein and all financial statements delivered herewith are true and correct.

8.        Capitalized terms not defined herein shall have the meanings given to such terms in the Loan Agreement.

**[continued on following page]**

Dated this _____ day of _____, 20\_\_\_\_\_.

<div style="margin-left: 40%;">

**JEFFERSON HILLS ACQUISITION LLC**,
**BEAVER HEALTHCARE REAL ESTATE, LLC**,
**MULBERRY HEALTHCARE REAL ESTATE,
LLC**,
**RIDGEVIEW HEALTHCARE REAL ESTATE,
LLC**,
**LAKEVIEW HEALTHCARE REAL ESTATE,
LLC**, and
**SCOTTDALE HEALTHCARE REAL ESTATE,
LLC**,
each a Delaware limited liability company

By: Guardian Acquisition, LLC, a Delaware limited
   liability company
Its: Manager


By: _____
Name: Yeshayahu Zidele
Title: Manager

**JEFFERSON HILLS OPERATING LLC**,
**BEAVER HEALTHCARE OPERATING, LLC**,
**MULBERRY HEALTHCARE OPERATING, LLC**,
**RIDGEVIEW HEALTHCARE OPERATING, LLC**,
**LAKEVIEW HEALTHCARE OPERATING LLC**,
and
**SCOTTDALE HEALTHCARE OPERATING, LLC**,
each a Delaware limited liability company

By: Bonamour Health Group, LLC, a Delaware
   limited liability company
Its: Manager


By: _____
Name: Yeshayahu Zidele
Title: Manager

</div>